IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**ROY BROWN,**

   *Plaintiff*,

   v.

**LATIN AMERICAN MUSIC CO., INC.,**

   *Defendant*.

Civil No. 24-01523 (MAJ)

**OPINION AND ORDER**

**I.   Introduction**

Plaintiff Roy Brown ("Brown") is a Puerto Rican musician, composer, singer and performer. (**ECF No. 1 at 1 ¶ 4**). Latin American Music Company ("LAMCO") is a music publisher that owns the rights to a large catalogue of Latin American musical compositions. (**ECF No. 14 at 7**). Brown filed this action for copyright infringement against LAMCO alleging that they infringed copyrights owned by Brown in 13 musical compositions. (**ECF No. 1 at 3 ¶ 14–6 ¶ 17**). Before the Court is a Motion to Dismiss for Failure to State a Claim filed by LAMCO. (**ECF No. 14**). For the reasons set forth below, the Motion to Dismiss is **GRANTED.**

**II.   Background**

According to the allegations set forth in the Complaint ("Complaint"),[1] Brown owns the copyright to the thirteen songs at issue in this litigation. (**ECF No. 1 at 3–4 ¶ 14**).

---

[1] For the purposes of resolving this Motion, the Court treats the well-pleaded facts alleged in the Complaint as true. *See Boit v. Gar-Tec Prod., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992) ("In determining

The songs adapt to music various poems written by Juan Antonio Corretjer and Clemente Soto Vélez, two renowned twentieth-century Puerto Rican poets. *Id*. The songs are: *Ahora Me Despido, Andando de Noche Sola, Árboles, Ayuburi, Boricua en la Luna, Día Antes, Diana de Guilarte, Distancias, El Hijo, En la Vida Todo Es Ir, Inriri Cahuvial, Oubau Moin*, and *Serenata*. *Id*.

According to the Complaint, LAMCO claimed ownership of these songs by registering a copyright interest with the Mechanical Licensing Collective ("MLC"), a non-profit organization designated by the U.S. Copyright Office to administer copyright licenses. *Id*. at 2 ¶¶ 6–10, 5–6 ¶ 16. LAMCO registered ownership of the songs with MLC in its capacity as a representative of Juan Antonio Corretjer. *Id*. at 5–6 ¶ 16. Based on these registrations, LAMCO collects royalties for the songs at issue. *Id*. at 6 ¶ 17. Brown alleges that, by registering a purported ownership interest in Brown's musical works with the MLC, LAMCO committed copyright infringement. *Id*. at 7 ¶¶ 21–24. For redress, Brown seeks actual and punitive damages, in addition to any other appropriate relief available under the Copyright Act. *Id*. at 7 ¶ 24–8 ¶ 25.

On January 9, 2025, LAMCO moved to dismiss Brown's claims. (**ECF No. 14**). Brown filed a response in opposition. (**ECF No. 18**). L later filed a reply, (**ECF No. 19**), and Brown filed a sur-reply, (**ECF No. 22**).

### III. Legal Standard

LAMCO moves for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, asserting that the Complaint "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To resolve a 12(b)(6) motion, federal courts follow a

---

whether a prima facie showing has been made, the district court is not acting as a factfinder. It accepts properly supported proffers of evidence by a plaintiff as true.").

two-step method. First, the court must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). A complaint need not include detailed factual allegations, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Douglas v. Hirshon*, 63 F.4th 49, 55 (1st Cir. 2023) (a district court entertaining a Rule 12(b)(6) motion need not "credit conclusory legal allegations [or] factual allegations that are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture"). Second, the court must take the remaining "well-[pleaded] . . . facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *Schatz*, 669 F.3d at 55 (citations and quotations omitted); *see also U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 383 (1st Cir. 2011) (stating that a 12(b)(6) motion requires the court to analyze the facts alleged in the complaint "in the light most hospitable to the plaintiff's theory"). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a context-specific job that compels [the court] to draw on its judicial experience and common sense.'" *Schatz*, 669 F.3d at 55 (citations and quotations omitted).

## IV.   Analysis

For more than a century, federal copyright law has allowed music distributors to obtain a license to distribute copyrighted musical works to the public without the consent of the copyright owner, provided that the distributor pay a royalty fee in exchange for the license. *See United States v. LaMacchia*, 871 F. Supp. 535, 539 (1994). Such licenses are known as "compulsory licenses." *See* 17 U.S.C. § 115. Traditionally, to obtain a compulsory

license, digital music providers – such as Spotify, Pandora, or Apple Music – were required to provide notice to copyright holders on a song-by-song basis before distributing the copyright holder's work. *See Lowery v. Rhapsody Int'l, Inc.*, 75 F.4th 985, 989 (9th Cir. 2023). Digital music providers, who deliver millions of sound recordings to consumers, found this system cumbersome and unworkable. *Id*. In an effort to adapt to the demands of the digital streaming age, Congress amended the Copyright Act in 2018 with the passage of the Orrin G. Hatch-Bob Music Modernization Act ("MMA"). 17 U.S.C. § 115(d); *Ithier v. Aponte-Cruz*, 105 F.4th 1, 4 n.1 (1st Cir. 2024). Under the MMA, "no longer must [digital music providers] scamper to obtain thousands or millions of compulsory licenses" to comply with copyright laws; they may now obtain "[o]ne blanket license" that "allows them to copy and distribute all musical compositions available for compulsory licensing." *Lowery*, 75 F.4th at 990.[2]

To facilitate the administration of the MMA, Congress directed the Register of Copyrights to designate a non-profit entity composed of copyright owners as an official "mechanical licensing collective" responsible for issuing blanket compulsory licenses to digital music providers. 17 U.S.C. § 115(d)(3). The Register of Copyrights complied with this directive in 2019 by designating the Mechanical Licensing Collective ("MLC"). 37 C.F.R. § 210.23. Some of the core functions of the MLC include administering processes by which copyright owners may claim ownership of their works; maintaining a public database reflecting those ownership rights; and distributing royalties received from digital streaming providers to their lawful claimants. 17 U.S.C. § 115(d)(3)(C).

---

[2] Under the Copyright Act, a musical composition is "available for compulsory licensing" if "phonorecords of [the] musical work have previously been distributed to the public in the United States and under the authority of the copyright owner of the work[.]" 17 U.S.C. § 115(a)(1)(A)(i). Based on the allegations in the Complaint, Brown's songs were "available for compulsory licensing." (**ECF No. 1 at 3–4 ¶ 14**).

Brown alleges that LAMCO registered with the MLC as the owner of the songs at issue in this case, claiming "100% ownership" of the material. (**ECF No. 1 at 5 ¶ 16**). Based on these registrations, LAMCO collects royalties from the MLC for those songs. *Id.* at 6 ¶ 17. According to the allegations in the Complaint, however, Brown is the lawful owner of those copyrights. (**ECF No. 1 at 3–4 ¶ 14**). Brown thus argues that LAMCO's registration of the songs with the MLC constitutes infringement of his copyright. LAMCO disagrees, arguing that the allegations in the Complaint do not constitute copyright infringement as a matter of law. (**ECF No. 14 at 11–14**).[3] Noting that no court has previously held that registering a song and collecting royalties through the MLC constitutes infringement under the Copyright Act, LAMCO insists that "registering a song with the MLC is not among the . . . exclusive rights" held by a copyright owner. *Id.* at 12–13.[4] Accordingly, LAMCO claims that "there is no recourse in court" when a third-party wrongfully registers a copyright with the MLC. *Id.* at 13.

Copyright infringement is defined by 17 U.S.C. § 501(a) as a violation of "any of the exclusive rights of the copyright owner[.]" Under the Copyright Act, these "exclusive rights" include the right "to do and to authorize" the reproduction of copyrighted works, 17 U.S.C. § 106(1), as well as the distribution of copyrighted works "by sale, or other transfer of ownership, or by rental, lease, or lending[.]" 17 U.S.C. § 106(3).[5] "Anyone who

---

[3] LAMCO also asserts that Brown "is not the copyright claimant of ten of the songs at issue" and that his claims should be dismissed on that basis. (**ECF No. 14 at 14**). The Court need not address that issue, however, because the Complaint must be dismissed on distinct grounds for the reasons set forth below.

[4] Neither party has cited to any caselaw that speaks directly to this issue, and the Court has not identified any such case.

[5] The exclusive rights set forth under Section 106(1) and (3) are the only rights implicated in this case. In the case of musical works, the Copyright Act creates two distinct protected interests: the musical work copyright, 17 U.S.C. § 102(a)(2), and the sound recording copyright, 17 U.S.C. § 102(a)(7). For the purposes of compulsory licensing, these interests are treated differently. *See* 17 U.S.C. § 115(c)(2)(C). Under the compulsory licensing system codified at 17 U.S.C. § 115, a sound recording copyright holder retains the exclusive right to "do or to authorize" the public performance of copyrighted work "by means of a digital

violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright or the right of the author[.]" 17 U.S.C. § 501(a). The owner of a copyright "is entitled . . . to institute an action for any infringement of that particular right" against the infringing party. 17 U.S.C. § 501(b).

The Complaint fails to allege that LAMCO ever violated an "exclusive right" belonging to Brown. The exclusive rights assigned to the copyright owner are subject to limitations imposed by other provisions of the Copyright Act. *See* 17 U.S.C. § 106 ("Subject to sections 107 through 122, the owner of the copyright under this title has the exclusive rights to do and to authorize any of the following . . ."). Notably, the compulsory licensing system codified at 17 U.S.C. § 115 forms one such "limited exception to the copyright holder's exclusive right to decide who shall make use of his [work][.]" *Fox Television Stations, Inc. v. Aereokiller, LLC*, 851 F.3d 1002, 1011 (9th Cir. 2017) (quoting *Fame Publ'g Co. v. Ala. Custom Tape, Inc.*, 507 F.2d 667, 670 (5th Cir. 1975)) (internal quotations omitted); *Dowling v. United States*, 473 U.S. 207, 216–217 (1985) (explaining that the "bundle of exclusive rights" conferred by Section 106 "has never accorded the copyright owner complete control over all possible uses of his work" and pointing to the compulsory licensing system of Section 115 as an example of the "precisely defined limits" imposed on "the copyright holder's dominion"). Specifically, under the terms of the MMA, a digital music provider need not seek express authorization from the musical work

---

audio transmission[.]" 17 U.S.C. § 106, 106(6); 17 U.S.C. § 115(c)(2)(C)(I). In contrast, a musical work copyright holder does not retain the exclusive rights to "do and to authorize" the reproduction or distribution of their works. 17 U.S.C. § 115(d)(1)(D). As LAMCO points out, this case involves only musical work copyright interests. (**ECF No. 14 at 7 n.2**). Brown does not dispute this point. (**ECF No. 18**). The Court therefore does not address the "exclusive right" provided under Section 106(6), as it is not implicated by the facts of this case. Nor do any of the other exclusive rights set forth under Section 106 – beyond the rights provided under subsections (1) and (3) – bear any relevance to the facts of this case. 17 U.S.C. § 106(2), (4), (5) (providing the exclusive rights "to prepare derivative works based upon copyrighted work . . . to perform the copyrighted work publicly . . . [and] to display the copyrighted work publicly").

copyright holder to stream their work. DAVID NIMMER, NIMMER ON COPYRIGHT § 11.02 n.121 (2025) (a compulsory license is "executed by operation of law, not by the consent of the author or his successors"). That is why the license is "compulsory": so long as the digital music provider complies with the terms and conditions of Section 115, they are not liable for copyright infringement under 17 U.S.C. § 106(1) or (3). *See* 17 U.S.C. § 115(d)(1)(D) ("A digital music provider that obtains and complies with the terms of a valid blanket license under this subsection shall not be subject to an action for infringement of the exclusive rights provided by paragraphs (1) and (3) of section 106"). In other words, to obtain a valid compulsory license under Section 115, a compulsory licensee need not obtain authorization from the musical work copyright holder (provided that royalties are paid), because the "exclusive right" of the musical work copyright holder to authorize reproduction or distribution of their copyright simply does not extend to the compulsory licensing context. *See, e.g., Mills Music, Inc. v. Snyder*, 469 U.S. 153, 185 n.12 (1985) (J. White, dissenting) ("Section 115 allows record producers to make and sell sound recordings without permission from the copyright owner, provided that they pay a statutory royalty"). Accordingly, LAMCO could not have wrongfully "authorized" the performance or distribution of the copyrighted materials at issue, because no such authorization was ever required.[6] Nor does Brown ever allege that LAMCO personally engaged in actions which infringed on his exclusive rights to perform or distribute the copyrighted material: instead, the Complaint alleges that a digital music provider

---

[6] By way of hypothetical, even if Brown had alleged, for example, that LAMCO sent a letter to Spotify explicitly stating "By the power invested in me as a musical work copyright holder, you are hereby AUTHORIZED to stream Roy Brown's music in exchange for royalty payments," such a letter would have no legal or practical effect on the rights and actions of Spotify. Spotify was permitted to stream the songs regardless of any such purported "authorization," by virtue of the blanket compulsory license provided under Section 115(d).

streamed the songs at issue, and that LAMCO collected the royalties resulting from those streams. (**ECF No. 1 at 6 ¶ 17**). Brown has thus failed to allege that LAMCO violated any "exclusive right."

More broadly, the Complaint fails to allege that any act of copyright infringement ever occurred, much less that LAMCO itself committed copyright infringement. There is no doubt that failure to pay royalties due under a compulsory license may render the reproduction or distribution of copyrighted materials actionable as infringement. *Peer Int'l Corp. v. Latin Am. Music Corp.*, 161 F. Supp. 2d 38, 52 (D.P.R. 2001); *Montalvo v. LT's Benjamin Records, Inc.*, 56 F. Supp. 3d. 121, 129 (D.P.R. 2014). That was true when Congress first created compulsory licenses in musical works in 1909,[7] and it remains true today under the MMA. 17 U.S.C. § 115(d)(1)(D) (providing that a "digital music provider that obtains and complies with the terms of a valid blanket license under this subsection shall not be subject to an action for infringement of the exclusive rights provided by paragraphs (1) and (3) of section 106"); *see also* 17 U.S.C. § 115(d)(4) (providing that a "blanket license is subject to, and conditioned upon, the . . . requirements" of "report[ing] and pay[ing] royalties to the mechanical licensing collective under the blanket license on a monthly basis"). Yet with the passage of the MMA, Congress relieved compulsory licensees of the obligation to issue royalty payments directly to the copyright owner.[8]

---

[7] *Peer Int'l Corp.*, 161 F. Supp. 2d at 54 n.18 (noting that "[n]on payment of royalties was also actionable under the 1909 Act."); *see also* Kenneth J. Abdo & Jacob M. Abdo, *What You Need to Know About the Music Modernization Act*, ENT. & SPORTS LAW., 35 ENT. & SPORTS LAW. 1, 2 (2019) (noting that Congress created the "compulsory mechanical license" in 1909).

[8] Under the MMA, a digital music provider who exercises a blanket compulsory license is obligated to "report and pay royalties to the mechanical licensing collective under the blanket license on a monthly basis[.]" 17 U.S.C. § 115(d)(4)(A)(i). The statute does not require that a digital music provider ensure that the royalty payment is ultimately received by the proper copyright claimant: once a digital music provider has properly distributed royalty funds to the MLC, their royalty payment obligations have been satisfied. *Id.*; *see also* 17 U.S.C. § 115(d)(3)(J). In contrast, under the general conditions applicable to non-blanket compulsory licenses under Section 115(c), a royalty payment is owed to the copyright holder or to a third-

Thus, regardless of whether the royalty payments ultimately reach the rightful owner of the copyright, a compulsory licensee has satisfied its royalty payment obligations when it has paid royalties to the MLC. 17 U.S.C. § 115(d)(4)(A)(i). 17 U.S.C. § 115(d)(1)(D). In other words, the fact that a copyright claimant has not received their royalty payments does not necessarily mean that their copyright has been infringed. The Complaint thus fails to allege that an act of copyright infringement ever occurred, despite the fact that Brown never received the royalty payments to which he was allegedly entitled. *Cf. Latin Am. Music Co. v. The Archdiocese of San Juan of Roman Cath. & Apostolic Church*, 499 F.3d 32, 46 (1st Cir. 2007) (holding that, to make out a claim for copyright infringement, "an infringing act" of reproduction or distribution must actually occur).

Neither did Congress create a novel right of action permitting a copyright claimant to sue a third-party who mistakenly receives royalty payments that are owed to the claimant. *See Alexander v. Sandoval*, 532 U.S. 275, 286–287 (2001) ("[P]rivate rights of action to enforce federal law must be created by Congress."). No express cause of action is set forth in the MMA, and nothing in the statute suggests that Congress intended to create a cause of action by implication. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 164 (2008) ("it is settled that there is an implied cause of action only if the underlying statute can be interpreted to disclose the intent to create one"). On the contrary, Congress was evidently aware that the compulsory licensing system created by the MMA would inevitably lead to disputes among competing claimants; apparently

---

party of their designation. 17 U.S.C. § 115(c)(1)(A) (With respect to "a compulsory license obtained under subsection (b)(1) . . .[t]he [copyright] owner is entitled to royalties for phonorecords made and distributed after being so identified"); 17 U.S.C. § 115(c)(1)(D) ("any copyright owners of nondramatic musical works and any persons entitled to obtain a compulsory license under subsection (a) may negotiate and agree upon the terms and rates of royalty payments under this section and the proportionate division of fees paid among copyright owners, and may designate common agents on a nonexclusive basis to negotiate, agree to, pay or receive such royalty payments.").

for that reason, Congress directed the MLC to establish a "dispute resolution committee." *See* 17 U.S.C. § 115(d)(3)(D)(vi); 17 U.S.C. § 115(d)(3)(K) ("The dispute resolution committee established under subparagraph (D)(vi) shall establish policies and procedures . . . for copyright owners to address in a timely and equitable manner disputes relating to ownership interests in musical works licensed under this section.").

Despite their awareness that such disputes were bound to occur, however, Congress never expressly created a right of action against wrongful recipients of copyright royalties. Congress also declined to invest the dispute resolution committee with any enforcement powers or subject its processes to judicial review.[9] Furthermore, Congress went out of its way to broadly immunize the MLC from liability for such disputes. 17 U.S.C. § 115(d)(11)(D) (providing that the MLC will not face liability in any case where it has engaged in the "good-faith administration" of its statutory duties). Taking these statutory provisions together, it appears that Congress declined to provide a federal right of action to copyright claimants aggrieved by errors in the royalty distribution process. This aligns with one of the overarching purposes of the MMA: as multiple commentators have noted, with the passage of the MMA, Congress placed the burden of identifying and matching

---

[9] LAMCO argues that Brown was required to raise his claims through the dispute resolution process in the first instance, and that by neglecting to do so Brown failed to exhaust administrative remedies. (**ECF No. 14 at 13**). This argument finds no support in the law. By the plain terms of the MMA, the policies and procedures of the dispute resolution committee "shall not affect any legal or equitable rights or remedies available to any copyright owner or songwriter concerning ownership of, and entitlement to royalties for, a musical work." 17 U.S.C. § 115(d)(3)(K)(iii). Notably, the MMA does not provide that participation in the dispute resolution process is mandatory. On the contrary, the MLC has released a "Dispute Policy" that expressly states: "The [MLC] does not judge or resolve Conflicts or Disputes." (**ECF No. 18-1 at 4**). Neither does the statute describe in any detail the powers held by the dispute resolution committee: it is unclear whether the committee may order discovery, conduct hearings, issue equitable or legal relief, or enforce its orders. There is thus no information on the record permitting the Court to conclude that the MLC would be "better equipped than . . . the federal courts" to resolve these claims, or that the MLC would have the ability to provide "appropriate redress." *Cf. Brito v. Garland*, 22 F.4th 240, 256 (1st Cir. 2021) (citations and quotations omitted) (holding plaintiff was required to exhaust administrative remedies because the federal agency in question was "better equipped than . . . the federal courts" to rule on relevant issues and provide "appropriate redress").

copyright owners to their works on the compulsory licensor. *See* Kenneth J. Abdo & Jacob M. Abdo, *What You Need to Know About the Music Modernization Act*, 35 ENT. & SPORTS LAW. 1, 4 (2019) (noting that critics have expressed frustration that the MMA placed "the administrative burden . . . on songwriters and publishers to submit copyright applications for all of their musical works and sound recordings to the MLC"); Tanner J. Kramp, *Rage Against the Machine: Why the Music Modernization Act is but the First Step in Musicians' Battle to Reclaim the Value of Their Works*, 64 BOS. COLL. L. REV. 219, 243 (2023) (same). From this perspective, it was Brown himself who was at fault for failing to properly register his copyright claims with the MLC.

Does this mean, as LAMCO argues, that "there is no recourse in court" for Brown to recover lost royalties? *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 393 (1982) (addressing whether "state law will afford an adequate remedy" as a factor relevant to whether Congress intended to create an implied cause of action). Not necessarily. The Court does not endorse the view that the MMA simply "confer[s] entitlement to . . . royalties on whomever is identified in the MLC's records" – as the U.S. Copyright Office has remarked, such an interpretation of the statute would be "absurd[.]" *See* Termination Rights, Royalty Distributions, Ownership Transfers, Disputes, and the Music Modernization Act, 89 Fed. Reg. 56586, 56598 (July 9, 2024) (to be codified at 37 C.F.R. pt. 210). However, in order to recover royalty funds paid out to a third-party, a copyright claimant must proceed under state law. The MMA expressly provides that "[t]he holding and distribution of funds by the [MLC] . . . shall supersede and preempt any State law (including common law) concerning escheatment or abandoned property, or any analogous provision, that might otherwise apply." 17 U.S.C. § 115(d)(11)(E). Yet neither of these principles would preempt, for instance, a state law cause of action for unjust

enrichment. *See, e.g., Rivera v. Marriott International, Inc.*, 456 F. Supp. 3d 330, 339 (D.P.R. 2020) ("To prove a claim for unjust enrichment under Puerto Rico law, [t]he following requirements must be present: (1) existence of enrichment; (2) a correlative loss; (3) nexus between loss and enrichment; (4) lack of cause for enrichment; and (5) absence of a legal precept excluding application of enrichment without cause.") (internal citations and quotations omitted). Yet, to the extent any state-law claim is available to Brown, the Court would lack jurisdiction over any such claim. (**ECF No. 1 at 1 ¶ 4 – 2 ¶ 5**). The Court will therefore dismiss the instant action without granting leave to amend the Complaint.

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). As the Supreme Court has explained, "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id*. Where, as here, the statute does not display that Congress intended to create a private remedy, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id*. Accordingly, the instant Motion to Dismiss is **GRANTED** and the Complaint is **DISMISSED**.

## V. Conclusion

For the reasons set forth above, the Court finds that the allegations in the Complaint do not amount to a claim for copyright infringement. Because Brown has failed to plead a claim for which relief may be granted, LAMCO's Motion to Dismiss is **GRANTED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 2nd day of October, 2025.

<u>*/s/ Maria Antongiorgi-Jordan*</u>
**MARIA ANTONGIORGI-JORDAN**
**UNITED STATES DISTRICT JUDGE**