**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| ROY BROWN<br>Plaintiff<br>v.<br>LATIN AMERICAN MUSIC CO.<br>Defendants | CIVIL NO. 24-cv-01523 (MAJ)<br>COPYRIGHT INFRINGEMENT |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE COURT:

Comes now Plaintiff, through the undersigned attorney, and respectfully states, alleges and prays:

## I. INTRODUCTION

On December 1, 2025, this Honorable Copurt entered Partial Judgment dismissing with prejudice the Counterclaims filed at ECF No. 44 "arising from alleged acts of infringement relating to the songs *Andando de Noche Sola, Ayuburi, Boricua en la Luna, Día Antes, Diana de Guilarte, Distancias, El Hijo, En la Vida Todo Es Ir, Inriri Cahuvial, and Oubau Moin*." ECF. 64. As per the Opinion and Order, this Honorable Court did not dismiss the counterclaims as to "Ahora Me Despido," "Serenata," and "En las Aguas del Inabón, El Nombre." ECF No. 61.

Plaintiff moves for summary judgment on those remaining three works. As will be shown, those three Corretjer poems are in the public domain and, thus, plaintiff was free to prepare derivative works based on them.

## II. ARGUMENT

### A. The standard for summary judgment

The Court must grant summary judgment to Plaintiff if he shows "that there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] dispute is genuine when the evidence is such 'that a reasonable jury could resolve the point in favor of the nonmoving party.'" Quintana-Dieppa v. Dep't of the Army, 130 F.4th 1, 7 (1st Cir. 2025) (quoting Doe v. Trs. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018)). A fact is material when it has "the 'potential to affect the outcome of the suit under the applicable law.'" Id. (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017)). In making its analysis, the Court must view "'the entire record in the light most hospitable to the [nonmoving party],'" drawing "'all reasonable inferences in that party's favor.'" Id. (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)).

The movant has the initial burden of showing that there is no genuine dispute as to any material fact with definite and competent evidence. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (citing Fed. R. Civ. P. 56(c)); Feliciano Muñoz v. Rebarber-Ocasio, 970 F.3d 53, 62 ((1st Cir. 2020). If the movant presents a properly supported motion, the burden then shifts to the nonmovant to show the existence of a genuine factual dispute. Geshke v. Crocs, Inc., 740 F.3d 74, 77 (1st Cir. 2014). The non-movant must thus "identify[]

competent evidence in the record sufficient to create a jury question." Tobin v. Fed. Exp. Corp., 775 F.3d 448, 450-51 (1st Cir. 2014).

In this process, the court must examine the record as a whole, view the facts in the light most favorable to the non-movant and indulge that party with all reasonable inferences to be derived from the facts, McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014), without making any credibility determinations or as to the weight of the evidence. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

**B. Under the 1909 Copyright Act any general publication made without a copyright notice fell into the public domain.**

The validity of a copyright in a work distributed prior to January 1, 1978, is determined by the 1909 Copyright Act. Self Realization Fellowship Church v. Ananda Church of Self Realization, 206 F.3d 1322, 1325 (9th Cir. 2000).

Under the 1909 Copyright Act, upon general publication of a work, the copyright owner could obtain federal protection for the published work by complying with the requirements of the Act. Under Section 10, an author seeking the act's protection had to affix a notice of copyright on the work:

> Any person entitled hereto by this title may secure copyright for his work by publication thereof with the notice of copyright required by this title; and such notice shall be affixed to each copy thereof published or offered for sale…

Section 19, in turn, spelled out the formalities required of the notice:

> The notice of copyright required by section 10 of this title shall consist of either the word "Copyright", the abbreviation "Copr.", or the symbol ©, accompanied by the name of the copyright proprietor, and if the work be a printed literary, musical, or dramatic work, the notice shall include also the year in which the copyright was secured by publication. …

As explained by the First Circuit Court of Appeals when Brown and LAMCO first litigated this matter:

> The general rule under the 1909 Act is that a work must bear a valid copyright notice upon publication in order to secure copyright protection in the United States. Nimmer on Copyright § 7.02(C)(1). Under that rule, a publication of a work in the United States without the statutory notice of copyright fell into the public domain, precluding forever any subsequent copyright protection of the published work.

Brown v. Latin Am. Music Co., 498 F.3d 18, 23 (1st Cir. 2007) (quoting Twin Books Corp. v. Walt Disney Co., 83 F.3d 1162, 1165-66 (9th Cir.1996)). In other words, failure to include the required notice forfeited copyright protection. Milton H. Green Archives, Inc. v. BPI Communications, Inc., 378 F.Supp 2d 1189 (C.D.Cal. 2005). If the owner of the work failed to satisfy the requirements of the 1909 Act, the published work was injected irrevocably into the public domain. La Cienaga Music Co. v. ZZ Top, 53 F.3d 950, 953 (9th Cir. 1995); Nimmer on Copyright §7.02[C][1].

Under the 1909 Act the principle evolved that a "general publication" without the statutory notice could bar access to federal copyright, but a "limited publication" would not. Brown, 498 F.3d at 23. A publication is deemed "general" when the work is "made available to members of the public at large without regard to who they are or what they propose to do with it." Burke v. NBC, 598 F.2d 688, 691 (1st Cir. 1979). A general publication is such dissemination of the work itself among the public as justifies the belief that it has been dedicated to the public and rendered common property. Id. A general publication can be found where only one copy of the work passes to a member of the general public, as general publication depends on the author making the work available to those interested, and not on the number of people who actually express an interest. Id.; Nimmer on Copyright §4.04.

The concept of "limited publication" has nothing to do with the number of copies printed. It is an issue of control. A "limited publication" refers to situations where tangible copies of the work are distributed to a limited class of persons and for a limited purpose. That is, when the contents of a work are communicated to a definitely selected group and for a limited purpose, without the right of diffusion, reproduction, distribution or sale. Burke v. NBC, 598 F.2d at 692; White v. Kimmell, 193 F.2d 744, 746-47 (9th Cir. 1952).

In order for a finding of limited publication to hold up, all three requirements or characteristics of limited publication have to exist. To wit: a tangible copy of the work is (1) made available to a selected group for (2) a limited purpose and (3) without the right of further reproduction, distribution or sale. Penguin Books USA Inc v. New Christian Church, 288 F.Supp.2d 544, 556 (S.D.N.Y. 2003), (citing White v. Kimmel, 193 F. 2d 744, Nimmer on Copyright §4.13[A]).

A classic example of a limited publication are professor notes handed to students, as discussed in White, supra. Another example is Martin Luther King providing the press at the press tent, with an advance copy of his "I have a dream" speech, for the limited purpose of assisting them in the coverage of the event. The advance copies were not available to anyone else, nor were the journalists given the freedom to reproduce the speech beyond what is normal for their reporting duties. See, King v. Mister Maestro, Inc., 224 F. Supp. 101, 107 (S.D.N.Y. 1963).

**C. The three remaining Corretjer poems were published prior to January 1, 1978.**

"Ahora Me Despido" and "Serenata" appeared in Corretjer's book Yerba Bruja published in 1957. As the Court of Appeals noted in Brown: "Brown filed photocopies of

the cover and pertinent pages of the first edition of Yerba Bruja, showing no copyright notice." Brown v. Latin Am. Music Co., 498 F.3d at 21. Those same photocopies are presented here as Exhibit A. The Court can confirm that those two poems appear in the book's index. The poem "En las Aguas del Inabón, El Nombre," was included in Construcción del Sur. Exhibit C. In making reference to another poem found in that same book, the Court of Appeals in Brown found that: "the poem 'Diana de Guilarte' was included in a volume entitled Construcción del Sur bearing the publication date of 1972; the first edition has no copyright notice. Id. examining Exhibit B which included the cover and inside pages but not showing "En las Aguas del Inabón, El Nombre," . Exhibit C is a complete copy of Construcción del Sur from which the Court can confirm that "En las Aguas del Inabón, El Nombre" is in the publication.

On March 29, 1958, El Mundo newspaper published a book review of Yerba Bruja in story titled "A book by Juan Antonio Corretjer". Exhibit D. The write up begins with the following statement: "Juan Antonio Corretjer offers us a new book of poems." On June 24, 1958, El Mundo published that Yerba Bruja had won first price by jurors of the Circulo Cultural Yaucano. Exhibit E. On April 1, 1973, the periodical Puerto Rico Ilustrado included Corretjer's Construcción del Sur in its section on "Libros de Puerto Rico" (Puerto Rico Books), identifying it as a 1972 publication. Exhibit F.

These newspaper clippings are proof of a general, not a limited, publication. A newspaper write-up, by definition, addresses the public at large. When El Mundo says that "Juan Antonio Corretjer offers us a new book of poems," the reference to "us" is to the paper's readers. When it then announces that the book has won first prize by a Cultural Circle in the town of Yauco, it reinforces that the publication was to the general public.

When it includes a publication in its section about books being published in Puerto Rico, it is informing the public at large about the new publication. After all, the purpose of a newspaper write-up regarding a book publication is inherently creating public awareness of the publication. That is the antithesis of a "limited purpose." It announces the availability of the work to "those interested," satisfying the Burke standard for general publication. The newspaper article serves as proof that the work was "made available to members of the public at large without regard to who they are." Cf. Burke v. NBC, 598 F.2d at 691.

LAMCO's sole argument provided in discovery rests on the claim that Corretjer suffered from political persecution. Exhibit G, Answer to Interrogatories No. 17, p. 13. LAMCO's Answer to Interrogatory No. 17 fails to establish any of the elements for a limited publication. Instead, it substitutes historical narrative, political repression, and inferred intent for the legal requirements governing limited publication. That showing is insufficient to defeat summary judgment.

LAMCO's primary contention is that Corretjer's works were "by necessity" limited due to political repression, surveillance, censorship, and the chilling effects of laws such as the Gag Law. Even accepting those historical assertions as true, they do not bear on the dispositive legal question: whether Corretjer distributed copies of his works subject to legally cognizable restrictions on further dissemination.

Copyright law does not condition publication on the political climate in which a work is created or distributed. Courts examine the author's acts, not the government's hostility toward the author. A work may be controversial, dangerous, underground, or politically persecuted and still be generally published if copies are disseminated without restriction. LAMCO identifies no authority holding that repression, fear, or marginalization

converts a general publication into a limited one. Because political context does not substitute for the doctrinal elements of limited publication, LAMCO's reliance on repression is legally immaterial.

LAMCO repeatedly asserts that Corretjer distributed his works among "friends," "acquaintances," "artists," "professors," "intellectuals," and individuals who sympathized with his political views. That description does not satisfy the requirement of a "definitely selected group." As the court in White noted: "the circulation must be restricted both as to persons and purpose, or it cannot be called a private or limited publication." White v. Kimmell, 193 F.2d 744, 747 (9th Cir. 1952). The group defined by LAMCO satisfies neither requirement.

A legally cognizable selected group must be clearly delimited and identifiable ex ante. Groups defined by ideological alignment, cultural sympathy, or political interest are inherently open-ended and fluid. Anyone who shared or came to share Corretjer's views could fall within LAMCO's definition.

Even if LAMCO could establish distribution to a selected group—which it cannot—its claim fails independently because it identifies no restriction whatsoever on the recipients' right to reproduce, redistribute, or further disseminate the works.

LAMCO does not allege that Corretjer: required confidentiality, imposed contractual restrictions, included notices prohibiting copying or redistribution, or otherwise communicated limits on downstream use.

Instead, LAMCO relies on the absence of evidence that Corretjer affirmatively granted permission and on an alleged "implicit" understanding, inferred from political circumstances, that dissemination was discouraged. That approach improperly reverses the

legal inquiry. The question is not whether permission was given, but whether rights were affirmatively withheld and communicated as such. Silence, assumption, or fear cannot satisfy this requirement. Limited publication demands objective, communicable restrictions. LAMCO concedes none existed.

LAMCO emphasizes that Corretjer's works were produced in small editions, self-published, distributed as pamphlets, and fall within what it labels "grey literature." None of those facts is legally dispositive. As cited above, the size of the audience and the informality of the medium do not determine publication status. What matters is whether copies were distributed without restriction.

LAMCO further argues that Corretjer controlled access to his works because he self-produced them and personally distributed copies. That argument misunderstands the law. An author may print, distribute, and gift copies personally and still effect a general publication if those copies leave the author's control without restriction.

Once copies are distributed without limits on further dissemination, publication is general as a matter of law. LAMCO identifies no facts showing that Corretjer retained legal control over copies once distributed.

LAMCO relies on testimony that certain works were not purchased in bookstores and were received as gifts. That evidence, even if credited, establishes only noncommercial distribution. Commercial sale is not a prerequisite for general publication. Free distribution and gifting may constitute general publication when unaccompanied by restrictions, as is the case here.

Because LAMCO has failed to produce evidence establishing either: (1) distribution to a definitely selected group, or (2) objective restrictions on reproduction or

redistribution, no reasonable factfinder could conclude that the Corretjer works were subject only to limited publication.

LAMCO's also attempts to create a dispute as to the dates of publication, but thay is to no avail. It presents a July 8, 2005, copyright registration filed by LAMCO itself, twenty-years after Corretjer's death. Exhibit 3 of the Counterclaim. In it, LAMCO claims that the date of first publication of "Ahora Me Despido," "Serenata" and "En las Aguas del Inabón, El Nombre," was January 1, 1978. Counterclaim, ECF 44-3.

A registration within five years of first publication is accompanied by a presumption of validity of the copyright, whereas a registration obtained after five years benefits from no presumption, and the weight given to such a registration is "within the discretion of the court." Brown v. Latin Am. Music Co., 498 F.3d 18, 23 (1st Cir. 2007). As is stated 17 U.S.C. § 410(c):

> (c) In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

17 USC 410(c). As the district court noted in Brown: "Congress added the five-year § 410(c) time limitation to the Copyright Act of 1979 on the ground that the longer the lapse of time between publication and registration, the less likely to be reliable are the facts stated in the certificate." Brown v. Latin Am. Music Co., No. CV 05-1242 (JAF), 2006 WL 8450668, at *3 (D.P.R. May 9, 2006), aff'd, 498 F.3d 18 (1st Cir. 2007) (quoting 3-12 Nimmer on Copyright § 12.11). No case illustrates the wisdom of this rule than this one.

In the exercise of the discretion given by the statute, the Court should afford LAMCO's copyright certificate no evidentiary weight. The First Circuit Court of Appeals has already recognized that Yerba Bruja was published in 1957 and Construcción del Sur

in 1972. And if that were not enough, both publications were reviewed in newspaper articles published in 1958 and 1973 respectively, which –absent Twilight Zone conditions– necessarily means that the publications had already occurred. The Institute of Puerto Rican Culture, furthermore, republished Yerba Bruja in 1970. Thus, LAMCO's copyright registration filed a half century later claiming that the publications occurred in 1978, seeks to override reality and, thus, must fail.

As works in the public domain, plaintiff was free to use them in his musical compositions. The Court should, thus, summarily dismiss defendants' claims based on those works, and grant plaintiff's request for declaratory judgment.

**CONCLUSION**

WHEREFORE, the plaintiff requests that this Honorable Court enter judgment dismissing defendants' remaining counterclaims.

RESPECTFULLY SUBMITTED,

In San Juan, this 16th of January 2026.

s/Patricia Rivera MacMurray
Patricia Rivera MacMurray
USDC 222309
250 Tetuan, Second Floort
San Juan, Puerto Rico 00901
Tel.787-607-3700
prm3@mac.com

CERTIFICATE OF SERVICE

I certify that on this date, I electronically filed the foregoing with the clerk using the CM/ECF system which will send notification to the attorneys of record.

s/Patricia Rivera MacMurray