**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **ROY BROWN**,<br><br>Plaintiff,<br><br>v.<br><br>**LATIN AMERICAN MUSIC CO.**,<br><br>Defendant. | **CIVIL CASE NO.**: 3:24-cv-01523 (MAJ) |
| **LATIN AMERICAN MUSIC CO.**,<br><br>Counterclaim-Plaintiff,<br><br>v.<br><br>**ROY BROWN**,<br><br>Counterclaim-Defendant. | |

**DEFENDANT/COUNTERCLAIM-PLAINTIFF LATIN AMERICAN MUSIC CO.'S ANSWERS AND OBJECTIONS TO ROY BROWN'S FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant/Counterclaim-Plaintiff Latin American Music Co. ("LAMCO"), via its undersigned counsel, provides the following objections and responses to Plaintiff/Counterclaim-Defendant Roy Brown's ("Plaintiff") First Set of Interrogatories dated June 4, 2025 (each, an "Interrogatory," and collectively, the "Interrogatories") in the above-captioned matter as follows:

## GENERAL OBJECTIONS

LAMCO makes the following General Objections to the Interrogatories and incorporates by reference therein the Definitions set forth in LAMCO First Set of Document Requests, dated July 11, 2025. These General Objections apply to each of the Interrogatories, set forth immediately

below, and are incorporated therein by reference. The assertion of the same, similar, or additional objections in response to specific Interrogatories does not waive any of LAMCO's General Objections. The provision of a substantive answer to any specific Interrogatory shall not be construed as an admission that Plaintiff is entitled to any response more specific than provided:

1. LAMCO objects to the Interrogatories to the extent they purport to impose on LAMCO duties or obligations beyond, or inconsistent with, those set forth in the Federal Rules, including but not limited to Fed. R. Civ. P. 33(a).

2. LAMCO objects to each Interrogatory to the extent it seeks information outside the scope of this proceeding. LAMCO further objects to each Interrogatory to the extent that it seeks information that is neither relevant to the claims or defenses of any party within the meaning of Fed. R. Civ. P. 26(b), nor proportional to the needs of the case.

3. LAMCO objects to each Interrogatory to the extent it seeks information that is not within LAMCO's possession, custody, or control. LAMCO responds to each Interrogatory only with respect to information within its possession, custody, or control.

4. LAMCO objects to each Interrogatory to the extent it seeks information already in the possession, custody, or control of Plaintiff and/or its counsel; or to which Plaintiff has equal or greater access than LAMCO; or that is publicly available.

5. LAMCO objects to each Interrogatory to the extent it seeks information that may be derived from business records and other documents being produced in this litigation, and the burden of deriving and ascertaining the answers is substantially the same for Plaintiff as for LAMCO, consistent with Fed. R. Civ. P. 33(d).

6. LAMCO objects to each Interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege, the work product doctrine, and/or any other

applicable privilege or protection from discovery. Such information shall not be provided in response to Plaintiff's Interrogatories, and any inadvertent disclosure thereof shall not be deemed a waiver of any privilege or protection with respect to such information.

7. LAMCO objects to each Interrogatory to the extent it seeks information that is confidential or proprietary business information belonging to LAMCO.

8. LAMCO objects to each Interrogatory to the extent it is vague, ambiguous, overly broad, and unduly burdensome. To the extent LAMCO seeks to provide information in response to portions of an Interrogatory that are vague or ambiguous, LAMCO will make a good faith effort to interpret each Interrogatory.

9. LAMCO objects to each Interrogatory to the extent the use of any such Interrogatory is not a more practical method of obtaining the information sought than a request for production of documents or a deposition.

10. LAMCO objects to each Interrogatory to the extent it assumes disputed facts or legal conclusions in defining the information requested. LAMCO denies any such disputed facts or legal conclusions to the extent assumed by each Interrogatory. Any response or objection by LAMCO to any such Interrogatory is without prejudice to this objection.

11. In providing responses to the Interrogatories, LAMCO does not waive and expressly reserves all objections as to the competency, authenticity, relevancy, materiality, and admissibility as evidence of the responses provided herein, as well as all objections to any other discovery notices.

12. LAMCO objects to the Interrogatories to the extent they are unlimited in temporal scope, and, in fact, there is no temporal scope identified whatsoever. LAMCO further objects to each Interrogatory not tied to a reasonable date range as overly broad, unduly burdensome,

harassing in nature, and constituting a fishing expedition that is not reasonably likely to lead to the discovery of admissible evidence. Notwithstanding the foregoing objections, LAMCO will provide information from the time period most relevant to each specific Interrogatory.

13. LAMCO reserves the right to supplement, alter or amend these Answers and Objections, if necessary or appropriate.

## SPECIFIC OBJECTIONS AND ANSWERS

Without waiver of, or prejudice to, any of its General Objections, LAMCO answers and responds to each Interrogatory as follows:

## INTERROGATORIES

**Interrogatory No. 1:**

Identify all persons who participated in or assisted with the preparation of the responses to these Interrogatories, including their names, job titles, and the nature of their involvement.

**Answer to Interrogatory No. 1:**

LAMCO repeats and incorporates its General Objections as if fully set forth herein.

Notwithstanding the foregoing objections, LAMCO identifies the following individuals:

- Luis R. Bernard Guzmán (President, LAMCO): Provided key information related to copyright assignments, copyright registrations, and documents from the previous lawsuit between Plaintiff and LAMCO captioned *Brown v. Latin Am. Music Co.*, D.P.R. No. 05-1242(JAF) (the "2005 Action").
- Carmen Rivera O'Farrill (Accountant, LAMCO): Prepared the statements in relation to Corretjer's royalties.
- Consuelo Corretjer (Daughter of Juan Antonio Corretjer): Provided key information about historic facts concerning Corretjer's production of his works.
- Alberto Suárez Romero (Copyright & Catalog Administrator, LAMCO): Conducted extensive research on Corretjer's works, copyright documentation and historical facts that put in context Juan Antonio Corretjer's limitations in publishing his works.

**Interrogatory No. 2:**

Identify all of LAMCO's shareholders, percentage shares owned and date of ownership.

**Answer to Interrogatory No. 2:**

LAMCO repeats and incorporates its General Objections as if fully set forth herein,

particularly that this Interrogatory seeks irrelevant information. Accordingly, LAMCO states that it will not respond to this Interrogatory.

**Interrogatory No. 3:**

Identify LAMCO's organizational structure and provide a list of all officers, employees, positions held, and date of employment.

**Answer to Interrogatory No. 3:**

LAMCO repeats and incorporates its General Objections as if fully set forth herein, particularly that this Interrogatory seeks irrelevant information, is unduly burdensome, and lacks temporal scope. Accordingly, LAMCO states that it will not respond to this Interrogatory but refers Plaintiff to its response to Interrogatory No. 1.

**Interrogatory No. 4:**

Describe in detail the basis for LAMCO's claim that it owns the copyrights in each of the Corretjer Works, including the dates and terms of any alleged assignments, licenses, or other transfers of rights, and identify all documents supporting such ownership.

**Answer to Interrogatory No. 4:**

LAMCO repeats and incorporates its General Objections as if fully set forth herein.

Notwithstanding the foregoing objections, LAMCO states that on December 4, 2000, Maria S. Corretjer, one of Juan Antonio Corretjer's daughters, signed an exclusive agreement with LAMCO assigning to LAMCO all rights, title, and interest in the Corretjer works. (*See* LAMCO000092-LAMCO000105.) Said agreement included the right to obtain the copyright certificates and all exclusive rights controlling their public performances. Ms. Corretjer had inherited an interest in the copyrights to the Corretjer Works via intestate succession when Juan Antonio Corretjer passed away in 1985. (*See* LAMCO000106-LAMCO000109, LAMCO000113-LAMCO000114, LAMCO000115-LAMCO000116, LAMCO000117-LAMCO000118.)

**Interrogatory No. 5:**

LAMCO has produced an assignment by one of the Corretjer heirs, please indicate in your answer if other heirs have assigned their rights at any time in the past, if those assignments are still current, and identify all documents related to those other assignment including regarding their cancellation.

**Answer to Interrogatory No. 5:**

LAMCO repeats and incorporates its General Objections as if fully set forth herein.

Notwithstanding the foregoing objections, LAMCO states that on November 29, 1999, Ricardo Corretjer, Juan Antonio Corretjer's son, signed a Power of Attorney granting all rights of Juan Antonio Corretjer's literary and musical works to LAMCO. (*See* LAMCO000137.) This power of attorney is still in place.

**Interrogatory No. 6:**

Identify each instance in which LAMCO has received royalties from the MLC in connection with any of the Brown Songs, including the song title, MLC code, amount received, and date of receipt.

**Answer to Interrogatory No. 6:**

LAMCO repeats and incorporates its General Objections as if fully set forth herein.

Notwithstanding the foregoing objections, in accordance with Fed. R. Civ. P. 33(d), LAMCO refers Plaintiff to the document Bates stamped LAMCO000273.

**Interrogatory No. 7:**

Describe in detail the process by which LAMCO claimed rights to any of the Brown Songs before the MLC, including the identity of the person(s) who submitted any registration or claim and the basis on which 100% collection share was asserted.

**Answer to Interrogatory No. 7:**

LAMCO repeats and incorporates its General Objections as if fully set forth herein.

Notwithstanding the foregoing objections, LAMCO provides the following information:

- "En la vida todo es ir", "Oubao Moin" and "Ahora me despido" were submitted to Harry Fox Agency ("HFA") before 2002. At that time submissions were made via Fax and LAMCO does not have a copy of that submission in its records.
- On January 3, 2012, Mr. Edward Enriquez, an independent contractor who worked for LAMCO between 2011-2015, submitted the following compositions to HFA on behalf of LAMCO: "Andando de Noche Sola," "Ayuburi, Boricua en la Luna," "Dia Antes, Diana de Guilarte," "El Hijo," "Inriri Cahuvial," "Distancias," and "Serenata." LAMCO does not have a copy of that submission in its records.
- Before August 7, 2020, HFA sent LAMCO an opt-in agreement to authorize the transfer of its data to the MLC. It was electronically signed by Zuheily Colon, LAMCO's former in-house attorney. (*See* LAMCO000133-LAMCO000134.)

**Interrogatory No. 8:**

Indicate who are the indispensable parties you claim in Affirmative Defense number 7 Brown has failed to include.

**Answer to Interrogatory No. 8:**

LAMCO repeats and incorporates its General Objections as if fully set forth herein.

Notwithstanding the foregoing objections, LAMCO states that Consuelo Corretjer, daughter of Juan Antonio Corretjer, is an indispensable party to this Action.

**Interrogatory No. 9:**

Pursuant to Affirmative Defense number 6 indicate the date when do you claim the statute of limitations began to run, and what is the applicable statute of limitations.

**Answer to Interrogatory No. 9:**

LAMCO repeats and incorporates its General Objections as if fully set forth herein. LAMCO further objects to this Interrogatory as it calls for legal conclusions and theories rather than facts or the application of facts to law and seeks privileged information.

Notwithstanding the foregoing objections, LAMCO states that any volitional conduct that would constitute copyright infringement (which LAMCO does not concede that any such conduct occurred here) that happened before November 12, 2021, would be barred by the three-year statute of limitations imposed by the Copyright Act. To the extent registration with the MLC constitutes volitional conduct (which LAMCO denies because it is not covered by the Copyright Act's bundle of rights), the Brown Songs were registered with the MLC on or about January 1, 2021, after migration of LAMCO's catalogue from HFA, and as such, the statute of limitations would have started to run as of that date.

**Interrogatory No. 10:**

State all facts supporting your affirmative defense that Plaintiff did not secure permission to create derivative works from the Corretjer Works, including whether any such permission was ever sought and/or denied.

**Answer to Interrogatory No. 10:**

LAMCO repeats and incorporates its General Objections as if fully set forth herein.

Notwithstanding the foregoing objections, LAMCO states that there is no doubt Juan Antonio Corretjer independently created the Corretjer Works that underly the Brown Songs. As admitted in Plaintiff's Complaint, the Brown Songs are derivatives of Corretjer's intellectual property. There has been no written assignment of Corretjer's intellectual property to Plaintiff, let alone any split sheet assigning a percentage of his shares to Plaintiff and Plaintiff has provided no such documentation. Accordingly, the copyrights to the Corretjer Works belong to Corretjer's heirs and LAMCO as inheritors and assignees and Plaintiff would require permission to create derivative works thereof.

In his deposition in connection with the 2005 Action (*see* LAMCO000163-LAMCO000271 ("Brown Depo.")), Plaintiff admitted under oath that he and Silverio Pérez, the former leader of the musical group Haciendo Punto en Otro Son, recorded "En la vida todo es ir" before even meeting Corretjer to ask for his permission, and that the purpose of that first 1974 meeting was to ask for his permission. (*Id*. at 14:5-17.)

In that same deposition, while Plaintiff claimed he obtained oral permission to create musical versions of certain Corretjer Works, he provided no detail regarding the material terms of the supposed agreement and admitted that he never obtained written permission from Corretjer to use the author's words as lyrics in the eventual publication, sale, distribution and reproduction of the album "Distancias" (*id*. at 14-15:2, 18:17-25:22.), which contains (7) Corretjer Works: "Oubao Moin", "Inriri Cahuvial", "El Hijo", "Andando de noche sola", "Dia Antes", "En la vida todo es ir", and "Distancias".

Moreover, in that same deposition Plaintiff admitted that he received mechanical royalties from the record label Artomax for a 50% share of "En la vida todo es ir" (*id*. at 16:13-17:12), a work he already admitted he was not authorized to license given the limitations in his alleged "permission" via oral agreement and its inherently nonexclusive basis (*id*. at 14:18-15:2). Plaintiff also licensed "Oubao Moin" to Artomax, but alleged he never received royalties for that license. (*Id*. at 41:23-43:4.)

After admitted to having received 50% of royalties from "En la vida todo es ir" without a

written agreement that transferred any of Corretjer's exclusive rights (*id*. at 14:18-15:2, 16:13-17:12), Plaintiff admitted being paid $7,067.00 from the licensing of the work to the music company BMG (*id*. at 45:22-47:17.) He received as payment "the whole rate" (100%) but didn't share any of it with Corretjer's heirs. (*Id*. at 48:14-21.)

The alleged "permissions" Plaintiff received conveniently only benefit him, and LAMCO has serious doubts regarding any supposed oral agreement between Corretjer and Plaintiff based on Plaintiff's own misrepresentation and misinterpretation of facts. Further, neither LAMCO nor Consuelo Corretjer are aware of any discussion of royalties or the sharing of royalties with Brown and are unaware of any royalty payments made from Brown to Corretjer or his heirs.

Plaintiff alleges in his deposition from the 2005 Action that Juan Antonio Corretjer personally handed him a copy of the poem "Boricua en la Luna" in 1977, in a concert held in Ponce, Puerto Rico and told him to "set that poem to music." (*Id*. at 23:13-24:16.) But this could not have happened because "Boricua en la Luna" wasn't even created until December 12, 1980. Indeed, that poem was inspired by a series of historical events that occurred in 1980, three years after the concert Plaintiff refers to in his testimony. And, conveniently, Plaintiff's inaccurate narrative would place "Boricua en la Luna" under the 1909 Copyright Act such that it would not have received automatic copyright protection afforded to works created after the implementation of the 1976 Copyright Act, making it vulnerable to Plaintiff's theories concerning ownership and public domain status that wouldn't otherwise apply. Plaintiff's recreation of terms and supposed rights in the Corretjer Works from his memory alone is simply not reliable given the inaccuracies and self-serving nature of his descriptions.

Plaintiff did not seek permission to create derivatives of the Corretjer Works "Ahora me despido" and "Serenata" (published in 1979 by Plaintiff and Aires Bucaneros in the album "Aires Bucaneros"), or "Ayuburi" and "Diana de Guilarte" (published in 1983 by Plaintiff in the album "New York"), we cannot rely in Plaintiff's testimony that he did for the same reasons discussed above. Moreover, while certain musicians and groups sometimes informally set Corretjer's poems to music during this time period, such songs were never released with a commercial purpose and

none of the artists claimed any copyright or monetary interest in the songs; they merely did so as an homage to Corretjer. Plaintiff, on the other hand, musicalized "En la vida todo es ir" and licensed it before even asking Corretjer. Although Plaintiff's tale revolves around works published in the album "Distancias", to LAMCO's knowledge he has—tellingly—never commented on how he supposedly got permission to create derivatives of these other Corretjer Works. And even if he had, he is not credible given his dishonesty concerning "Boricua en la Luna."

Finally, Plaintiff never sought permission to create a derivative and change the name of the poem "En las orillas del Inabon, el nombre" to "Inabon Yunez" from Corretjer's heirs when he published it in 1990 as part of the album "Poetas Puertorriqueños". Consuelo Corretjer will corroborate this, and LAMCO is unaware of anyone else who was approached by Plaintiff or has any record of Plaintiff seeking permission in connection with the above.

**Interrogatory No. 11:**

Identify all communications between LAMCO and the heirs or estate of Juan Antonio Corretjer relating to any rights over the Brown Songs or Corretjer Works.

**Answer to Interrogatory No. 11:**

LAMCO repeats and incorporates its General Objections as if fully set forth herein.

Notwithstanding the foregoing objections, LAMCO refers Plaintiff to its forthcoming documents produced in accordance with Fed. R. Civ. P. 33(d). Bates numbers will be provided in a separate communication.

**Interrogatory No. 12:**

Identify all concerts, recordings, or commercial uses, including Youtube channels, by LAMCO or its licensees of the Corretjer Works since 2010, including the name of the work, date of use, nature of use, and amount of revenue received.

**Answer to Interrogatory No. 12:**

LAMCO repeats and incorporates its General Objections as if fully set forth herein.

Notwithstanding the foregoing objections, in accordance with Fed. R. Civ. P. 33(d), LAMCO refers Plaintiff to the document Bates stamped LAMCO000272.

**Interrogatory No. 13:**

Indicate for each Corretjer work, when was its date of creation.

**Answer to Interrogatory No. 13:**

LAMCO repeats and incorporates its General Objections as if fully set forth herein.

Notwithstanding the foregoing objections, LAMCO states that the exact dates for some older works are unavailable given the loss of records by a third-party foundation who was supposed to be responsible for Corretjer's belongings, including his books, records, letters, etc., after his passing. LAMCO further states that "Ahora me despido" was created before 1957; "Andando de Noche Sola" was created on November 5, 1950; "Ayuburi" was created before 1957; "Boricua en la Luna" was created on December 12, 1980; "Dia Antes" was created before 1967; "Diana de Guilarte" was created before 1964; "Distancias" was created on March 9, 1951; "El Hijo" was created before 1957; "En la vida todo es ir" was created before 1957; "Inabon Yunes" was created before 1972; "Inriri Cahuvial" was created before 1957; "Oubao Moin" was created before 1952; and "Serenata" was created before 1957.

**Interrogatory No. 14:**

Indicate for each Corretjer work, when was its first date of publication (regardless of whether you consider it a limited or general publication).

**Answer to Interrogatory No. 14:**

LAMCO repeats and incorporates its General Objections as if fully set forth herein.

Notwithstanding the foregoing objections, LAMCO states that Corretjer engaged in limited publication of the Corretjer Works in the following years:

- Ahora me despido: 1957
- Andando de Noche Sola: 1957
- Ayuburi: 1957
- Dia Antes: 1967
- Diana de Guilarte: 1972
- Distancias: 1957
- El Hijo: 1957
- En la vida todo es ir: 1957
- Inabon Yunes: 1972
- Inriri Cahuvial: 1957

- Oubao Moin: first published in Costa Rica in 1953 and first published in Puerto Rico in 1965
- Serenata: 1957

Corretjer never published the Corretjer Work Boricua en la Luna, which was only published by Plaintiff as a musical composition in 1987 as part of a Brown Song.

**Interrogatory No. 15:**

Indicate if you disagree with any of the following statements:

**a)** *Yerba Bruja* was first published in 1957. The publication lacks a copyright notice.

**b)** *Imagen de Borinquen* was first published in 1957. The publication lacks a copyright notice.

**c)** *Alabanza en la Torre de Ciales* was first published in Costa Rica in 1953 and in Puerto Rico in 1965. The publication lacks a copyright notice.

**d)** *Pausa para el amor* was first published in 1967. The publication lacks a copyright notice.

**e)** *Construcción del Sur* was first published in 1972. The publication lacks a copyright notice.

**Answer to Interrogatory No. 15:**

LAMCO repeats and incorporates its General Objections as if fully set forth herein.

Notwithstanding the foregoing objections, LAMCO states that the above-referenced dates are correct, and it is true that these specific works did not include copyright notices as of their initial publication. However, as discussed below, these were all limited publications that required no copyright notice (assuming also that publications abroad even required notice under the 1909 Act, which LAMCO does not concede).

**Interrogatory No. 16:**

[Intentionally Left Blank, as Interrogatory 16 was omitted]

**Answer to Interrogatory No. 16:**

[Intentionally Left Blank, as Interrogatory 16 was omitted]

**Interrogatory No. 17:**

Indicate which of the publications identified on the previous interrogatory you considered to have been limited publications and identify the reasons for your belief and the documentary evidence in your possession that supports that contention.

**<u>Answer to Interrogatory No. 17:</u>**

LAMCO repeats and incorporates its General Objections as if fully set forth herein.

Notwithstanding the foregoing objections, LAMCO states that all the titles referenced in Interrogatory No. 15 (including the Corretjer Works contained therein) were subject only to limited publications. A limited publication is defined as "the distribution of copies of a work to a definitely selected group with a limited purpose and without the right of diffusion, reproduction, distribution, or sale. A limited publication is not considered a distribution to the public and, therefore, is not publication." Copyright Office Compendium III Ch. 1905.1 (citing *White v. Kimmell*, 193 F.2d 744, 746-47 (9th Cir. 1952)).

Corretjer faced significant limitations and challenges in the dissemination of his works given the historical context of the politics in Puerto Rico at the time. There was significant political repression by Puerto Rican authorities against dissidents, including via unconstitutional surveillance practices against Puerto Rican citizens. Accordingly, Corretjer's publications during the relevant timeframe were, by necessity, limited.

Juan Antonio Corretjer was a poet and a journalist among other things, but his main commitment was as a champion for the independence of Puerto Rico, a posture he never renounced and that put him in jail several times and led to several failed attempts against his life. It is an uncontested fact that Corretjer was the victim of political persecution and repression all through his lifetime. He was followed, photographed, recorded, repressed, and constantly oppressed by a political system that feared his writings and ideas and had no space for dissention.

Political repression started early in Corretjer's life when he was in eighth grade and was expelled from his local high school for organizing a strike against the United States' occupation of Puerto Rico. Some years later, in 1936, Corretjer was named Secretary General of the Puerto Rican Nationalist Party and in that same year, he was unjustly accused by a Federal Grand Jury and charged with sedition, among other criminal violations. In 1937, as result of his political belief, Corretjer was sent to prison for his refusal to hand over to American authorities the Book of Acts of the Nationalist Party. He was imprisoned in Atlanta until 1942, when he was released but

prohibited from returning to Puerto Rico for five more years.

With the emergence of the Cold War, in 1948 the U.S.-appointed governor of Puerto Rico, Jesús T. Piñero, signed a bill which became known as "Ley de la Mordaza" (The Gag Law) which criminalized printing, publishing, selling or exhibiting any material intended to undermine or oppose the insular government. Sadly, the implementation of that law included a wide gap for misinterpretation and subjective exercise of injustice. It made it illegal to display the Puerto Rican flag or sing a patriotic song, including Puerto Rico's anthem "La Borinqueña". For someone that shared Juan Antonio Corretjer's political views, it was absolutely a repressive environment that extended over all his literary production.

Corretjer's extensive literary and journalistic output was consistently hampered by direct and systemic political repression such as the Gag Law, which represents a clear instance of the institutionalization of literary suppression. It was not merely an arbitrary act of harassment but a formalized legal framework that directly criminalized the very content and act of publishing that defined Corretjer's political and literary identity. This legal constraint generated a chilling effect, making commercial publishers reluctant to engage with his work and compelling pro-independence writers to resort to clandestine or limited distribution channels, thereby directly contributing to the restricted circulation of Corretjer's published materials. This institutional suppression of speech continued for decades.

Between 1953 and 1960, Corretjer produced several works which he shared among a limited group of people that were interested in his ideas, which included Distancias (published 1957), Alabanza a la Torre de Ciales (published 1953) and Yerbabruja (published 1957).

During the 1960s Corretjer collaborated with the Cuban Revolution and traveled across Latin America gathering support from several important figures for the Puerto Rico Independence movement. Between 1961 and 1963, he participated in several United Nations summits gathering support for the decolonization of Puerto Rico. In 1963 he was arrested in Mexico because President Kennedy was going to visit because Mexican authorities were concerned about his ideas in favor of Puerto Rico's independence and he was later deported. Back in Puerto Rico, Corretjer organized

a series of protests against mandatory military service, the usurpation of the Vieques island for military exercises and maneuvers, mineral resource exploitation in Puerto Rico, and the 1967 Plebiscite.

During this decade, Corretjer produced several literary works in limited editions which he shared only with a small group of people who sympathized with his ideas. Among those works, a subsequent limited publication of Alabanza de la Torre de Ciales (published 1965) and Pausa para el Amor (published 1967). The titles in question were all self-produced by Corretjer and a small group of friends and Corretjer controlled access to his works. Most copies were distributed among his friends and acquaintances, who typically were artists, professors, and intellectuals, all politically aligned with Corretjer and favored Puerto Rico's independence. To LAMCO's knowledge, most if not all surviving copies are few and far between and are part of private collections. Based on the many challenges in obtaining actual copies of these titles, to LAMCO's knowledge, Corretjer never gave explicit permission for further reproduction of the titles in question, and as discussed, given the prevailing political and cultural climate, there would have been an implicit, if not understood prohibition on widespread dissemination (i.e., general publication).

The 1970s in Puerto Rico was also a decade full of political turmoil, government repression and protests, but in a different way. The government of Puerto Rico had implemented a series of political surveillance programs. With direct collaboration from several U.S. Intelligence Agencies, the Puerto Rico Police gathered information on citizens they suspected of being involved with movements favoring the independence of Puerto Rico. The practices used to gather intelligence included direct intimidation, visiting the neighbors of a subject to inform them that they were surveying a subject, visiting their job places, photographing them during private meetings, tapping telephone lines without a judicial order, and some subjects were even killed by some of the police squads. In 1968, as a result of these surveillance practices, Corretjer was accused of conspiracy along with his wife and several others and in 1970, there was a failed assassination attempt against Corretjer and his wife. In 1971 they were all incarcerated for a brief period. During the 1970s,

Corretjer produced many works including a limited publication of Construcción del Sur (published 1972) which he shared only among a small group of people interested in his ideas and who were not afraid of being associated with him.

Indeed, Corretjer's unwavering pro-independence stance and his leadership roles within the Nationalist Party and Socialist League meant that his literary and journalistic works were inherently political and often critical of U.S. colonial rule. This context, combined with the prevailing repressive political climate, created significant obstacles to achieving widespread commercial distribution or mainstream acceptance for his writings. Consequently, exclusion from official histories and mainstream literary discourse meant that Corretjer's work was not widely taught, reviewed, or promoted, thereby perpetuating its perceived "limited" status.

The academic and critical reception of Corretjer's work is also intrinsically linked to his political ideology. The challenges in his reception are not purely aesthetic; they are also ideological. The restricted nature of his publications and their reception extends beyond mere censorship; it reflects the reluctance of certain academic or commercial spheres to fully embrace an author whose politically charged views directly challenge the prevailing status quo.

Therefore, the political nature and limited circulation of Corretjer's works, put in context with the repression he suffered under Puerto Rico's authorities, define his literary production as "grey literature," a term used to describe material produced outside of traditional publishing and distribution channels. Grey literature is characterized by small print runs, which by nature is a limitation on the general circulation of the work. The fact that he shared his works as small-run pamphlets, a format usually used to disseminate political ideas that go under the radar to a select group of people without the intention of widespread distribution, is a clear example of limited publication.

In the context of the above-described censorship and repression, traditional commercial publications from Corretjer would have been inaccessible and even considered dangerous for him or the people associated with their production and possession. His autodidactic formation and his early immersion in journalism provided the necessary abilities and infrastructure for his

independent publishing through noncommercial means. The creation of his own limited publications and the dissemination of his pamphlets by his own means was not an imposed limitation, but an active strategy to evade censorship based on his activism and share his ideas directly with his base of support.

Plaintiff is aware of all of this. In a November 2020 interview about his own political persecution titled "Roy y su version de 'Boricua en la Luna" ("Roy and his version of 'Boricua en la Luna"), Brown persecution stated that "I've dedicated many years of my life to this [referring to "Boricua en la Luna"]. At no point when I did it [set the poem to music] did, I think it would be a success because this man [Corretjer] was a persecuted person, and I was persecuted too." (*See* LAMCO000143-LAMCO000144.) Further supporting the limited publication of Corretjer's works, in his 2005 deposition Plaintiff declared that Corretjer gave him some of his books as gifts (Brown Depo. at 86:19-87:6) as that they were not circulated, and when asked if he ever purchased a Corretjer book in a bookstore, Plaintiff could not declare he did (*id.* at 88:20-25); this is presumably because access to the Corretjer Works was limited and to LAMCO's knowledge, the titles at issue were not sold in bookstores at the time they were released and could only be procured from Corretjer.

**<u>Interrogatory No. 18:</u>**

Identify the "new evidence material" alleged on paragraph 27 of the Counterclaim, where it "has now been discovered" that Corretjer created Boricua En La Luna approximately in 1980 or 1981.

**<u>Answer to Interrogatory No. 18:</u>**

LAMCO repeats and incorporates its General Objections as if fully set forth herein.

Notwithstanding the foregoing objections, LAMCO states that "Boricua en la Luna" was created in December 12, 1980. Based on a newspaper article published in El Nuevo Dia (END) on November 14, 2020 (*see* LAMCO000138-LAMCO000141) LAMCO became aware of a photocopy of the original manuscript of "Boricua en la Luna" that was signed by Juan Antonio Corretjer and dated December 12, 1980 (*see* LAMCO000142). Before the END's article most of the elements and circumstances behind the creation of "Boricua en la Luna" were unknown except

to a very small group of people. In the prior 2005 Action, LAMCO relied on Plaintiff's testimony from his deposition in the 2005 Action in which he asserted that "Boricua en la Luna" was publicly handed to him by Corretjer in 1977 at a concert in Teatro La Perla de Ponce. Apparently, Plaintiff kept repeating his misrepresentation of facts long enough, that most people took his statements as true. To this day, there are still people repeating it, perpetuating Plaintiff's false narrative, which would call into question the copyright status of "Boricua en la Luna"—a narrative that would inherently fail under the 1976 Copyright Act.

As a direct reaction to November 14, 2020 END article, Plaintiff published an interview on his website www.roybrown.com dated November 17, 2020 titled "Roy and his version of 'Boricua en la Luna'". In the interview Plaintiff publicly declared what he conveniently forgot during his deposition in the 2005 Action—that Corretjer gave him a copy of "Boricua en la Luna" years later than he previously declared under oath, and under totally different circumstances. (*See* LAMCO000143-LAMCO000144.) Specifically, he admits Corretjer gave him the poem in New Jersey (not Ponce) in 1981 (not 1977) at Corretjer's daughter's private home (not at a public concert). In that interview, Plaintiff also declared that he still has the paper Corretjer gave him while also claiming he never changed the original lyrics. (*See id*.)

"Boricua en la Luna" is one of Plaintiff's most important musicalizations and part of the success of his career revolves around that important work. It is implausible that while under oath (and presumably having been prepared for his deposition) Plaintiff simply forgot critical dates and locations and forgot to share important details about how he got the poem. Now that we know by his own statements that he still has a manuscript of "Boricua en la Luna" in his possession—which, according to statements made by his wife is signed (and presumably dated)—, that previously hidden or withheld manuscript must be produced in this action.

Plaintiff's misrepresentation of facts even misled his own attorney into thinking that "Boricua en la Luna" was created earlier than 1980, when in Plaintiff's Answer to the LAMCO Counterclaims (ECF 25) Atty. Rivera states that "During a 'Distancias' concert at Teatro la Perla in Ponce, Puerto Rico, Corretjer personally gave Brown the unpublished "Boricua en la Luna"

with the request that he put it to music. (ECF 25 at ¶ 20) and that "it was Corretjer who approached him with the poem during a concert". In paragraph 27 of the same document, she incorrectly alleges that "Boricua en la Luna' was written at least as far back as 1976". (ECF 25 at ¶ 27.) In Plaintiff's Answer to the LAMCO Counterclaims, she keeps repeating the same story that was already debunked by Plaintiff in his November 2020 interview. (ECF 25 at ¶ 36.) Plaintiff's Answer to the LAMCO Counterclaims must be amended to reflect the truth.

**Interrogatory No. 19:**

Identify all copyright removal requests "take-downs" submitted by LAMCO pursuant to the DMCA in relation to the Brown works.

**Answer to Interrogatory No. 19:**

LAMCO repeats and incorporates its General Objections as if fully set forth herein.

Notwithstanding the foregoing objections, LAMCO provides the following information:

December 13, 2023, Boricua en la Luna: https://www.youtube.com/watch?v=Vp9Wj9Fmdmc
December 13, 2023, Boricua en la Luna: https://www.youtube.com/watch?v=gCc4X6eIc-s
December 13, 2023, Boricua en la Luna: https://www.youtube.com/watch?v=4quxzdOlnUA
November 27, 2023, Boricua en la Luna: https://www.youtube.com/watch?v=SF0yxsk96ho
November 27, 2023, Boricua en la Luna: https://www.youtube.com/watch?v=op_GsEZbAz4
November 27, 2023, Boricua en la Luna: https://www.youtube.com/watch?v=3isXMknYkiY
November 27, 2023, Boricua en la Luna: https://www.youtube.com/watch?v=HPoUKRK6ybU
November 2, 2023, Boricua en la Luna: https://www.youtube.com/watch?v=Wddsk2Frt9A
November 1, 2023, Boricua en la Luna: https://www.youtube.com/watch?v=KAwAW6FwlqU
October 30, 2023, Boricua en la Luna: https://www.youtube.com/watch?v=hQvKP5lHykE
October 30, 2023, Boricua en la Luna: https://www.youtube.com/watch?v=xaVwfzAYKGg

**Interrogatory No. 20:**

Identify all international licensing of the Corretjer works and Brown works.

**Answer to Interrogatory No. 20:**

LAMCO repeats and incorporates its General Objections as if fully set forth herein.

Notwithstanding the foregoing objections, LAMCO states that neither the Corretjer works nor Brown works have been licensed internationally.

**Interrogatory No. 21:**

Identify and produce the deposit copies provided with each copyright registration of the Corretjer works.

**Answer to Interrogatory No. 21:**

LAMCO repeats and incorporates its General Objections as if fully set forth herein.

Notwithstanding the foregoing objections, in accordance with Fed. R. Civ. P. 33(d), LAMCO refers Plaintiff to documents Bates stamped LAMCO000001-LAMCO000091; LAMCO000125-LAMCO000132; LAMCO000145- LAMCO000162.

**Interrogatory No. 22:**

Identify any and all documents and persons that were consulted or that contributed in any way, shape or form, to your responses in your Answer to Complaint and your claims in the Counterclaim.

**Answer to Interrogatory No. 22:**

LAMCO repeats and incorporates its General Objections as if fully set forth herein.

Notwithstanding the foregoing objections, LAMCO identifies the following individuals: Mr. Luis R. Bernard; Mrs. Carmen Rivera; Mrs. Consuelo Corretjer; and Mr. Alberto Suárez. LAMCO further refers to its documents produced in accordance with Fed. R. Civ. P. 33(d).

Dated: New York, New York
July 11, 2025

COWAN, DEBAETS, ABRAHAMS & SHEPPARD LLP

By: /s/ Scott J. Sholder
Scott J. Sholder
CeCe M. Cole
60 Broad Street, 30th Floor
New York, New York 10004
Tel.: (212) 974-7474
Fax: (212) 974-8474
ssholder@cdas.com
ccole@cdas.com

*Attorneys for Defendant/Counterclaim-Plaintiff Latin American Music Co.*

**CERTIFICATE OF SERVICE**

I, CeCe M. Cole, hereby certify that a true and correct complete copy of the foregoing Defendant and Counterclaim-Plaintiff Latin American Music Co.'s Responses and Objections to Plaintiff's First Set of Interrogatories have been served on counsel of record for plaintiff Roy Brown, by serving said copy on July 11, 2025, via email, to:

Patricia Rivera-MacMurray
#206 Tetuan Street, Of. 702
San Juan, PR 00901
Tel.: 787-722-7782
Fax: 787-722-7782
prm3@mac.com

*Attorneys for Plaintiff/Counterclaim-Defendant*
*Roy Brown*

/s/ CeCe M. Cole
CeCe M. Cole

**VERIFICATION**

I, Alberto Suárez, am the Copyright & Catalog Administrator at Latin American Music Co. the Defendant and Counterclaim-Plaintiff in the above-captioned action. I have read the foregoing Latin American Music Co.'s Responses and Objections to Plaintiff's First Set of Interrogatories, and other than the legal objections which have been provided by counsel and to which I have no knowledge, I believe the answers therein to be true to the best of my knowledge and belief, based on the information available to and/or shared with me.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on: July 11, 2025

Alberto Suárez