**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| ROY BROWN<br>Plaintiff<br>v.<br>LATIN AMERICAN MUSIC CO.<br>Defendants | CIVIL NO. 24-cv-01523 (MAJ)<br>COPYRIGHT INFRINGEMENT |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO CONSUELO CORRETJER AND MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE COURT:

Comes now Plaintiff Roy Brown, through the undersigned attorney, and respectfully states and prays:

## I. INTRODUCTION

Consuelo Corretjer charges Roy Brown with copyright infringement over thirteen poems written by her deceased father Juan Antonio Corretjer. She acknowledges that Roy Brown put those poems to music in the 1970s and 1980s. ECF 44, ¶24. The evidence shows that she has known at least since 1976 that his father was thankful to Brown for taking his poems "to their place of birth: the heart of Puerto Rico." For forty years after his father's passing, she never complained or protested. She only appears now at the eleventh hour in an attempt to rescue LAMCO from its res judicata misfortunes.

On December 1, 2025, this Honorable Court entered Partial Judgment as to LAMCO dismissing with prejudice the Counterclaims as to ten of the thirteen poems. ECF

61. On January 16, 2026, plaintiff moved for Summary Judgment as to LAMCO on the three-remaining works. ECF 65.

Plaintiff now moves for summary judgment as to Consuelo Corretjer. Twelve of the thirteen poems at issue are in the public domain and, thus, while Juan Antonio Corretjer approved of Brown's musical adaptations, no authorization was required. The other poem, *Boricua en la luna*, was given to Brown personally by Juan Antonio Corretjer with the expressed wish that he put it to music. Thus, Brown's musical adaptation of *Boricua en la luna* is an authorized derivative work. The Court must enter summary judgment dismissing Consuelo Corretjer's counterclaim because uncontroverted facts demonstrate that Brown's derivative works are lawful.

## II. ARGUMENT

### A. The standard for summary judgment

The Court must grant summary judgment to Plaintiff if he shows "that there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] dispute is genuine when the evidence is such 'that a reasonable jury could resolve the point in favor of the nonmoving party.'" Quintana-Dieppa v. Dep't of the Army, 130 F.4th 1, 7 (1st Cir. 2025) (quoting Doe v. Trs. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018)). A fact is material when it has "the 'potential to affect the outcome of the suit under the applicable law.'" Id. (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017)). In making its analysis, the Court must view "'the entire record in the light most hospitable to the [nonmoving party],'" drawing "'all reasonable inferences in that party's favor.'" Id. (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)).

The movant has the initial burden of showing that there is no genuine dispute as to any material fact with definite and competent evidence. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (citing Fed. R. Civ. P. 56(c)); Feliciano Muñoz v. Rebarber-Ocasio, 970 F.3d 53, 62 (1st Cir. 2020). If the movant presents a properly supported motion, the burden then shifts to the nonmovant to show the existence of a genuine factual dispute. Geshke v. Crocs, Inc., 740 F.3d 74, 77 (1st Cir. 2014). The non-movant must thus "identify[] competent evidence in the record sufficient to create a jury question." Tobin v. Fed. Exp. Corp., 775 F.3d 448, 450-51 (1st Cir. 2014).

In this process, the court must examine the record as a whole, view the facts in the light most favorable to the non-movant and indulge that party with all reasonable inferences to be derived from the facts, McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014), without making any credibility determinations or as to the weight of the evidence. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

**B. Brown's musical adaptation of the Corretjer Works are derivative works entitled to their own copyright if authorized or based on works in the public domain**

The parties in this case do not contest that Brown's musical adaptations of the Corretjer poems are derivative works under copyright law. A "derivative work" is a work based upon one or more preexisting works, such as a dramatization, fictionalization, motion picture version, abridgment, or condensation. 17 U.S.C. § 101. It consists of a contribution of original material to a pre-existing work so as to recast, transform or adapt the pre-existing work. Mass. Museum of Contemporary Art Found., Inc. v. Büchel, 593 F.3d 38, 64–65 (1st Cir. 2010) (quoting 1 Nimmer § 3.03[A]).

The aspects of a derivative work added by the derivative author are that author's property, Stewart v. Abend, 495 U.S. 207, 223 (1990), and the work is entitled to its own copyright independent of any copyright protection in the preexisting material. 17 U.S.C. § 103.

When the pre-existing work is still protected by copyright, which may be argued as to the poem *Boricua en la luna*, the owner of the original copyright has the exclusive right to prepare derivative works. 17 U.S.C. § 106 (2). Thus, the creator of a derivative work, if different from the author of the preexisting work, is only entitled to a copyright if he had permission to use the underlying copyrighted work. Mulcahy v. Cheetah Learning, LLC, 386 F.3d 849, 852 (8th Cir. 2004); Dam Things from Denmark v. Russ Berrie & Co., Inc., 290 F.3d 548, 563 (3d Cir. 2002); Palladium Music, Inc. v. EatSleepMusic, Inc., 398 F.3d 1193, 1197 (10th Cir. 2005).

That permission need not be in writing. The Copyright Act requires a writing only for transfers of copyright ownership or exclusive licenses, not for non-exclusive licenses authorizing derivative works. See 17 U.S.C. § 204(a); Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 558–59 (9th Cir. 1990) (holding that a non-exclusive license "may be granted orally, or may even be implied from conduct"); Asset Mktg. Sys., Inc. v. Gagnon, 542 F.3d 748, 754–55 (9th Cir. 2008) (same).

If the pre-existing work is in the public domain, as argued below for twelve of the Corretjer poems, it is not protected by copyright and may be copied, distributed, performed, displayed, or adapted by anyone without authorization. The First Circuit reaffirmed this principle in Perea v. Editorial Cultural, Inc., holding that once a work is in the public domain, it is "freely subject to copying and performance without the owner's permission."

13 F.4th 43, 52 (1st Cir. 2021). The Court of Appeals underscored that copyright law "does not permit the resurrection of exclusive rights" in public-domain material through private assertions of ownership or control. Id. at 51–52.

**B. Under the 1909 Copyright Act any general publication made without a copyright notice fell into the public domain.**

The validity of a copyright in a work distributed prior to January 1, 1978, is determined by the 1909 Copyright Act. Self Realization Fellowship Church v. Ananda Church of Self Realization, 206 F.3d 1322, 1325 (9th Cir. 2000).

Under the 1909 Copyright Act, upon general publication of a work, the copyright owner could obtain federal protection for the published work by complying with the requirements of the Act. Under Section 10, an author seeking the act's protection had to affix a notice of copyright on the work:

> Any person entitled hereto by this title may secure copyright for his work by publication thereof with the notice of copyright required by this title; and such notice shall be affixed to each copy thereof published or offered for sale…

Copyright Act of 1909, ch. 320, §10, 35 Stat. 1075, 1078 (1909). Section 19, in turn, spelled out the formalities required of the notice:

> The notice of copyright required by section 10 of this title shall consist of either the word "Copyright", the abbreviation "Copr.", or the symbol ©, accompanied by the name of the copyright proprietor, and if the work be a printed literary, musical, or dramatic work, the notice shall include also the year in which the copyright was secured by publication. …

Copyright Act of 1909, ch. 320, §19, 35 Stat. 1075, 1082 (1909).

As explained by the First Circuit Court of Appeals when Brown and LAMCO first litigated this matter:

> The general rule under the 1909 Act is that a work must bear a valid copyright notice upon publication in order to secure copyright protection in the United States. Nimmer on Copyright § 7.02(C)(1). Under that rule, a publication of a work in the

> United States without the statutory notice of copyright fell into the public domain, precluding forever any subsequent copyright protection of the published work.

Brown v. Latin Am. Music Co., 498 F.3d 18, 23 (1st Cir. 2007) (quoting Twin Books Corp. v. Walt Disney Co., 83 F.3d 1162, 1165-66 (9th Cir.1996)). In other words, if the owner of the work failed to satisfy the requirements of the 1909 Act, the published work was injected irrevocably into the public domain. La Cienaga Music Co. v. ZZ Top, 53 F.3d 950, 953 (9th Cir. 1995); Nimmer on Copyright §7.02[C][1].

Under the 1909 Act the principle evolved that a "general publication" without the statutory notice could bar access to federal copyright, but a "limited publication" would not. Brown, 498 F.3d at 23. A publication is deemed "general" when the work is "made available to members of the public at large without regard to who they are or what they propose to do with it." Burke v. NBC, 598 F.2d 688, 691 (1st Cir. 1979). A general publication is such dissemination of the work itself among the public as justifies the belief that it has been dedicated to the public and rendered common property. Id. A general publication can be found where only one copy of the work passes to a member of the general public, as general publication depends on the author making the work available to those interested, and not on the number of people who actually express an interest. Id.; Nimmer on Copyright §4.04.

The opposite concept of "limited publication" has nothing to do with the number of copies printed. It is an issue of control. A "limited publication" refers to situations where tangible copies of the work are distributed to a limited class of persons and for a limited purpose. That is, when the contents of a work are communicated to a definitely selected group and for a limited purpose, without the right of diffusion, reproduction, distribution

or sale. Burke v. NBC, 598 F.2d at 692; White v. Kimmell, 193 F.2d 744, 746-47 (9th Cir. 1952).

In order for a finding of limited publication to hold up, all three requirements or characteristics of limited publication have to exist. To wit: a tangible copy of the work is (1) made available to a selected group for (2) a limited purpose and (3) without the right of further reproduction, distribution or sale. Penguin Books U.S.A. Inc. v. New Christian Church, 288 F. Supp. 2d 544, 556 (S.D.N.Y. 2003) (citing White v. Kimmel, 193 F.2d 744 (9th Cir. 1952); 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 4.13[A]).

A classic example of a limited publication are professor notes handed to students, as discussed in White, supra. Another example is Martin Luther King providing the press at the press tent, with an advance copy of his "I have a dream" speech, for the limited purpose of assisting them in the coverage of the event. The advance copies were not available to anyone else, nor were the journalists given the freedom to reproduce the speech beyond what is normal for their reporting duties. See King v. Mister Maestro, Inc., 224 F. Supp. 101, 107 (S.D.N.Y. 1963).

Accordingly, where a work was distributed prior to January 1, 1978, the Court's inquiry under the 1909 Copyright Act is necessarily twofold. First, the Court must determine whether the work was published without the statutorily required copyright notice. Second, if the work was so distributed, the Court must determine whether that distribution constituted a general publication rather than a limited one. If both conditions are satisfied, the law is clear that the work entered the public domain upon publication and is not entitled to federal copyright protection. That is the case as to twelve of the works at issue in this case.

**C. Twelve of the Corretjer poems at issue were published prior to January 1, 1978 and are, thus, in the public domain.**

In Brown v. Latin American Music Co., 498 F.3d 18 (1st Cir. 2007), the First Circuit expressly found that Juan Antonio Corretjer's publications: Yerba Bruja (1957), Construcción del Sur (1972), Imagen de Borinquen 3 (1957), Alabanza en la Torre de Ciales (1953/1965), and Pausa para el Amor (1967), were published prior to January 1, 1978, without copyright notice. Twelve of the poems at issue in this case first appeared in those books. The conclusion is inevitable that those poems are in the public domain.

Seven of the poems at issue in this case –*Inriri Cahuvial, El Hijo, Ayuburi, Ahora Me Despido*, *Serenata*, *En la Vida Todo Es Ir,* and *Andando de Noche Sola*– appeared in Corretjer's book Yerba Bruja published in 1957. As the Court of Appeals noted in the first Brown v. LAMCO case: "Brown filed photocopies of the cover and pertinent pages of the first edition of Yerba Bruja, showing no copyright notice." Brown v. Latin Am. Music Co., 498 F.3d at 21. Those same photocopies are presented here as Exhibit A. The book's index shows that the mentioned seven works appear therein. It has, thus, been established that Yerba Bruja did not meet the notice requirements of the 1909 Copyright Act.

TheYerba Bruja was a general publication is demonstrated by the fact that on March 29, 1958, El Mundo newspaper published a book review of Yerba Bruja in a story titled "A book by Juan Antonio Corretjer". Exhibit B. The write up begins with the following statement: "Juan Antonio Corretjer offers us a new book of poems." Furthermore, on June 24, 1958, El Mundo published that Yerba Bruja had won first price by jurors of the Circulo Cultural Yaucano. Exhibit C.

The poems *Diana de Guilarte* and *En las Aguas del Inabón, El Nombre*, were included in Construcción del Sur. Exhibit D. The Court of Appeals in Brown found that:

"the poem 'Diana de Guilarte' was included in a volume entitled Construcción del Sur bearing the publication date of 1972; the first edition has no copyright notice. Id. examining Exhibit E which included the cover and inside pages but not showing "En las Aguas del Inabón, El Nombre". A complete copy of Construcción del Sur confirm that *En las Aguas del Inabón, El Nombre* is also in the publication. Exhibit D.

That Construcción del Sur was a general publication is demonstrated by the fact that on April 1, 1973, the periodical Puerto Rico Ilustrado included Corretjer's Construcción del Sur in its section on "Libros de Puerto Rico" (Puerto Rico Books), identifying it as a 1972 publication. Exhibit F.

The poem *Distancias*, was included in Imagen de Boriquen 3. Exhibit G. The Court of Appeals in Brown found, after examining Exhibit G, that: "The poem *Distancias* was first published in 1957 in a publication entitled Imagen de Borinquen 3; the cover and pertinent pages contained no copyright notice." Id.

That Imagen de Borinquen 3 was a general publication is demonstrated by the fact that on April 6, 1957, El Mundo newspaper published in a section titled "Libros Recibidos" (Books Received): "Distancias, Imagen de Borinquen 3, by Juan Antonio Corretjer, Guaynabo, 1957: cover and vignettes by Torres Martinó; printed by Ediciones Vel, Santurce, poem." Exhibit H.

The poem *Oubao Moin* was included in a book of poems titled Alabanza en la Torre de Ciales. Exhibit I. The Court of Appeals in Brown, after examining Exhibit I, found that Alabanza en la Torre de Ciales was: "published in Costa Rica in 1953 and first published in Puerto Rico in 1965; no copyright notice appeared in either publication." Id.

That Alabanza en la Torre de Ciales was a general publication is demonstrated by the fact that on January 23, 1954, El Mundo newspaper published an article titled "Temario Isleño", by Juan Martínez Capo, stating that the Mexican July-August 1953 edition of the bimonthly magazine *Poesía de América*, had reviewed three works by Juan Antonio Corretjer, including Alabanza en la Torre de Ciales. Exhibit J.

*Día Antes*, was first published in 1967 in a pamphlet titled Pausa para el Amor. Exhibit K. The Court of Appeals in Brown, after examining Exhibit K, found that: "The record also contains photocopies of the relevant pages for the poem 'Día Antes,' as first published in 1967, without a copyright notice, in a pamphlet entitled Pausa para el Amor." Id.

That Pausa para el Amor was a general publication is demonstrated by the fact that on December 3, 1967, the periodical Puerto Rico Ilustrado included Corretjer's Pausa para el Amor in its section on "Libros Recibidos" (Received Books), identifying it as a 1967 publication. Exhibit L.

Taken together, the First Circuit's prior findings regarding the absence of copyright notice in the books mentioned, the confirmation that the twelve poems are found in those publications, coupled with the contemporaneous newspaper reviews and notices evidencing general publication, compel a single conclusion: those twelve Corretjer poems were published prior to January 1, 1978, without the requisite copyright notice and through general publication, and, thus, as a matter of law, they entered the public domain upon publication and are not subject to copyright protection.

While it will be shown in the following section that Juan Antonio Corretjer approved and praised Brown's musical adaptations of his poems, from a strictly legal

standpoint, as works in the public domain no authorization was required to set to music *Inriri Cahuvial, El Hijo, Ayuburi, Ahora Me Despido*, *Serenata*, *En la Vida Todo Es Ir,* and *Andando de Noche Sola, Diana de Guilarte*, *En las Aguas del Inabón-El Nombre, Distancias, Oubao Moin,* and *Días Antes*. Thus, Consuelo Corretjer's copyright infringement claim against Brown for his musical adaptations of those poems must fail.

**E. Brown's musical adaptation of *Boricua en la luna* is an authorized derivative work.**

The only other poem at issue is *Boricua en la luna*. On October 10, 2005, Roy Brown declared under oath during his deposition in the first Brown v LAMCO case that: "the poem was handed to me directly by Antonio Corretjer". Exhibit O, p. 23, l. 23. And that Corretjer told him: "This is something you should set to music." Exhibit O, p. 24, l. 13. When asked where Corretjer handed the poem to him, Brown responded: "It was in the concert that we had in Ponce, which is what I think…. If it was that concert, in Teatro la Perla, in 1977, if that's true, I would have to really think about that." Exhibit O, p. 25, l. 11-18.

As courts have repeatedly held, a party's own declaration, which contains relevant information of which he or she has first-hand knowledge, may be self-serving, but is nonetheless competent to support or defeat motions as a matter of law. Rivera Molina v. Casa La Roca, LLC, No. CV 21-1004 (GAG), 2021 WL 3744424, at *3 (D.P.R. Aug. 24, 2021). What matters is whether it is contradicted by the record or unsupported by objective evidence. Here, the opposite is true: objective evidence forcefully supports Brown's testimony.

The La Perla concert Brown mentioned during his deposition in 2005 took place on Monday, September 13, 1976, as the event's leaflet demonstrates. Exhibits M & S. The

leaflet shows that the concert was named after one of Corretjer's poems, *Distancias,* and was exclusively about musical adaptations of Corretjer poems. The poem *Boricua en la Luna* Brown asserts was personally handed to him by Juan Antontio Corretjer is dated "Guaynabo, September 1976". Exhibits N & S. Brown also owns a copy of Construcción del Sur dedicated to him and his family by Juan Antonio Corretjer in 1976. Exhibits D & S. Thus, Brown's concert featuring musical adaptations of Corretjer poems and Corretjer's handwritten dedication of the *Boricua en la luna* poem show the same month and year. That, and the book's dedication, is strong evidence that Brown and Corretjer's encounter occurred in 1976. Giving testimony from memory almost thirty years later, Brown might have missed the date by a year and perhaps the precise location of the hand-over, be it in Ponce during the *Distancias* concert or at Corretjer's house in Guaynabo shortly before or after the concert, but that is not material.

Less than two months before the *Distancias* concert and the poem's handover, Juan Antonio Corretjer put out a book titled Para Que Los Pueblos Canten. Exhibit P (see last page showing the printing date of July 31, 1976). The book includes a picture of Brown on page 53 and a statement by Juan Antonio Corretjer on page 56 that says: "In this modest proof of my gratefulness I have included in this edition pictures of these groups of young musicians and singers that so generously have received my poems. I cannot but think of them as I take this book to print. They have taken my poetry to their place of birth: the heart of Puerto Rico." Exhibit P.

The aforementioned acts cannot be disentangled. On July 31, 1976, Juan Antonio Corretjer was publishing a book thanking Brown for "taking [his] poetry to the people" through musical adaptations and, just forty-five days later, on September 13, 1976, he is

personally handing Brown a new poem. Viewed together, they form a coherent and mutually reinforcing body of evidence. An author who expressly praises a musician for transforming his poems into song and, contemporaneously, entrusts that same musician with a new poem does so with an obvious and consistent expectation: that the poem will be used in the same manner as the prior works. To conclude otherwise would require the Court to assume that Corretjer simultaneously approved of Brown's musical adaptations, encouraged them publicly, and yet intended that *Boricua en la luna*—delivered directly to Brown—be excluded from that very practice.

In short, the record establishes—through Brown's sworn testimony and multiple, contemporaneous, objective documents—that Juan Antonio Corretjer personally delivered *Boricua en la luna* to Roy Brown in 1976 with the express purpose that he set it to music.

Roy Brown and Consuelo Corretjer's conduct for forty years after Juan Antonio's Corretjer's death are consistent with that authorization. In his 1988 copyright registration for the *Arboles* album (PAu 1-236-872), Brown expressly claimed authorship only in the musical composition for *Boricua en la luna* and identified Corretjer's poem as the preexisting work. Exhibit Q §§ 2, 6. By candidly disclosing the derivative nature of the work and limiting his claim to the new authorship, Brown complied with the precise disclosures required for derivative works, conduct that strongly supports an inference of authorization, since an unauthorized user would have no reason to make such admissions.

On June 24, 2021, Consuelo Corretjer filed a copyright registration PA 2-299-059 for the lyrics to *Boricua en la luna,* identifying as "previous registration" Brown's PAu001236872. Exhibit R. By structuring her application around Brown's 1988 derivative registration, Consuelo Corretjer affirmatively treated that registration as valid and

operative for Copyright Office purposes. If she considered that the 1988 derivative work had been unlawful, she would have challenged it, sought its cancellation, or refuse to acknowledge it. Instead, she relied on it to delimit her own claim.

One cannot simultaneously rely on Brown's registered work to define the scope of one's own claimed rights and yet contend that the very adaptation reflected in that registration was unauthorized. To do so would require treating the same prior registration as both legally operative and legally void: operative for purposes of identifying the preexisting work and delimiting her claimed interest in the lyrics, void for purposes of assessing whether the derivative musical work could lawfully exist at all.

This sequence of events confirms that the present claim of non-authorization is not contemporaneous with the alleged wrong but is instead an after-the-fact attempt to recharacterize as infringing a long-accepted and publicly acknowledged adaptation. Consuelo Corretjer was aware as far back as 1976 that Roy Brown was setting his father's poems to music, much to his father delight and gratefulness. She is the copyright holder of Para Que Los Pueblos Canten. Exhibit P, page 6 ("Es propiedad de [property of] Consuelo Corretjer Pérron"). In other words, she is the person that published the book with Brown's picture and his father's praises of Brown's musical adaptations. It is befuddling that she would now join LAMCO in a counterclaim and claim that her father had not authorized Brown.

Under 17 U.S.C. § 205(c), furthermore, the recordation of a copyright registration in the Copyright Office provides constructive notice to the world of the facts stated in the recorded document. Thus, as a matter of law, Consuelo Corretjer is on constructive notice since 1988 that *Boricua en la luna* had been commercially released by Brown. But even if

constructive notice is imputed by operation of law and does not depend on actual awareness, a Puerto Rican would have to be literally living on the moon not to have heard –and felt– *Boricua en la luna's* climax line: "yo sería borincano aunque naciera en la Luna" (I would be a *borincano* even if born on the moon).. Her four decades of inaction and silence speaks loudly in favor of authorization.

The evidentiary record admits of only one reasonable conclusion: Roy Brown's musical adaptation of *Boricua en la luna* is an authorized derivative work. Brown's sworn testimony establishes direct delivery of the poem by Juan Antonio Corretjer with the express instruction that it be set to music. That testimony is not only competent but powerfully corroborated by contemporaneous, objective evidence: the September 1976 *Distancias* concert devoted exclusively to musical adaptations of Corretjer's poems; the poem's own September 1976 date; Corretjer's 1976 dedications to Brown; and the publication of <u>Para Que Los Pueblos Canten</u>, in which Corretjer publicly praised Brown for transforming his poetry into song and expressly acknowledged that practice at the very moment he entrusted Brown with new work. Taken together, these facts form a coherent, mutually reinforcing narrative of authorization that cannot be plausibly disaggregated.

The post-1976 conduct of both Roy Brown and Consuelo Corretjer further confirms authorization. Brown's 1988 copyright registration candidly identified *Boricua en la luna* as a derivative work and limited his claim to the musical composition—precisely the conduct expected of an authorized adapter, and inexplicable for an infringer. Decades later, Consuelo Corretjer herself relied on that very registration in filing her own application, thereby treating it as valid and operative. She cannot now disavow the authorization implicit in the same registration she used to define the scope of her own rights. Moreover,

constructive notice under 17 U.S.C. § 205(c), coupled with the work's ubiquitous cultural presence, forecloses any claim of ignorance or contemporaneous objection.

In short, the claim of non-authorization is not supported by the record and is contradicted by forty years of consistent conduct, public acknowledgments, and legal filings. The evidence establishes that Juan Antonio Corretjer knowingly and intentionally authorized Roy Brown to set *Boricua en la luna* to music, and that the resulting adaptation has long been accepted as lawful. The counterclaim premised on alleged lack of authorization therefore fails as a matter of fact and law.

## CONCLUSION

There is no genuine dispute of material fact and Plaintiff Roy Brown is entitled to judgment as a matter of law. Twelve of the thirteen poems at issue were published prior to January 1, 1978, without the copyright notice required by the 1909 Copyright Act and through general publication. As the First Circuit has already recognized, those works entered the public domain irrevocably and may be freely adapted without authorization. Consuelo Corretjer therefore has no viable copyright claim as to Brown's musical adaptations of those twelve poems.

As to the sole remaining work, *Boricua en la luna*, the undisputed record establishes that Juan Antonio Corretjer personally delivered the poem to Roy Brown in 1976 with the express purpose that it be set to music. That authorization is confirmed by contemporaneous documentary evidence, by Corretjer's own public praise of Brown's musical adaptations, and by four decades of consistent conduct by both Brown and Consuelo Corretjer treating the adaptation as lawful. Brown's derivative registration in 1988, and Consuelo Corretjer's later reliance on that registration to define her own claimed

rights, further foreclose any assertion of non-authorization. No reasonable jury could conclude otherwise.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court grant summary judgment in his favor as to Consuelo Corretjer, dismiss her copyright infringement claims with prejudice, and grant such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED,

In San Juan, this 30th of January 2026.

s/Patricia Rivera MacMurray
Patricia Rivera MacMurray
USDC 222309
250 Tetuan, Second Floor
San Juan, Puerto Rico 00901
Tel.787-607-3700
prm3@mac.com

CERTIFICATE OF SERVICE

I certify that on this date, I electronically filed the foregoing with the clerk using the CM/ECF system which will send notification to the attorneys of record.

s/Patricia Rivera MacMurray