**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **ROY BROWN**,<br>Plaintiff,<br><br>v.<br><br>**LATIN AMERICAN MUSIC CO.**,<br>Defendant. | **CIVIL CASE NO.**: 3:24-cv-01523 (MAJ) |

# COUNTERCLAIM-PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE COURT: Comes now Counterclaim-Plaintiffs Latin American Music Co. and Consuelo Corretjer, through the undersigned attorney, and respectfully states and prays:

## PRELIMINARY STATEMENT

This case is one of a rare species of copyright litigations where the defendant does not dispute that he wholesale copied the works of the plaintiff. Plaintiff/Counterclaim-Defendant Roy Brown ("Brown") admits that he used the words of original poems authored by Juan Antonio Corretjer ("Corretjer")—in which Defendant/Counterclaim-Plaintiff Latin American Music Co. ("LAMCO") and Counterclaim-Plaintiff Consuelo Corretjer ("Consuelo"; collectively with LAMCO, "Counterclaim-Plaintiffs") own copyright interests—to serve as lyrics for his songs of the same name. Many other facts crucial to proving Counterclaim-Plaintiffs' infringement claims are not disputed, as discussed in detail, below.

As evidenced by his own motions for summary judgment, Brown has gone all in on his argument that the 13 Corretjer poems at issue in this case are in the public domain. This position, of course, runs directly counter to his decades-long narrative that Corretjer purportedly granted him permission to set his poems to music (permission would, of course, not have been needed if

the poems were no longer subject to copyright), but even so, the undisputed facts do not support this argument.

*First*, as discussed herein, and in Counterclaim-Plaintiffs' respective forthcoming oppositions to Brown's summary judgment motions, while many of Corretjer's works were published without a copyright notice before January 1, 1978, those publications were strictly limited in scope and did not place Corretjer's poems in the public domain. LAMCO's sworn interrogatory answers explain in detail why this is the case, and nothing in the record contradicts them; in fact, Brown's own statements corroborate LAMCO's account of Corretjer's limited and constrained approach to disseminating his works.

*Second*, LAMCO and Consuelo both have enforceable interests in the Corretjer poems at issue. While the Court dismissed LAMCO's claims relating to 10 of the 13 works in suit, LAMCO can still enforce its rights in the remaining three, and Consuelo is free to pursue claims on all 13 works based on her own independent copyright interests. The record establishes a clear chain of title both as to LAMCO and Consuelo through intestate succession after Corretjer's death in 1985, and the copyright registrations covering the works in suit are valid, notwithstanding certain discrete, immaterial, and wholly inadvertent errors.

*Third*, there is no dispute that Brown copied the 13 Corretjer poems in their entireties and used their original expressive words as lyrics to his songs. Brown admits as much. The evidence affirmatively proves this. He also admits that Corretjer authored these original expressive literary works and that his song versions constitute derivative works under the Copyright Act. Except for one poem, Brown claims he never needed to ask for permission to create his songs because the poems are in the public domain (he is wrong about this). Brown also does not dispute that he has sold copies of his songs; publicly performed the songs; posted videos of the songs online;

reproduced the songs' lyrics (i.e., the words to Corretjer's poems) in physical media and on his website; and that he has not paid Counterclaim-Plaintiffs or Corretjer's heirs for any money earned in connection with his exploitation of the songs.

While some of the legal copyright issues in this case may be complex, these technical nuances do not foreclose summary judgment. Rather, the limited record in this case, myriad factual admissions, and uncontested evidence counsel that the Court should grant summary judgment in favor of Counterclaim-Plaintiffs.

## BACKGROUND

The salient factual background is largely set forth in the relevant pleadings (ECF 44 & 48). In short, this is the second chapter in a long-running legal battle between LAMCO and Brown, which started in 2005. Corretjer authored the 13 poems at issue in this case, namely: (1) "Ahora Me Despido"; (2) "Andando De Noche Sola"; (3) "Ayuburi"; (4) "Boricua En La Luna"; (5) "Día Antes"; (6) "Diana De Guilarte"; (7) "Distancias"; (8) "El Hijo"; (9) "En La Vida Todo Es Ir"; (10) "Inriri Cahuvial"; (11) "Oubau Moin; (12) "Serenata"; and (13) Inabón Yunez (otherwise known as "En Las Aguas Del Inabon, El Nombre") (collectively, the "Corretjer Works"). (ECF 44 ¶ 3; ECF 48 ¶ 3.) Brown used the Corretjer Works as song lyrics to create musicalized versions of the poems. (ECF 44 ¶ 3; ECF 48 ¶ 3.) Brown has claimed, alternatively, that Corretjer permitted him to do so or at least encouraged this practice, or (inconsistently) that the Corretjer Works are in the public domain and so no permission was required. (*See generally* ECF 48.)

As discussed in detail in Section II, *infra*, Counterclaim-Plaintiffs can prove clear chain of title: LAMCO's copyright interests derive from an assignment of copyright rights in the Corretjer Works via recorded assignment from one of Corretjer's daughters, Maria Corretjer; meanwhile, Consuelo's copyright interests derive from intestate succession after her father's death in 1985. All the Corretjer Works are registered with the U.S. Copyright Office ("USCO").

This case began as a lawsuit brought by Brown against LAMCO for LAMCO's registration of Brown's musicalized versions of the 13 Corretjer Works (collectively, the "Brown Songs") with the Mechanical Licensing Collective. (ECF 1.) LAMCO and Consuelo countersued for copyright infringement against Brown for his reproduction, distribution, public performance, and creation of derivatives of the Corretjer Works. (*See generally* ECF 23, 44.) The Court dismissed Brown's claim for failure to state a cause of action for copyright infringement (ECF 54) and partially dismissed LAMCO's claims relating to 10 out of the 13 Corretjer Works based on res judicata due to rulings from the 2005 litigation. (ECF 61.) With discovery concluded, Counterclaim-Plaintiffs now seek summary judgment on their respective claims.

## ARGUMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is "genuine" if it could be resolved in favor of either party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986), and is considered "material" if it potentially affects the outcome of the case in light of applicable law. *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). While all reasonable inferences are drawn in favor of the non-moving party, *see Shafmaster v. United States*, 707 F.3d 130, 135 (1st Cir. 2013), "'[c]onclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative' will not suffice to ward off a properly supported motion for summary judgment." *Nieves-Romero v. United States*, 715 F.3d 375, 378 (1st Cir. 2013) (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)). Cross-motions for summary judgment do not change this standard, and the Court must simply determine whether either party is entitled to judgment as a matter of law based on the

undisputed facts. *See Wells Real Estate v. Chardon/Hato Rey P'ship S.E.*, 615 F. 3d 45, 51 (1st Cir. 2010).

To establish infringement of an original work of authorship under the Copyright Act, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Johnson v. Gordon*, 409 F.3d 12, 17 (1st Cir. 2005) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361 (1991)). Both elements are satisfied here based on the undisputed facts.

## I. THE CORRETJER COPYRIGHTS ARE VALID

As a threshold matter, there is no dispute that all the Corretjer Works at issue in this case—written poems constituting literary works—are original works of authorship fixed in a tangible medium expression under 17 U.S.C. § 102(a)(1); Brown admits this in his answer to the Amended Counterclaims. (ECF 48 ¶ 42). There is also no dispute that Corretjer was the original author of the Corretjer Works, which Brown also admits. (*Id.* ¶ 16, 42). Below, Counterclaim-Plaintiffs address Brown's contention that the Corretjer Works are in the public domain, the Counterclaim-Plaintiffs' chain of title, and the applicable copyright registration certificates.

For the avoidance of doubt, considering the Court's ruling on Brown's motion to dismiss Amended Counterclaims in certain of the works as to LAMCO, LAMCO is only seeking summary judgment concerning the Post-2005 Works, claims which the Court held were not precluded (ECF 61 at 10, n.8, 17). But Brown did not move to dismiss Consuelo's claims, and because there has been no court ruling to date concerning Consuelo's claims to any of the 13 Corretjer Works at issue in this case, Consuelo is seeking summary judgment concerning all the Corretjer Works.[1]

[1] Consuelo will, of course, oppose Brown's motion for summary judgment against her claims filed today.

### A. The Corretjer Works Are Not in the Public Domain Because They Were Only Subject to Limited Publication

The 13 Corretjer Works at issue here (three of which are relevant to LAMCO, and all 13 of which are relevant to Consuelo) are still protected by the Copyright Act and have not lapsed into the public domain, contrary to Brown's assertions otherwise. While there is no dispute that the Corretjer Works—except *Boricua en la Luna*, which is an unpublished work, and which Brown does not contend is in the public domain (Statement of Undisputed Facts ("SUF") ¶ 5)—were first distributed without copyright notices (*id.* ¶ 4) they were only ever distributed on a limited basis so that under the 1909 Act, they did not pass into the public domain. Copyright Act of 1909, Pub. L. No. 60-349, 34 Stat. 1075 (1909) (repealed 1978). While Brown contends that such distribution constituted a "publication," to the extent any publication could be said to have occurred at all, it was so highly limited as to not constitute a "publication" for purposes of copyright law.

1. <u>Standards governing limited and general publication under the 1909 Act</u>

As the First Circuit explained in *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, the statutory definition of publication "'in general constitutes a codification of the definition evolved by case law' before the 1976 Act" (quoting 1 M.B. Nimmer & D. Nimmer, *Nimmer on Copyright* § 4.04, at 4-20 (2001), which included "judicially crafted exceptions for limited publication: restricted distribution of the work that does not qualify as publication or trigger the notice requirement." 322 F.3d 26, 36 (1st Cir. 2003). According to the U.S. Copyright Office, a limited publication is defined as "the distribution of copies of a work to a definitely selected group with a limited purpose and without the right of diffusion, reproduction, distribution, or sale. A limited publication is not considered a distribution to the public and, therefore, is not publication." Copyright Office Compendium III Ch. 1905.1 (citing *White v. Kimmell*, 193 F.2d 744, 746-47 (9th Cir. 1952)).

The First Circuit has consistently applied a two-pronged test to determine whether a distribution constitutes limited publication: limited publication "occurs when tangible copies of the work are distributed, but to a *limited class of persons* and for a *limited purpose*." *Burke v. Nat'l Broad. Co.*, 598 F.2d 688, 692 (1st Cir. 1979) (emphasis added). This definition requires both elements to be satisfied simultaneously. The Corretjer Works do so.

As to the first element, for distribution to be limited, it must be restricted to a definitely selected and limited group of recipients. *Id.* at 693 (first prong satisfied where the plaintiff sent a film to a colleague in response to a specific request to use the copy personally in lectures and on a television program). On the contrary, when a work is "made available to members of the public at large without regard to who they are or what they propose to do with it" the first element is not satisfied. *Id.* at 691. The second element, limited purpose, means that the distribution does not include the right of general diffusion, reproduction, distribution, or sale. *See id.* at 693 (second element satisfied where plaintiff's colleague's request was for specific educational purposes, and the plaintiff's permission "cannot be thought to have authorized any further use or other purpose"). Corretjer's treatment of the Corretjer Works satisfies both these elements.

Further, unauthorized general publication by third parties does not divest copyright protection by injecting a work into the public domain. *See Soc'y of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory of Denver, Colorado*, 754 F. Supp. 2d 219, 225 (D. Mass. 2010), *aff'd sub nom. Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29 (1st Cir. 2012). This is because "'[A]n unauthorized user lacks not only the right, but also the ability to 'publish' an author's work and any attempt to do so is ineffective.'" *Id.* (quoting *Cipes v. Mikasa, Inc.*, 346 F. Supp. 2d 371, 375 (D. Mass. 2004).

2. LAMCO's uncontested proof of limited publication of the Corretjer Works

LAMCO explained, in painstaking detail, in its answer to Brown's Interrogatory No. 17, why all the Corretjer Works were disseminated on a limited basis at the time. (SUF ¶¶ 9-19). There is no evidence or testimony in the record to contest Interrogatory Answer No. 17, and Brown's anemic and unsupported motion for summary judgment based on general publication of the Post-2005 Works, and as against Consuelo, will be addressed in full in Counterclaim-Plaintiffs' respective forthcoming oppositions (to the extent it is not completely defeated here). For purposes of this motion, the testimony provided in Interrogatory Answer No. 17 is undisputed, and in fact, is at least in part confirmed and corroborated by Brown elsewhere in the record.

The story of the Corretjer Works is one built around political persecution (*id.* ¶¶ 6, 14, 17, 22) which can directly impact the elements of limited publication. Courts have recognized that historical and social contexts can influence how publication occurs and should be evaluated when applying copyright doctrines. *See generally Soc'y of the Holy Transfiguration Monastery, Inc.*, 689 F.3d 29. Under severe political repression, such as that experienced by Corretjer, authors routinely and deliberately restrict distribution to trusted individuals (i.e., the "definitely limited" "class of persons"), to share ideas with a sympathetic group while avoiding government censorship (i.e., the "limited purpose"), with the implicit understanding that unauthorized reproduction and wider dissemination could endanger both author and recipients.

Juan Antonio Corretjer was a poet and a journalist among other things, but his main commitment was as a champion for the independence of Puerto Rico, a posture he never renounced and that put him in jail several times and led to several failed attempts against his life. (SUF ¶ 6). It is an uncontested fact that Corretjer was the victim of political persecution and repression all through his lifetime. (*Id.*). He was followed, photographed, recorded, and constantly oppressed by

a political system that feared his writings and ideas and had no space for dissention. (*Id.*). Between 1953 and 1960, Corretjer produced several works including *Distancias* as a handwritten pamphlet in 1957. (*Id.* ¶ 7). Corretjer circulated the book *Yerba Bruja* in 1957, which includes the works "Inriri Cahuvial," "El Hijo," "Ayuburi," "Serenata," "En la vida todo es ir," "Andando de noche sola," and "Ahora Me Despido." (*Id.* ¶ 8). Corretjer shared these works only among a limited group of people that were interested in and sympathetic to his ideas. (*Id.* ¶ 9).

Later, in the 1960s, Corretjer produced several literary works in limited editions which he also shared only with a small group of people who sympathized with his philosophies (*id.* ¶ 10). In 1965, Corretjer circulated the book *Alabanza a la Torre de Ciales* in 1965, which includes the work "Oubau Moin." (*Id.* ¶ 11). In 1967, Corretjer circulated the book *Pausa para el Amor* in 1967, which includes the work "Dia Antes." (*Id.* ¶ 12). These titles were all self-produced by Corretjer and a small group of friends and Corretjer exercised sole control over access to them. (*Id.* ¶ 13) Specifically, copies were only distributed among his small group of friendly artists, professors, and intellectuals, all of whom were politically aligned with Corretjer and favored Puerto Rico's independence. (*Id.* ¶ 14). To LAMCO's knowledge, most if not all surviving copies of these works are few and far between and are part of private collections. (*Id.* ¶ 15) Corretjer never gave explicit permission for further reproduction of the titles in question, and given the prevailing political and cultural climate, there would have been an implicit and generally understood prohibition on widespread dissemination, even absent explicit statements in that regard. (*Id.* ¶¶ 16-17) Similarly, during the 1970s, Corretjer produced other works, including *Construcción del Sur* in 1972, which includes the works "En las Aguas del Inabón, El Nombre (Inabon Yunes)," and "Diana de Guilarte." (*Id.* ¶ 18). He again shared them only with a small group of people interested in and sympathetic to his ideas. (*Id.* ¶ 19).

The political nature and limited circulation of Corretjer's works, put in historical context with the repression he suffered under Puerto Rico's authorities at the time, qualify his works as "grey literature," a term used to describe material produced outside of traditional publishing and distribution channels. (*Id.* ¶ 20) Grey literature is characterized by small print runs, which by nature is a limitation on the general circulation of the work. (*Id*. ¶ 21) Moreover, Corretjer often shared his works as small-run pamphlets—a format usually used to disseminate political ideas that float under the radar to a select group of people *without the intention of widespread distribution* (*id*. ¶ 22); this practice clearly places such works in the category of limited publications.

Plaintiff is aware of all these factors. In a November 2020 interview about his own political persecution titled "Roy y su version de 'Boricua en la Luna" ("Roy and his version of 'Boricua en la Luna"), Brown stated that "I've dedicated many years of my life to this [referring to "Boricua en la Luna"]. At no point when I did it [set the poem to music] did, I think it would be a success because this man [Corretjer] was a persecuted person, and I was persecuted too." (*Id.* ¶ 23) In his 2005 deposition Plaintiff testified that Corretjer gave him some of his books as gifts (*id.* ¶ 24) presumably because they were not circulated, and when asked if he ever purchased a Corretjer book in a bookstore, Plaintiff could not say that he did (*id*.). Indeed, Plaintiff could not purchase the Corretjer's works because the titles at issue were not sold in bookstores at the time they were released and could only be procured from Corretjer. (*Id.* ¶ 25).

Corretjer's story is a straightforward example of limited publication. When an author carefully controls distribution based on political trust and ideological alignment during periods of censorship, this can create sufficiently defined boundaries. Indeed, limited publication has been found where the range and purpose of distribution did not suggest that the general public was free to obtain and use the work. *See Burke*, 598 F.2d at 692. While a distribution, to be limited, must

communicate the contents of the work "without the right of diffusion, reproduction, distribution or sale," and must be "[r]estricted both as to persons and purpose," such "restrictions can be implied as well as express." *Id.* (internal citations omitted).

Corretjer's intent and actions, even if they were implied, draw a clear line establishing limited publication, such that his circumscribed permission "cannot be thought to have authorized any further use or other purpose." *Id.* at 693. The case law supports such a finding. *See, e.g.*, *Allen v. Walt Disney Productions, Ltd.*, 41 F. Supp. 134, 136 (S.D.N.Y.1941) (finding limited publication where composer of a song had loaned manuscripts thereof to various musicians and had sent a copy to two different music companies and no copies had been sold and the composition was not printed until 1936 almost thirty years after it was written); *Patterson v. Century Productions, Inc.*, 93 F.2d 489 (2d Cir. 1937) (no general publication even though copies of the film at issue were circulated widely; the copies were sent only to non-profit groups to be shown for non-commercial purposes, with no authorization to copy them further and, apparently, with the understanding that they would be returned); *King v. Mister Maestro, Inc.*, 224 F. Supp. 101, 106-07 (S.D.N.Y. 1963) ("Advance text" copies of Rev. Martin Luther King's "I Have a Dream" speech were given to the press, and excerpts were later broadcast on national television and used in movie house newsreels; publication was limited because copies were given only to a specific group to assist it in covering the event, and were never offered to the public at large); *McCarthy & Fischer, Inc. v. White*, 259 F. 364, 364 (S.D.N.Y. 1919) (composer gave a copy of his song to a singer for performance but had not dedicated it to the public because "to give the song to a limited number of artists to sing" did not prove "probability that any of the copies were sold, or that they were given out for any purpose but a limited use by a few vaudeville artists").

When contrasting the facts surrounding Corretjer's circulation of his works and the facts of the above-referenced cases with cases where general publication has been found, the differences could not be clearer. "In cases where general publication has been found, the creator had made his work available in a manner that suggested that any interested person could have a copy." *Burke*, 598 F.2d at 692. *See, e.g.*, *Pub. Affs. Assocs., Inc. v. Rickover*, 284 F.2d 262, 270-71 (D.C. Cir. 1960), *vacated on other grounds*, 369 U.S. 111 (1962) (general publication found where copies of speeches were given to the press, sent to individuals both on request and without solicitation, and sent in batches of 50 to sponsors for distribution); *White v. Kimmell*, 193 F.2d 744, 745-47 (9th Cir. 1952) (general publication found where author distributed copies of manuscript to friends, acquaintances, and strangers alike, affirmatively telling many to pass them on and authorizing some to make copies, with no limitations, no defined group or association, and no limit on the number of copies to be made or who could receive them upon "a mere request"); *Am. Visuals Corp. v. Holland*, 239 F.2d 740, 744 (2d Cir. 1956) (general publication found where plaintiff placed copies of his brochures on a hotel table during an convention and gave copies to insurance association for further distribution to member companies; while purpose of distribution was limited, no limit placed on who could obtain copies); *Conner v. Mark I, Inc.,* 509 F. Supp. 1179, 1181-1182 (N.D. Ill. 1981) (general publication found where photographer submitted image to a newspaper "for the purpose of publication and general circulation. Anyone who desired a copy of the photograph could have obtained it simply by purchasing the particular edition of the newspaper in which it ran.").

Corretjer's literature was not disseminated in a manner that suggested "[a]nyone was welcome to a copy." *Rickover*, 284 F.2d at 271. (*See generally* Suarez Dec. Ex. A, No. 17 (at 13-17)). Like the plaintiff in *Burke*, Corretjer shared his writings with individuals who would

inherently know not to reproduce, redistribute, or further disseminate them (i.e., small group of friends and acquaintances, who typically were artists, professors, and intellectuals, all politically aligned with Corretjer) because doing so would run counter to both their interests and could have resulted in danger both to liberty and physical safety, (*see id.*); and, as noted above, such limitations could be implicit. *See Burke*, 598 F.2d at 692.

Because both elements of limited publication have been met and Brown has adduced no evidence to the contrary, the Court should find that the Corretjer Works are not in the public domain as a result of publication without notice.

**B. LAMCO's Copyrights Are Registered**

LAMCO registered the copyrights in the Post-2005 Works with the USCO, with LAMCO listed as the copyright claimant. True and correct copies of the applicable certificates of registration are attached to the Suarez Declaration as Ex. D (LAMCO115-116 (April 10, 2008 registration TX 7-207-339 for the book *Yerba Bruja*, which contains *Ahora Me Despido* and *Serenata*, hereinafter the "'339 Registration")) and Ex. E (LAMCO113-114 (July 8, 2005 registration PA 1-285-742 for *Ahora Me Despido, Serenata,* and *Inabón Yunez*; hereinafter the "'742 Registration")). *See generally*, *Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC*, 586 U.S. 296 (2019).

While the Corretjer Works encompassed by the '339 Registration appeared in a prior registration (*see infra*), the '339 Registration does not violate 37 C.F.R. § 202.3 (preventing duplicate registrations) because the '339 Registration is for literary works, i.e., the poems of Corretjer contained in the book *Yerba Bruja*, whereas the '742 Registration (discussed below) was for words used in connection with works of performing arts (i.e., song lyrics). (Suarez Dec.. Exs. D & E). Poetry used as song lyrics—as Brown admits—constitute derivative works of the underlying poem, which must be registered independently. *See* 17 U.S.C. § 103(b); *Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1112 (1st Cir. 1993).

LAMCO further clarifies for the record that the '339 Registration contains two inadvertent errors. First, it lists the "year of completion" of the book *Yerba Bruja* (which contains the poems *Ahora Me Despido* and *Serenata*) as 1985, when *Ahora Me Despido* and *Serenata* were both completed before 1957 (SUF ¶ 28). Second, as to the date of first publication listed as 2006, per LAMCO's answer to Brown's Interrogatory 13, and per LAMCO's answers to Brown's Interrogatories 14 and 15, the first *limited* publications of *Ahora Me Despido* and *Serenata* and of the book *Yerba Bruja* were in 1957 (*Id.* ¶ 29).

Similarly, the '742 Registration lists the "year of completion" of the Post-2005 Works as 1978 and the date of "first publication" of the Post-2005 Works as January 1, 1978. (*Id.* ¶ 30). Per LAMCO's answer to Brown's Interrogatory 13, *Ahora Me Despido* and *Serenata* were both completed before 1957, and *Inabón Yunez* was completed before 1972 (*Id.*); and per LAMCO's answer to Brown's Interrogatory 14, the first *limited* publications of *Ahora Me Despido* and *Serenata* were in 1957, and the first *limited publication* of *Inabón Yunez* was 1972 (*Id.* ¶ 31).

These errors do not invalidate the '399 Registration or the '742 Registration. *See* 17 U.S.C. § 411(b); *Unicolors, Inc. v. H&M Hennes & Mauritz, L. P.*, 595 U.S. 178 (2022). They were not included knowingly; rather, they were inadvertent and included based on LAMCO's misunderstanding of USCO registration practices, rules, and conflicting USCO guidance at the time. (SUF ¶ 32). Moreover, such errors would be considered immaterial such that they would not impact the validity of the registrations. *See Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1157-61 & n.21 (1st Cir.1994) (holding that inadvertent application-related discrepancies do not invalidate a registration; approving district court's jury instruction that "discrepancies in the dates, filing the wrong pages, or partial pages, and similar errors, if accepted by the Copyright Office, do not impeach the validity and effect of the registration"). *See also*,

*Sierra-Pascual v. Pina Recs., Inc*., 660 F. Supp. 2d 196, 203 (D.P.R. 2009) (holding that incorrect dates of creation and failure to list all co-authors are "immaterial" because such errors would not have caused the USCO to render a different registration decision); *Franklin v. Ciroli*, 865 F. Supp. 940, 943 (D. Mass. 1994) (finding failure to list dates of publication on copyright registration to be immaterial mistakes).

**C. Consuelo's Copyrights Are Registered**

Consuelo has a certificate of registration for *Boricua en La Luna*, a true and correct copy of which is attached to the Declaration of Consuelo Corretjer ("Corretjer Dec.") as Exhibit A (LAMCO000117 (June 24, 2021 Registration for PA 2-299-059, hereinafter the "'059 Registration")). (SUF ¶ 33). While Consuelo does not have registrations for the other Corretjer Works in her name, the rest of the works are registered by LAMCO pursuant to the two registrations discussed above and LAMCO's registration for the Corretjer Works "Oubao Moin," "Inriri Cahuvial," "El Hijo," "Andando de noche sola," "Dia Antes," "En la vida todo es ir," "Distancias," "Boricua en la Luna," "Ayuburi," "Diana de Guilarte," and "Inabon Yunes," "De Ciales Soy." (*Id.* ¶ 34; Suarez Dec. Ex. F (LAMCO000106 (February 3, 2000 Registration for PA 995-275, hereinafter the "'275 Registration")).

Consuelo is entitled to rely on LAMCO's copyright registrations for the remaining 12 works because, as discussed in detail below, both she and LAMCO are recipients of assignments or other transfers of copyright ownership as opposed to being co-owners ab initio. *See, e.g.*, *Brode v. Tax Mgmt., Inc.*, No. 88 C 10698, 1990 WL 25691, at *7 (N.D. Ill. Feb. 1, 1990) ("The [Copyright Act] does not address copyright assignments or indicate that an assignment in any way alters the effect of [§ 412]. . . . Thus, in contrast to defendants' interpretation of section 412, an assignee is not required to 're-register' a copyright . . . as a prerequisite to instituting an action. The initial registration of the copyright is sufficient."); *Cf. Hustlers Inc. v. Thomasson*, 253 F. Supp.

2d 1285, 1291 (N.D. Ga. 2002) (noting that "holders of an assigned interest can rely on a previous registration of that interest"). *See generally* 17 U.S.C. § 201(d)(1) (inheritance is listed as a type of transfer; copyright "may be bequeathed by will or pass as personal property by the applicable laws of intestate succession."); *Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg.*, 295 F.3d 59 (1st Cir. 2002).

Consuelo also hereby clarifies two errors in the '059 Registration. Her registration only covers *Boricua en la Luna*, which as discussed *infra*, Counterclaim-Plaintiffs contend was completed in 1980, (LAMCO Answer to Brown Interrogatory No. 13 (at 11)), but the '059 Registration lists the date of completion as 1981. (SUF ¶ 35). The date of first publication in the '059 Registration is listed as March 1, 1987, when Brown first released his musical version of the poem, but *Boricua en la Luna* is, in fact, an unpublished work. (*Id.* ¶ 36).

As above, these errors do not invalidate the '059 Registration. *See* 17 U.S.C. § 411(b); *Unicolors*, 595 U.S. 178. They were not included knowingly; rather, the use of the 1981 completion date is consistent with Consuelo's prior—albeit erroneous—belief based on a 2020 interview with Brown that the poem was completed in 1981 ), and that Brown's unauthorized publication of the musical version of the poem constituted the date of first publication for purposes of the application to register the copyright. (SUF ¶ 37). In addition, such an error would also be considered immaterial so as not to invalidate the registration. *See, e.g.*, *Data Gen. Corp.*, 36 F.3d at 1157-61 & n.21; *Franklin*, 865 F. Supp. at 943.

Moreover, the '275 Registration, like the '742 Registration, contains an incorrect completion date and date of first publication. (SUF ¶ 38). And, also like the '742 Registration, these errors were not included knowingly; they, too, were inadvertent and occurred based on LAMCO's misunderstandings of USCO registration practices, rules, and conflicting USCO

guidance at the time. (SUF ¶ 40). They would also be considered immaterial so as not to invalidate the registration. *See, e.g.*, *Data Gen. Corp.*, 36 F.3d at 1157-61 & n.21; *Sierra-Pascual*, 660 F. Supp. 2d at 203; *Franklin*, 865 F. Supp. at 943. Brown has produced no evidence to the contrary.

Finally, Brown is not prejudiced in any way by these minor errors. *See Data Gen. Corp.*, 36 F.3d at 1161 n. 24 (noting that, before a registration is declared invalid based on a registration error, courts generally require that either defendant was prejudiced by the error or that it was intentional). Indeed, Brown has known about the errors in the '275 Registration since the prior 2005 litigation and cannot be said to be unaware of "the work in which the applicant claims a copyright," which is a "chief purpose of the registration process." *Cipes v. Mikasa, Inc.*, 346 F. Supp. 2d 371, 373–74 (D. Mass. 2004) (denying motion to invalidate copyright registrations, finding that defendant was "well aware of [plaintiff's] rights in the subject photographs" despite registration errors).

## II. COUNTERCLAIM-PLAINTIFFS OWN ENFORCEABLE COPYRIGHT RIGHTS IN THE CORRETJER WORKS

### A. LAMCO Owns Copyright Interests in the Post-2005 Works

With respect to the Post-2005 Works, "Ahora Me Despido," "Serenata," and "Inabón Yunez," LAMCO was the recipient of a valid assignment of copyrights from Corretjer's daughter, Maria Corretjer, who, herself, inherited Corretjer's copyrights by way of intestate succession. The Copyright Act states that "ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession." 17 U.S.C. § 201(d)(1). *See also* §§ 24 & 42 of the 1909 Copyright Act. In situations involving intestate succession, such as this case, federal courts look to the state law governing the descent of the author's estate to determine appropriate ownership rights in the deceased author's heirs. *See De Sylva v. Ballentine*, 351 U.S. 570, 580

(1956); *Rodrigue v. Magnus*, No. CV 20-1240, 2021 WL 1564417, at *4 (E.D. La. Apr. 21, 2021) ("A leading commentator has observed that this 'leaves no doubt that, at least in the case of deceased authors, state law controls disposition of copyright ownership.'") (quoting 1 Nimmer & Nimmer on Copyright § 6A.02(A)(1)).

Under 17 U.S.C. § 501(b), only "the legal or beneficial owner of an exclusive right under a copyright is entitled ... to institute an action for any infringement of that particular right committed while he or she is the owner of it." *Motta v. Samuel Weiser, Inc.*, 768 F.2d 481, 483–84 (1st Cir. 1985). Where, as here, the plaintiff is not the author of the copyrighted works, the plaintiff "must establish a proprietary right through the chain of title in order to support a valid claim to the copyright." *Id.* at 484 (internal citations omitted). LAMCO has ample evidence of copyright ownership via intestate succession through a clear chain of title to the three Post-2005 Works.

*First*, Corretjer is undisputedly the original author of the Corretjer Works at issue in this case, including the Post-2005 Works, as Brown admits in his Reply to LAMCO's Amended Counterclaims. (ECF 48 ¶ 16).

*Second*, there is no dispute that Corretjer died in 1985. (*Id.* ¶ 17).

*Third*, Corretjer died intestate, which led to court proceedings in Puerto Rico for a judicial declaration of heirship.[2] (SUF ¶ 42). Corretjer's three children and his widow initiated an heirship proceeding pursuant to 32 L.P.R.A. § 2301; title 32 governs special legal proceedings relating to testamentary and intestate succession, and section 2301 specifically states that "[i]n case of intestate succession . . . those who may have an interest in the inheritance may petition the Court

[2] This court order was attached to Certificate of Recordation filed with the U.S. Copyright Office ("USCO") on December 4, 2000 by Corretjer's daughter Maria S. Corretjer Ruiz, evidencing the transfer of Maria's copyright rights in the Corretjer Works to LAMCO, which will be addressed further below.

of First Instance of the last domicile of the decedent, or of the place where his property is situated, for the issuance of the corresponding order of heir's declaration." (*Id.* ¶ 43).

Suarez Dec. Ex. G proves that the Puerto Rico Superior Court granted the petition of Corretjer's heirs, declaring his three children, Maria Soledad Corretjer Ruiz, Ricardo Diego Corretjer Ruiz, Consuelo Roberta Corretjer Lee, and his widow, Consuelo Lee Tapia, as Corretjer's sole and exclusive heirs. (SUF ¶ 43).

For the avoidance of doubt, Puerto Rico's laws of intestate succession (read in tandem with § 201(d)(1) of the Copyright Act) permit Corretjer's children to inherit Corretjer's copyrights. Per 31 L.P.R.A. § 2591, legitimate succession takes place "[i[f a person dies without a will," and copyrights are treated as personal property that passes to the decedent's heirs according to Puerto Rico's statutory order of succession. *See generally*, 31 L.P.R.A. § 1021; *Sucn. Rosado v. Acevedo Marrero*, 196 D.P.R. 884, 897–98, 2016 TSPR 236 (Nov. 23, 2016).

That order of succession is "in the first place, to the descending direct line," 31 L.P.R.A. § 2641, and then only to ancestors, *id.* § 2651, and next to "collateral relatives" and spouses, *id.* § 2671. *See also id.* § 2607 ("In inheritances the relative nearest in degree excludes the most remote excepting the right of representation in proper cases."). Section 2607 also specifies that relatives "who are in the same degree shall inherit in equal shares, with the exception of what is provided in § 2674 of this title with regard to whole blood relationship." *Id.* § 2607. *See also id.* § 2643 ("The children of the deceased shall always inherit from him in their own right, dividing the inheritance in equal shares.").[3] *See also Ruiz-Hance v. Puerto Rico Aqueduct & Sewer Auth.*, 596 F. Supp. 2d 223, 229 (D.P.R. 2009) (by accepting the estate, "each ... heir acquires an independent right over the estate[,] and the abstract portion of the estate that belongs to him/her immediately

[3] The inheritance rights of Corretjer's late widow are not at issue because the inheritance rights of children supersede the inheritance rights of spouses. *See* 31 L.P.R.A. § 2671.

enters his/her patrimony as an independent and autonomous value that only belongs to him/her and of which he/she can dispose of with total liberty," and "any of the heirs ... may appear at the trial to defend his/her common rights. If he/she prevails, his/her victory is for the benefit of all the co-owners") (internal citations omitted).

*Fourth*, Maria Corretjer, one of the lawfully declared Corretjer heirs, assigned her ownership rights in and to the Corretjer Works to LAMCO, via valid written assignment dated August 21, 1999 (the "Assignment"). (SUF ¶ 44). The Assignment included a list of Corretjer's works the copyrights to which Maria assigned to LAMCO and that list includes, among many other works, the three Post-2005 Corretjer Works at issue in LAMCO's claim in this case. (*See Id.*, Suarez Dec. Ex. G at 0101-105).

*Finally*, LAMCO properly recorded the Assignment with the USCO via the aforementioned assignment. (SUF ¶ 45)). *Inabón Yunez* appears under its previous title, *En las Aguas del Inabón, el Nombre*. (SUF ¶ 46).

**B. Consuelo Owns Copyright Interests in All 13 Corretjer Works**

The chain-of-title analysis for Consuelo is the same as above with respect to Maria Corretjer's ownership of Corretjer's copyrights. As noted above, there is no dispute that Corretjer is the original author of the Corretjer Works (ECF 48 ¶ 16) and that Corretjer died in 1985. (*Id.* ¶ 17). There is no dispute that Maria Corretjer is one of Corretjer's daughters and that, as his heir, she inherited an interest in the Corretjer works by way of intestate succession under Puerto Rico law, as Brown admits in his answer (ECF 48 ¶ 11). Moreover, the same 1992 court ruling concerning a declaration of heirship applies to Consuelo's claim to inheritance (*see* SUF ¶ 48). Consuelo, however, did not assign her copyrights to LAMCO or anyone else. (*See* SUF ¶ 50; Sholder Dec. Ex. A No. 5 (at 5-6) (noting that, aside from Maria, only Ricardo—Corretjer's son—assigned rights to the Corretjer Works)).

## III. BROWN UNLAWFULLY COPIED CORRETJER'S PROTECTED EXPRESSION

"Proof of wrongful copying is a two-step process. First, the plaintiff must show that copying actually occurred. This showing entails proof that, as a factual matter, the defendant copied the plaintiff's copyrighted material." *Johnson*, 409 F.3d at 18 (citing *Segrets, Inc. v. Gillman Knitwear Co*., 207 F.3d 56, 60 (1st Cir.2000)). "Second, the plaintiff must establish that the copying is actionable by 'prov[ing] that the copying of the copyrighted material was so extensive that it rendered the infringing and copyrighted works 'substantially similar.'" *Johnson*, 409 F.3d at 18 Normally, because "[p]lagiarists rarely work in the open and direct proof of actual copying is seldom available," plaintiffs must "adduc[e] evidence that the alleged infringer enjoyed access to the copyrighted work and that a sufficient degree of similarity exists between the copyrighted work and the allegedly infringing work to give rise to an inference of actual copying." *Id.*

This is one of the rare cases where there is no dispute that Brown copied the words of the Corretjer Works to create lyrics for the Brown Songs—each of which is a musicalized version of the corresponding Corretjer poem—and that the Brown Songs constitute "adaptations" and are therefore derivative works under 17 U.S.C. § 101 & 106(2). (ECF 48 ¶¶ 24, 44; SUF ¶ 51). Brown wholeheartedly admits it. Even so, for the avoidance of doubt, there is no dispute that Brown had access to the Corretjer Works. (ECF 48 ¶ 43), and that the lyrics of the Brown Songs and the words of the corresponding Corretjer Works (as poems) are identical (or, at a minimum, nearly identical). (*See* SUF ¶ 53).

Further, there is no dispute that Brown sells the Brown Songs on his website, has posted videos of the Brown Songs on YouTube, and has publicly performed the Brown Songs, including within the last three years. (ECF 48 ¶¶ 48, 49, 50). *See also* 17 U.S.C. § 106(1), (3), (4). There is no material dispute that Brown did not receive permission to prepare these derivative works or

otherwise exploit them. (ECF 48 ¶¶ 25, 45, 48, 50, 51); *See* SUF ¶ 55.[4] There is no material dispute that Brown did not receive permission from Corretjer, his heirs, or LAMCO to print the Corretjer Works as song lyrics in physical album media or to reproduce them on his website. (ECF 48 ¶ 51). And there is certainly no dispute that Brown has not paid Corretjer's heirs or LAMCO for his exploitation of the Corretjer Works. (ECF 48 ¶ 27). The above evidence and analysis apply equally to LAMCO's claims relating to the Post-2005 Works and Consuelo's claims relating to all the Corretjer Works.

Finally, as the 13 Corretjer Works at issue are unquestionably not in the public domain, Brown's sole defense to infringement is that he is insulated from liability as to "Boricua en la Luna" because the late Juan Corretjer requested that Brown set this poem to music, ostensibly giving Brown an implied license. (*See* ECF 48 at 11). This defense—which is Brown's burden to prove, *see Latin Am. Music Co., Inc. v. Disco Hit Prods.*, 2008 WL 11500497, at *5 (D.P.R. June 23, 2008) ("Because an implied license is an affirmative defense to infringement, the party claiming the protection of a license has the burden of proving the existence of a license.")—is supported by nothing other than an unauthenticated, hearsay statement supposedly made by Corretjer (Sholder Dec. Ex. A (Brown Answer to LAMCO Interrogatory 10 (at 9) and 16 (at 11)), who has been deceased for 41 years and as such, is conveniently well outside the ambit of any factfinder. And it is a statement that Brown claims was purportedly made *decades* before Corretjer's rights in "Boricua en la Luna" passed to Counterclaim-Plaintiffs, and *decades* before the present dispute over the rights to same. Accordingly, any alleged permission granted by Corretjer would unquestionably constitute inadmissible hearsay under Fed. R. Evid. 804(a)(4).

---

[4] Brown states that he did not need permission from Corretjer or anyone else because the Corretjer Works are in the public domain, but this is wrong for the reasons stated in Section I, *supra*.

However, for the avoidance of doubt, even if this self-serving, decades-old statement of an out-of-court and unavailable declarant were somehow considered admissible, the statement would fall well short of proving an implied license, which is only found in "narrow circumstances," and which requires affirmative proof that the licensee requested the creation of the work, that the licensor created and delivered the work, and most importantly, that the licensor *intended* that the licensee distribute the work. *See John G. Danielson, Inc.*, 322 F.2d at 41 (citing test set forth in *Effects Associates*, *Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 2020)); *see also see Disco Hit Prods.*, 2008 WL 11500497, at *5 ("The touchstone for finding an implied license is intent."). Simply put, the record here is devoid of evidence, let alone *admissible* evidence, that would show that Corretjer *intended* to grant Brown any type of copyright interest, let alone the type of broad, unrestricted, commercial use that Brown has engaged in here, whether of "Boricua en la Luna" or of any other Corretjer Work at issue. Accordingly, to the extent Brown raises a license defense, it should be rejected.

## CONCLUSION

For the reasons set forth above, the Court should grant summary judgment in favor of Counterclaim-Plaintiffs and find Brown liable for copyright infringement.

Dated: January 30, 2026

Respectfully Submitted,

**COWAN DEBAETS ABRAHAMS & SHEPPARD, LLP**
Scott J. Sholder *(admitted pro hac vice)*
60 Broad Street, 30th Floor
New York, New York 10004
Telephone: (212) 974-7474
Fax: (212) 974-8474
ssholder@cdas.com

**DMR Law**
Javier Micheo Marcial
USDC-PR No. 305310

Capital Center Building
239 Arterial Hostos Avenue
South Tower – Suite 1101
Hato Rey, P.R. 00918
787-331-9970 / 786-710-8138
j.micheo@dmrpr.com

*Attorneys for Counterclaim-Plaintiffs*