UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ROY BROWN<br><br>Plaintiff<br><br>v.<br><br>LATIN AMERICAN MUSIC CO.<br><br>Defendants | CIVIL NO. 24-cv-01523 (MAJ)<br><br>COPYRIGHT INFRINGEMENT |

**PLAINTIFFS' OPPOSITION TO COUNTERCLAIM-PLAINTIFFS' MOTION FOR SUMMARYJUDGMENT**

TO THE HONORABLE COURT:

Comes now Plaintiff, Roy Brown, through the undersigned attorney, and very respectfully states and prays:

INTRODUCTION

Counterclaim-Plaintiffs' –LAMCO and Consuelo Corretjer– motion for summary judgment should be denied because it rests on inadmissible and legally insufficient proof. Their theory depends on recasting Juan Antonio Corretjer's mid-century books as "limited publications" under the 1909 Copyright Act despite undisputed evidence that they were printed by commercial presses, publicly reviewed, and openly circulated without copyright notice. The sole evidentiary foundation for their limited-publication claim—an interrogatory response offered only "to the best of knowledge and belief" and based on information "shared with" the declarant—fails Fed. R. Civ. P. 56(c)(4)'s personal-knowledge requirement and, even if considered, does not establish the required elements of limited publication: restricted distribution to a definitely selected group for a limited

purpose with retained dominion over further dissemination. Because Counterclaim-Plaintiffs cannot prove ownership of valid copyrights as a matter of law and because the record also supports authorization as to *Boricua en la luna*, the Court must deny the motion.

## ARGUMENT

When analyzing a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party, in this case favoring Plaintiff. Vera v. McHugh, 622 F.3d 17, 25–27 (1st Cir.2010). However, while the Court "draw[s] all reasonable inferences in the light most favorable to [the non-moving party] ... [the Court] will not draw unreasonable inferences or credit bald assertions, empty conclusions or rank conjecture." Vera, 622 F.3d at 26 (internal quotations and citation omitted). Further, "[t]he [C]ourt may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The [C]ourt shall have no independent duty to search or consider any part of the record not specifically referenced." Local Rule 56(e). The Court will not consider hearsay statements nor allegations presented by parties that do not properly provide specific reference to the record. Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir.1990). "Neither party may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact." Magee v. United States, 121 F.3d 1, 3 (1st Cir. 1997).

## I. THE LAMCO AND CONSUELO CORRETJER COPYRIGHTS ARE NOT VALID

It is undisputed that twelve of the thirteen poems at issue in the case appeared in Juan Antonio Corretjer's *Distancias, Yerba Bruja, Alabanza a la Torre de Ciales*, *Pausa*

*para el Amor*, and *Construcción del Sur*. LAMCO and Consuelo Corretjer admit that *Distancias* was published in 1957 (SMF 7), that *Yerba Bruja* –which includes the works *Inriri Cahuvial*, *El Hijo*, *Ayuburi*, *Serenata*, *En la vida todo es ir*, *Andando de noche sola*, and *Ahora Me Despido*– was published in 1957, (SMF 8), that *Alabanza en la Torre de Ciales* –which includes the work *Oubao Moin*,– was published in 1965, (SMF 11), that *Pausa para el Amor* –which includes the work *Dia Antes*– was published in 1967, (SMF 12), and that *Construcción del Sur* –which includes the works *En las Aguas del Inabón, El Nombre* (*Inabon Yunes*), and *Diana de Guilarte*,– was published in 1972, (SMF 18). When Brown and LAMCO first litigated Corretjer poems two decades ago, the First Circuit Court of Appeals observed that "none of these works contained a copyright notice." Brown v. Latin Am. Music Co., 498 F.3d 18, 20 (1st Cir. 2007)

The validity of a copyright in a work distributed prior to January 1, 1978, is determined by the 1909 Copyright Act. Self Realization Fellowship Church v. Ananda Church of Self Realization, 206 F.3d 1322, 1325 (9th Cir. 2000). The general rule under the 1909 Act is that a work must bear a valid copyright notice upon publication to secure copyright protection in the United States. Nimmer on Copyright § 7.02(C)(1). Under that rule, a publication of a work in the United States without the statutory notice of copyright fell into the public domain, precluding forever any subsequent copyright protection of the published work. Brown v. Latin Am. Music Co., 498 F.3d 18, 23 (1st Cir. 2007). Only if the publication was "limited," as that term is defined by the case law, the work would avoid falling into public domain.

As the First Circuit has put it, a "limited publication," occurs when tangible copies of the work are distributed to a limited class of persons and for a limited purpose. Burke v.

Nat'l Broad. Co., 598 F.2d 688, 692 (1st Cir. 1979). The most quoted definition is from White v. Kimmell: a limited publication, "communicates the contents of a (work) to a definitely selected group and for a limited purpose, . . . without the right of diffusion, reproduction, distribution or sale . . . (T)he circulation must be restricted both as to persons and purpose, or it cannot be called a private or limited publication." White v. Kimmell, 193 F.2d 744, 746-47 (9th Cir. 1952). The Second Circuit has made clear that limited publication is fundamentally a matter of retained control, not the size of the audience exposed to the work. Patterson v. Century Productions, Inc., 93 F.2d 489 (2d Cir. 1937).

Burke provides a good example of what is a limited publication. In 1972, Burke filmed a rare wildlife incident in Tanzania. He later sent a copy of the film to a professor in Germany for use in university lectures and on German public (non-commercial) television. The original film was returned to Burke, and he gave no permission for any broader distribution of the footage. Nonetheless, the film later made its way to a British production company and was ultimately broadcast in the United States by NBC without Burke's authorization. Burke's dissemination of his film through the professor was deemed a limited publication.

The First Circuit in Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d 29 (1st Cir. 2012), offers a second example. There, the Monastery acknowledged that it authorized St. Nectarios Press to distribute booklets containing in-progress translations of certain works to selected parishes for use and editorial critique. It argued that this dissemination was restricted in scope and purpose and therefore constituted only a limited publication. The court agreed, concluding that delivery of the booklets to a defined group of religious congregations for the narrow purpose of literary feedback was a distribution to

a limited class for a limited purpose, not a general publication to the public at large without restriction. 689 F.3d at 45-46.

A classic example of a limited publication are professor notes handed to students, as discussed in White, supra. Another example is Martin Luther King providing the press at the press tent, with an advance copy of his "I have a dream" speech, for the limited purpose of assisting them in the coverage of the event. The advance copies were not available to anyone else, nor were the journalists given the freedom to reproduce the speech beyond what is normal for their reporting duties. See King v. Mister Maestro, Inc., 224 F. Supp. 101, 107 (S.D.N.Y. 1963).

As can be gathered from the discussion above, the key elements for limited publication are the distribution to a "definitely selected group" –meaning, a specifically identified, defined, ascertainable, and limited class of persons, as opposed to an undefined or open segment of the public– and for a "a limited purpose," –meaning, the retention of control.

The element of control must be highlighted. In Patterson, a motion picture was exhibited publicly in numerous theaters, but each print was distributed under restrictive licenses that confined exhibitors to performance only (which was not regarded as publication), prohibited copying or further distribution, forbade transfer of possession, and required return of the prints. Because no unrestricted copies were placed into the hands of the public and no right of reproduction or general diffusion was surrendered, the court held that there had been no general publication. The decisive consideration was that the copyright owner never relinquished dominion over the tangible copies or the right of

further dissemination; public viewing alone did not amount to surrender of proprietary control. 93 F.2d at 490–92.

Similarly, in Paramount Pictures Corp. v. Leslie Rubinowitz, 1981 WL 1396 (S.D.N.Y. 1981), the court concluded that syndication of *Star Trek* episodes did not constitute general publication because Paramount retained strict contractual control over the prints—limiting broadcasts to non-paying audiences, prohibiting duplication or transfer of possession, and regulating delivery and return. The case underscores that publication analysis hinges on whether the copyright owner relinquishes dominion over the work; where control over distribution, copying, and possession is contractually preserved, the dissemination remains limited rather than general. See also, American Vitagraph, Inc. v. Levy, 659 F.2d 1023, 1027–28 (2d Cir. 1981), where the court emphasized that a "limited publication" turns on the copyright holder's retention of dominion and control over the work—where exhibition is restricted to a select audience, for a defined purpose, without sale, general distribution, or commercial exploitation, and without relinquishing copies into the stream of commerce. Thus, limited publication is fundamentally a function of the proprietor's maintained control over both the scope of dissemination and the disposition of copies.

LAMCO and Consuelo Corretjer seek to convince the Court that the distribution of the Corretjer Works "[were] so highly limited as to not constitute a 'publication' for purposes of copyright law." Doc. 74, p. 6. But, as the Court will gather, they have not presented any admissible evidence to prove that, nor do their explanations of why they claim those publications to be limited match the legal definition.

LAMCO and Consuelo Corretjer's sole evidence in support of their claim of limited publication is the answer given by LAMCO's Copyright & Catalog Administrator, Alberto Suárez, to Interrogatory Number 17. Doc. 74-13. That testimony is not admissible.

Rule 56 makes clear that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). In summary judgment proceedings, answers to interrogatories are subject to exactly the same infirmities as affidavits. Garside v. Osco Drug, Inc., 895 F.2d 46, 49 (1st Cir. 1990). They should be accorded no probative force where they are not based upon personal knowledge or are otherwise deficient. Id. Personal knowledge includes inferences and opinions, so long as they are grounded in personal observation and experience. United States v. Doe, 960 F.2d 221, 223 (1st Cir. 1992).

Here, Interrogatory Answer No. 17 rests on a declaration that affirmatively disclaims personal knowledge. Alberto Suárez verifies the interrogatory responses only "to the best of my knowledge and belief," and expressly states that his statements are based on information "available to and/or shared with me." Doc. 74-13. That language confirms that the assertions in Answer No. 17 are derived from secondhand sources—be them materials reviewed, conversations held, or information conveyed by others—not from Suárez's own perception.

A declaration grounded in what was "shared" with the declarant is, by definition, not testimony from personal knowledge. The content of Answer No. 17 reinforces that conclusion. Rather than identifying specific contemporaneous documents or firsthand observations establishing limited publication, the Answer launches into a sweeping

historical narrative concerning political repression in Puerto Rico from the 1930s through the 1970s. It proceeds to assert that Corretjer shared works only with sympathetic individuals, that surviving copies are scarce, that no explicit permission for reproduction was given, and that an "implicit and generally understood prohibition" on dissemination existed. Nowhere does the Answer establish that Suárez personally observed any of that. The narrative spans decades before Suárez's involvement—and probably birth—and concerns events for which no foundation of personal perception is laid.

Significantly, Answer No. 17 repeatedly frames its assertions as to LAMCO's –not Suarez's– knowledge:

> To LAMCO's knowledge, most if not all surviving copies are few and far between and are part of private collections. Based on the many challenges in obtaining actual copies of these titles, to LAMCO's knowledge, Corretjer never gave explicit permission for further reproduction of the titles in question, and as discussed, given the prevailing political and cultural climate, there would have been an implicit, if not understood prohibition on widespread dissemination (i.e., general publication)

Doc. 74-13, p.16. Such phrasing underscores the absence of Suárez's personal knowledge. The assertion that "given the prevailing political and cultural climate, there would have been an implicit, if not understood prohibition on widespread dissemination" is particularly illustrative of the lack of personal knowledge defect. The prohibition is an essential element for proving "limited publication", see White v. Kimmell, 193 F.2d at 746-47. Yet LAMCO and Consuelo Corretjer seek to prove it through a catalog administrator speculating about the mental states and understandings of unidentified recipients decades ago.

It is also demonstrable that Suárez is repeating things told to him of which he knows nothing about and are manifestly false. For instance, he states in Statement of Fact No. 20, that Corretjer produced his works "outside of traditional and distribution channels." Doc. 74-1, ¶ 20. Yet, *Yerba Bruja*, was printed at Imprenta Venezuela, 74-5, a commercial

printer at the time that published works by many well-known Puerto Rican poets. Exhibit B, José Emilio González, "La poesía puertorriqueña de 1945 a 1963 *Asomante* (1964) listing Imprenta Venezuela as the publisher for numerous books of poetry by a wide range of poets, including; *Laureles* (1940) and *Siemprevivas* (1940) by Ramón Negrón Flores (pp.52-53), *El oro en la espiga* (1941) (p. 53) by Graciany Miranda Archilla; *Barro* (1945) and *Anclas de oro* (1945) by Evaristo Ribera Chevremont (p. 54), *Antología* Poética (1941 (p. 54); *Poemas de la vida breve* (1940) by Luis Hernández Aquino (p.55); *Yumbra* (1943) by Samuel Lugo (p.55), *En voz baja* (1944) by Manuel Joglar Cacho (p.55), *Romancero de Cofresí* (1942) by Gustavo Palés Matos, (p. 56); *Huella-sombra y cantar* (1943) by Francisco Manrique Cabrera (p.56), *AR* (1947) by Enrique Jiménez Solá (p.57), *Puesta de sol* (1948) by Alma Rubens (p. 58): *Derrumbe* (1948) by Carmen Demar (p.58); *Verbo* (1947) by Evaristo Ribera Chevremont (p. 58); *Cauce hondo* (1947) by Olga R. de Nolla (p. 59); *Las hogueras de cal* (1947) by Obdulio Bauzá, Espín (p.59); *Vuelo íntimo and Mar de sargazo* (1954) by Carmen Demar (p.61); *Creación* (1951) and *La llama pensativa* (1955) by Evaristo Ribera Chevremont (p. 62); *Faena íntima* (1955) and *Soliloquios de Lázaro* (1956) by Manuel Joglar Cacho (p.63), *Don Diego en "el Cariño"* (1956) and *Yerba bruja* (1957) by Juan Antonio Corretjer (p.64); *Las voces esperadas* (1956) by Obdulio Bauzá (p.65); *Gotas en mano* (1953), *Unas cuantas estrellas en mi camino* (1957) and *En Diluvio* (1958) by Violeta López Subirá (p. 69); *Mundo* Abierto (1958) by Hugo Magernat (p. 70); *El Ruiseñor Bajo el* Cielo (19556) by Ramón Felipe Medina (p. 70); Desnudez (1956) by Anagilda Garrastegui (p.70); *La vida que perdí y otros poemas de* separación (1958) by Hugo Margenat (p. 70); *Láminas de mi infinito* (1961) by Ángel Manuel Arroyo (p.71); *Montaña, Cielo y mar* (1962) by Emiliano Martínez Avilés (p.72);

*Ultimo surco* (1961) by Manuel Joglar Cacho (p.72), *Inefable Orilla* (1961) by Evaristo Ribera Chevremont (p.72); *Canto del amor infinito* (1962) and *Bajo el signo de Géminis* (1963) by Vicente Géigel Polanco (p. 73), *Ventana hacia lo último* (1961) by Hugo Margenat (p.74), *Hubo unos pinos claros* (1961) and *La piel pegada al almo* (1962) by Violeta López Suria, (p.74). *Distancias,* Doc. 74-4; *Pausa Para el Amor*, 74-8; and *Construcción del Sur*, 74-9, were printed in Cooperativa de Artes Gráficas Romualdo Real, Ave. F.D. Roosevelt, recognized by Puerto Rico's Department of Education as a San Juan printer. Exhibit C, Departamento de Instrucción Pública, *Anuario Bibliográfico Puertorriqueño* (1966), p. 383. *Alabanza en la Torre de Ciales*, 74-6, was printed in Talleres Gráficos Interamericanos, a printer that also did work for well-known mainstream magazines such as Angela Luisa. Exhibit D.

Because the statements in Interrogatory Answer No. 17 are not based on personal knowledge and instead rest on secondhand information and inference, they fail to meet the requirements of Rule 56(c)(4). Accordingly, it cannot support a finding that the Corretjer Works were subject to limited publication. The Court must disregard it for purposes of summary judgment.

As stated in Brown's "Motion for Summary Judgment as to Consuelo Corretjer" (Doc. 71): That *Yerba Bruja*—containing *Inriri Cahuvial, El Hijo, Ayuburi, Ahora Me Despido*, *Serenata*, *En la Vida Todo Es Ir,* and *Andando de Noche Sola*—was a general publication is demonstrated by the fact that on March 29, 1958, El Mundo newspaper published a book review of *Yerba Bruja* in a story titled "A book by Juan Antonio Corretjer". Doc. 71-3. The write up begins with the following statement: "Juan Antonio Corretjer offers us a new book of poems." The term "us" evidently means the general

public. Furthermore, on June 24, 1958, El Mundo published that *Yerba Bruja* had won first price by jurors of the Circulo Cultural Yaucano. Doc. 71-4. That *Construcción del Sur*—*Diana de Guilarte* and *En las Aguas del Inabón, El Nombre*—was a general publication is demonstrated by the fact that on April 1, 1973, the periodical Puerto Rico Ilustrado included Corretjer's *Construcción del Sur* in its section on "Libros de Puerto Rico" (Puerto Rico Books), identifying it as a 1972 publication. Doc. 71-8. That *Imagen de Borinquen 3: Distancias*—containing *Distancias*—was a general publication is demonstrated by the fact that on April 6, 1957, El Mundo newspaper published in a section titled "Libros Recibidos" (Books Received): "Distancias, Imagen de Borinquen 3, by Juan Antonio Corretjer, Guaynabo, 1957: cover and vignettes by Torres Martinó; printed by Ediciones Vel, Santurce, poem." Doc. 71-10. That *Alabanza en la Torre de Ciales*—containing *Oubao Moin*—was a general publication is demonstrated by the fact that on January 23, 1954, El Mundo newspaper published an article titled "Temario Isleño", by Juan Martínez Capo, stating that the Mexican July-August 1953 edition of the bimonthly magazine *Poesía de América*, had reviewed three works by Juan Antonio Corretjer, including *Alabanza en la Torre de Ciales*. Doc. 71-12. That *Pausa para el Amor*—containing *Dias Antes*—was a general publication is demonstrated by the fact that on December 3, 1967, the periodical Puerto Rico Ilustrado included Corretjer's *Pausa para el Amor* in its section on "Libros Recibidos" (Received Books), identifying it as a 1967 publication. Doc. 71-14.

Corretjer works were also mentioned in monthly literary publications. The April 1958 issue of *Artes y Letras, Mensuario de Cultura*, included a review of *Yerba Bruja* in its "Libros y Revistas" section, stating that by that time Corretjer had published sixteen books. Exhibit E. His poetic works were even discussed in French literary magazines. See

Exhibit F, Luis de Arrigoitia, *Cuatro poetas puertorriqueños: José de Diego, Luis Lloréns Torres, Luis Pales Matos, Juan Antonio Corretje*r, Caravelle. Cahiers du monde hispanique et luso-brésilien, Année 1972 18 pp. 59-76 (https://www.persee.fr/doc/carav_0008-0152_1972_num_18_1_1849).

This level of open critical engagement, including Mexican and French publications, is wholly incompatible with the notion of limited publication. Limited publication requires dissemination to a defined and restricted class for a circumscribed purpose, accompanied by retention of control over further copying or diffusion. Here, by contrast, the works were printed in book form, reviewed in newspapers and literary journals, and discussed internationally—demonstrating that they were released into general circulation. Such objective acts of public dissemination are the hallmark of general publication, not limited publication.

Admissibility issues aside, LAMCO's Interrogatory Answer No. 17 does not satisfy the doctrinal requirements for limited publication under the controlling case law. It substitutes political narrative and sociological characterization for the legally operative elements the courts have repeatedly required, namely, distribution to a definitely selected class; for a defined and restricted purpose; without the right of further diffusion; and with retention of dominion and control over the tangible copies.

LAMCO and Consuelo Corretjer have not shown that publication was to a "definitely selected group" as required in White. The interrogatory answer repeatedly uses indeterminate phrases: "friends and acquaintances," "artists, professors, and intellectuals," "people interested in his ideas," "a small group of people," and "those not afraid of being associated with him." "Limited" in the legal sense, is a "definitely selected group." It does

not mean merely "some people" or "a particular type of audience." It means a defined group that is concrete and ascertainable (e.g., specific students in a course as in White; specific licensees as in Patterson; specific congregations as in Soc'y of Holy Transfiguration Monastery, Inc.). We do not have that here.

Limited publication requires not only a restricted class, but a *restricted purpose*. White, 193 F.2d at 746–47. The interrogatory answer does not identify any circumscribed purpose—such as editorial review, classroom instruction, or licensed exhibition. Instead, it describes dissemination to share ideas, advance political goals, and circulate pamphlets within a movement. That is expressive distribution for communicative consumption, not a narrowly confined functional use.

In Burke v. National Broadcasting Co., Inc., the film was provided for university lectures and non-commercial broadcast, and the original was returned. In Patterson, exhibition copies were subject to explicit no-charge restrictions and retained control. Here, there is no evidence of any stated limitation on use beyond generalized claims of restraint based on political repression. The works were distributed to be read and absorbed—precisely the purpose of general publication.

White makes clear that limited publication must occur "without the right of diffusion, reproduction, distribution or sale." The interrogatory answer concedes there was no "explicit" prohibition on reproduction and instead posits an "implicit" or "generally understood" prohibition inferred from political climate. That is legally insufficient.

An "implicit" social understanding derived from repression is not a legal restriction. There is no evidence of non-duplication clauses, return requirements, numbering systems,

or any retained possessory control. Once books were handed to recipients, nothing in the answer shows Corretjer retained dominion over them.

The Suarez declaration acknowledge that the works were "published" in 1953, 1957, 1965, 1967, and 1972, and physical copies were distributed to people without restriction. Copies were distributed permanently; there was no requirement of return; and no limitation on retention. The interrogatory response does not claim copies were loaned subject to recall. It describes completed transfers of tangible copies—exactly what the 1909 Act treated as publication.

The extensive narrative regarding the Gag Law, surveillance, and persecution does not substitute for doctrinal elements. The publication inquiry under the 1909 Act is objective and transactional. Courts assess the *acts of dissemination*, not the sociopolitical motives behind them. Small print runs do not equal limited publication. "Grey literature" is not a statutory category. The 1909 Act did not condition publication on commercial success, bookstore placement, academic recognition, or mainstream acceptance. A book may be politically marginalized and still be generally published. The legal question is whether copies were placed into circulation without retained control. The interrogatory answer admits they were.

The assertion that surviving copies are "few and far between" is irrelevant. Scarcity decades later does not establish restricted dissemination at the time of publication. Limited publication turns on retained dominion at the moment of distribution, not on later availability in private collections. The unsubstantiated suggestion that the works were not sold in bookstores and were instead procured directly from Corretjer is immaterial. Direct

distribution by an author to readers is still publication if copies are transferred without restriction. The 1909 Act did not require commercial intermediaries.

In short, LAMCO and Consuelo Corretjer cannot sustain their burden of proving that the twelve poems at issue were subject to limited publication under the 1909 Act. The undisputed facts establish that the works were printed in book form in 1957, 1965, 1967, and 1972 without copyright notice, were distributed without demonstrated restriction, and were openly reviewed and discussed in newspapers, local and international literary journals, and cultural publications. That pattern of public dissemination is the hallmark of general publication. LAMCO's sole contrary proof—an interrogatory response grounded in "knowledge and belief" and historical conjecture—fails Rule 56's personal knowledge requirement and, even if considered, does not demonstrate distribution to a definitely selected group, for a limited purpose, with retained dominion over copies.

Under the governing law, publication without statutory notice irrevocably placed these works in the public domain. Because works in the public domain cannot be resurrected through later registration, LAMCO's and Consuelo Corretjer's claimed copyrights in these poems are invalid as a matter of law.

## II. LAMCO'S COPYRIGHT REGISTRATIONS ARE INVALID

LAMCO registered *Yerba Bruja* in 2008, TX 7-207-339, and *Ahora Me Despido, Serenata*, and *Inabón Yunez*, PA 1-285-742, in 2005. As in the first Brown v. LAMCO, suit, LAMCO cannot meet the burden of proving their validity.

Under 17 U.S.C. § 410(c), a certificate of registration constitutes prima facie evidence of validity only if registration is made within five years after first publication. Where the gap exceeds five years, the statute expressly provides that: "[t]he evidentiary

weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court." 17 U.S.C. § 410(c). As judge Fuste said in the first Brown v. LAMCO suit:

> We do not find Defendants' [LAMCO's] assertions, even taken in the light most favorable to their case, sufficient to constitute prima-facie evidence of ownership of a valid copyright. Numerous federal courts have held that in cases where, as here, a certificate of registration is registered more than five years after the first publication of the work, the registration does not constitute prima-facie evidence that the copyright is valid, and the party alleging infringement bears the burden to prove validity. See Sem-Torq, Inc. v. K Mart Corp., 936 F.2d 851, 854 (6th Cir. 1991) (where a work was first published in 1982 and the copyright was registered in 1988, the district court was not bound to accept the validity of the copyright); Dollcraft Industries, Ltd. v. Well-Made Toy Mfg. Co., 479 F. Supp. 1105, 1114 (E.D.N.Y. 1978) (where a work falls outside the statutory presumption of 17 U.S.C. § 410(c), plaintiff carries the burden of proving ownership of a valid copyright); Tuff 'N' Rumble Management, Inc. v. Profile Records, Inc., 1997 U.S. Dist. LEXIS 4186, at *6–7 (S.D.N.Y. 1997) (when work was published 18 years prior to the registration certificate, plaintiff has the burden of proving the validity of the copyright).
>
> Congress added the five-year limitation in 17 U.S.C. § 410(c) on the ground that the longer the lapse of time between publication and registration, the less reliable are the facts stated in the certificate. See 3 Nimmer on Copyright § 12.11. Where the gap between first publication and registration exceeds five years, the certificate does not enjoy automatic prima facie status; rather, it is within the district court's discretion to determine the evidentiary weight to be accorded to the registration. Cabrera v. Teatro del Sesenta, Inc., 914 F. Supp. 743, 745 (D.P.R. 1995).

Brown v. LAMCO, 2006 WL 8450668, 05-cv-01242-JAF.

LAMCO and Consuelo Corretjer have acknowledged in the Statement of Material Facts, Doc. 74-1 ¶¶29-30, that the *Yerba Bruja* book was published in 1957, that the poems *Ahora Me Despido* and *Serenata* –which appear in that book– were created before 1957, and that *Inabón Yunez* was published in 1972. Thus, LAMCO's 2005 and 2008 registrations have no prima facie validity as the registrations were made 51 years after *Yerba Bruja* was published and 33 years after *Inabon Yunez* was published.

As discussed in the previous section, their claim that these works were limited publications under the 1909 Copyright Act, and therefore not in the public domain, is unsupported by admissible evidence and contradicted by the uncontestable fact that the books were reviewed in the mainstream press, printed by commercial printers and discussed in literary magazines. As works in the public domain, any registration claiming copyright ownership is invalid. Brown v. Latin Am. Music Co., 498 F.3d 18, 23 (1st Cir. 2007) (a work that falls into the public domain, precludes forever any subsequent copyright protection of the published work).

For the same reason, Consuelo Corretjer cannot rely in LAMCO's February 3, 2000, PA 995-275 Registration to claim that the Corretjer works are registered.

As acknowledged in the Statement of Fact, Doc. 74-1 *Oubao Moin* was published in 1965 (¶11), *Inriri Cahuvial*, *El Hijo*, *Andando de noche sola*, *En la vida todo es ir*, and *Ayuburi*, in 1957 (¶8), *Dia Antes* in 1967 (¶12), *Distancias* in 1957 (¶7), *Diana de Guilarte* and *Inabon Yunes*, in 1972 (¶18). Those are the works at issue in this case included in the PA 995-275 Registration. Consequently, those registrations were made within a range of 28 to 43 years after publication. As registrations with no prima facie validity, LAMCO has failed to prove their validity.

As discussed previously, LAMCO's and Consuelo Corretjer's claim that these poems appeared in works of limited publications under the 1909 Copyright Act is unsupported by admissible evidence and contradicted by the uncontestable fact that the books were reviewed in the mainstream press, printed by commercial printers and discussed in literary magazines. Those works are, therefore, in the public domain. As works in the public domain, any registration claiming copyright ownership is invalid.

## III. BROWN HAS NOT UNLAWFULLY COPIED THE CORRETJER WORKS

For twelve of the thirteen works at issue in the case –*Distancias, Inriri Cahuvial, El Hijo, Ayuburi, Serenata, En la vida todo es ir, Andando de noche sola, Ahora Me Despido, Oubao Moin, Dia Antes, "En las Aguas del Inabón, El Nombre (Inabon Yunes),* and *Diana de Guilarte*–, Brown was free to use them because, as argued in the previous sections, they are in the public domain. Once a work is in the public domain, it is "freely subject to copying and performance without the owner's permission." Perea v. Editorial Cultural, Inc., 13 F.4th 43, 52 (1st Cir. 2021).

As to the last remaining work, *Boricua en la luna*, Brown was authorized to put it to music by Juan Antonio Corretjer. He asserts that Corretjer personally gave him the poem and asked him to put it to music. Doc. 71-18. That permission need not be in writing. The Copyright Act requires a writing only for transfers of copyright ownership or exclusive licenses, not for non-exclusive licenses authorizing derivative works. See 17 U.S.C. § 204(a); Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 558–59 (9th Cir. 1990) (holding that a non-exclusive license "may be granted orally, or may even be implied from conduct"); Asset Mktg. Sys., Inc. v. Gagnon, 542 F.3d 748, 754–55 (9th Cir. 2008) (same).

LAMCO and Consuelo Corretjer argue that Brown's claim of authorization, "is supported by nothing other than an unauthenticated, hearsay statement supposedly made by Corretjer." Doc. 74, p. 22. That "any alleged permission granted by Corretjer would unquestionably constitute inadmissible hearsay under Fed. R. Evid. 804(a)(4)." Id. This statement misapprehends the hearsay rule.

Fed. R. Evid. 804(a)(4) does not make a statement inadmissible. It merely defines when a declarant is "unavailable" (including death). Unavailability is a prerequisite to

certain hearsay exceptions under Rule 804(b), but it is not itself a hearsay bar. Citing Rule 804(a)(4) as the ground for exclusion reflects a doctrinal error: analysis must begin with Fed. R. Evid. 801 and the definition of hearsay. For if the statement by itself is not hearsay, there is no need to examine if it falls under the exceptions. And that is the case here.

LAMCO's hearsay objection fails under Rule 801(c). Under the well-established "verbal acts" doctrine statements that themselves affect legal rights—such as words of offer, acceptance, consent, or authorization—are not hearsay because they carry independent legal significance. See Preferred Props., Inc. v. Indian River Estates, Inc., 276 F.3d 790, 798–99 (6th Cir. 2002); Robertson v. U.S. Bank, N.A., 831 F.3d 757, 764 (6th Cir. 2016); Wright & Miller § 7005. As the Advisory Committee explains, the rule excludes from hearsay the entire category of "verbal acts" and "verbal parts of an act," in which the statement itself affects the legal rights of the parties. Fed. R. Evid. 801(c), Advisory Committee Note. In other words, statements that have independent legal significance—i.e., that constitute the very operative words creating authorization—are not hearsay at all. When the existence of the statement itself has legal consequences, it falls outside Rule 801(c).

Here, Brown offers Corretjer's statement to establish that permission was verbally granted. That is a quintessential verbal act. The legal significance lies in the utterance itself—the granting of authorization to set the poem to music. Because legal consequences flow from the fact that the words of authorization were spoken, Brown's testimony recounting those words constitutes evidence of a verbal act and is not hearsay under Rule 801(c).

Brown's statement carries evidentiary weight because it is supported by the documentary record and Consuelo Corretjer's decades long conduct His recollection is that Corretjer gave the poem to him at a concert in Ponce. Doc 71-18. The copy of *Boricua en la Luna* contains the handwritten note "Juan A Corretjer, Guaynabo 1976" note. Doc 74-1. The September 13, 1976, *Distancias* concert leaflet confirms that Brown was publicly performing musical adaptations of Corretjer's poetry during the very month the poem *Boricua en la luna* is dated. Doc. 71-15.

Further corroboration appears in *Para Que Los Pueblos Canten*, published July 31, 1976—mere weeks before the September concert and poem delivery. Doc. 71-18. In that book, Corretjer expressly praised Brown and other musicians for transforming his poetry into song and bringing it "to the heart of Puerto Rico."

It would be incongruous to conclude that Corretjer would publicly praise Brown's musical adaptations, attend a concert of those musical adaptations, and there hand over a poem to Brown without intending that he put it to music.

Consuelo Corretjer's 2021 registration of *Boricua en la luna* and her declaration, Doc. 74-21, are further confirmation of authorization. In it, she claimed ownership of the words to *Boricua en la Luna* by referencing Brown's 1988 derivative registration, where he claimed ownership of the music and not the words. She referenced it as the "previous registration," thereby treating it as legally operative. If she thought Brown's derivative work to be unauthorized, she would have contested its validity. Instead, she did the opposite, she relied on it.

Her declaration now only confirms that she has believed all along that Brown was authorized by her father:

> Previously, my understanding of Brown's position was that my father gave him permission to record musical versions of my father's poems. It was not until Brown started claiming he never needed my father's permission because his poems are "in the public domain," that I realized his narratives were incorrect.

Doc. 74-21. That statement does not establish lack of authorization. To the contrary, it affirms that for decades she believed her father had granted Brown permission to record musical versions of his poems. That is an acknowledgment that Brown's use was understood to be authorized.

Her subsequent change of view is not grounded in newly discovered facts concerning her father's conduct. She does not assert that her father denied permission or objected to Brown's musical adaptations. Rather, she explains that her shift in position occurred after Brown articulated a public-domain argument regarding certain poems. But whether some works are in the public domain is a legal question that turns on objective publication facts, not on personal disagreement between the parties.

Brown has consistently maintained, including in the earlier litigation two decades ago, that certain Corretjer poems entered the public domain because they were published without statutory notice. See Brown v. Latin Am. Music Co., 498 F.3d 18, 20 (1st Cir. 2007). That position concerns the legal status of specific works under the 1909 Act. It does not contradict the separate and consistent factual assertion that Corretjer approved of Brown's musical adaptations. Indeed, Corretjer publicly expressed appreciation for Brown's work in *Para que los pueblos canten*, Doc. 71-18, published in 1976 by Consuelo Corretjer.

Brown's legal argument that authorization was unnecessary for certain poems because they are in the public domain does not negate the historical fact of Corretjer's approval. More importantly, it provides no factual basis to contend that *Boricua en la luna*

was unauthorized. That determination must rest on evidence of what occurred between Corretjer and Brown—not on later disagreement about legal theory.

As to that, Consuelo Corretjer offers no competent testimony that her father refused or withheld permission, no first-hand account of any denial. On the contrary, she admits that she has always considered Brown was authorized. Her declaration therefore does not create a genuine dispute as to authorization for *Boricua en la luna*.

In sum, for twelve of the thirteen works at issue, Brown's use was lawful because those works reside in the public domain and are therefore "freely subject to copying and performance without the owner's permission." Perea v. Editorial Cultural, Inc., supra. As to the sole remaining work, *Boricua en la luna*, the undisputed record establishes that Brown acted pursuant to authorization granted directly by Juan Antonio Corretjer.

The record presents no unlawful copying. Thus, LAMCO's infringement claim fails as a matter of law.

## CONCLUSION

Counterclaim-Plaintiffs are not entitled to summary judgment because they cannot establish—on admissible evidence—that they own enforceable copyrights in the works they accuse Brown of "copying." Their effort to avoid the 1909 Act's notice rule rests on an incompetent "knowledge and belief" narrative that does not satisfy Rule 56(c)(4) and does not prove the doctrinal elements of limited publication in any event. The objective record shows general publication without notice and widespread public engagement with the books—facts incompatible with any claim of retained dominion and restricted circulation.

Because Counterclaim-Plaintiffs cannot carry their threshold burden on ownership and validity, their infringement claims fail. And even as to Boricua en la luna, the record supports authorization to create a musical setting—permission that may be oral and whose operative words are admissible as a verbal act. For all these reasons, the Court should deny Counterclaim-Plaintiffs' Motion for Summary Judgment in its entirety.

WHEREFORE, Brown respectfully requests that this Honorable Court deny LAMCO and Consuelo Corretjer's Motion for Summary Judgment.

RESPECTFULLY SUBMITTED

In San Juan, Puerto Rico, this 20 January 2026.

**s/ Patricia Rivera MacMurray**
Patricia Rivera MacMurray
USDC 222309
E-mail: prm3@mac.com
250 Tetuán, San Juan, PR 00901
Tel. 787 607-3700

I HEREBY CERTIFY that on this date, I electronically filed the foregoing using the CM/ECF system, which will send a notification to all parties in the case.

**s/ Patricia Rivera MacMurray**