**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**ROY BROWN**,
Plaintiff,

v.

**LATIN AMERICAN MUSIC CO.**,
Defendant.

**CIVIL CASE NO.**: 3:24-cv-01523 (MAJ)

## LAMCO'S OPPOSITION TO BROWN'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE COURT: Comes now Defendant/Counterclaim-Plaintiff Latin American Music Co. ("LAMCO") through the undersigned attorneys, and respectfully states and prays:

## PRELIMINARY STATEMENT

Plaintiff Roy Brown's ("Plaintiff") Motion for Summary Judgment seeks to dismiss Defendant Latin American Music Co.'s ("LAMCO") remaining counterclaims related to three poems written by Juan Antonio Corretjer that were not subject to the 2005 litigation between the parties to this action, namely: "Ahora Me Despido," "Serenata," and "En las Aguas del Inabón, El Nombre" ("the Post-2005 Works"). Plaintiff attempts to argue that the Post-2005 Works reside in the public domain due to general publications, and therefore LAMCO cannot enforce its copyright rights therein. However, this argument is flawed as the Post-2005 Works were only subject to limited publications. As such, Plaintiff was not free to create derivative works based on the Post-2005 Works and has infringed on Defendant's copyright interests. Plaintiff's motion should be denied in its entirety.

## ARGUMENT

### I. THE POST-2005 WORKS WERE SUBJECT TO LIMITED PUBLICATION AND DID NOT FALL INTO THE PUBLIC DOMAIN

#### A. Standards Governing Limited and General Publication under the 1909 Act

Under the 1909 Copyright Act, if a work was generally published without a copyright notice, it lost its copyright protection; but if the publication was limited in nature, it did not lose protection even if it lacked proper notice. *See Technicon Med. Info. Sys. Corp. v. Green Bay Packaging Inc.*, 687 F.2d 1032, 1035 (7th Cir. 1982). As the First Circuit explained in *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, the statutory definition of publication "'in general constitutes a codification of the definition evolved by case law' before the 1976 Act" (quoting 1 M.B. Nimmer & D. Nimmer, *Nimmer on Copyright* § 4.04, at 4-20 (2001), which included "judicially crafted exceptions for limited publication: restricted distribution of the work that does not qualify as publication or trigger the notice requirement." 322 F.3d 26, 36 (1st Cir. 2003). According to the U.S. Copyright Office, a limited publication is defined as "the distribution of copies of a work to a definitely selected group with a limited purpose and without the right of diffusion, reproduction, distribution, or sale. A limited publication is not considered a distribution to the public and, therefore, is not publication." U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 1905.1 (3d ed. 2021) (citing *White v. Kimmell*, 193 F.2d 744, 746-47 (9th Cir. 1952)).

The First Circuit has consistently applied a two-pronged test similar to that articulated by the Copyright Office to determine whether a distribution constitutes limited publication: limited publication "occurs when tangible copies of the work are distributed, but to a *limited class of*

*persons* and for a *limited purpose*." *Burke v. Nat'l Broad. Co.*, 598 F.2d 688, 692 (1st Cir. 1979) (emphasis added). This definition requires both elements to be satisfied simultaneously.

As to the first element, for distribution to be limited, it must be restricted to a definitely selected and limited group of recipients. *Id.* at 693 (first prong satisfied where the plaintiff sent a film to a colleague in response to a specific request from that colleague). On the contrary, when a work is "made available to members of the public at large without regard to who they are or what they propose to do with it" the first element is not satisfied. *Id.* at 691. The second element, limited purpose, means that the distribution does not include the right of general diffusion, reproduction, distribution, or sale. *See id.* at 692-93 (second element satisfied where plaintiff's colleague's request was for specific educational purposes, and the plaintiff's permission "cannot be thought to have authorized any further use or other purpose").

Further, *unauthorized* general distribution by third parties does not divest copyright protection by injecting a work into the public domain. *See Soc'y of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory of Denver, Colorado*, 754 F. Supp. 2d 219, 225 (D. Mass. 2010), *aff'd sub nom. Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29 (1st Cir. 2012). This is because "'[A]n unauthorized user lacks not only the right, but also the ability to 'publish' an author's work and any attempt to do so is ineffective.'" *Id*. (quoting *Cipes v. Mikasa, Inc.*, 346 F. Supp. 2d 371, 375 (D. Mass. 2004)).

Corretjer's treatment of the Post-2005 Works satisfies both elements of the limited publication test and any unauthorized general publication—by Plaintiff or otherwise—does not constitute a legally viable publication that would divest the Post-2005 Works of copyright protection.

**B. The Post-2005 Works Were Only Subject to Limited Publications**

Plaintiff's entire argument for why the Post-2005 Works are in the public domain distills to two main points. First, Plaintiff argues that the fact of an author's political persecution fails to evidence that limited publication occurred. (ECF 65 at 7). Second, Plaintiff argues that newspaper reviews and third-party commentary on Corretjer's poems prove that general publication must have occurred. (*Id.* at 6). However, both arguments are fundamentally flawed and fail to refute that Corretjer's conduct established only limited publication of the Post-2005 Works.

As to the first argument, Plaintiff oversimplifies LAMCO's position. LAMCO does not claim that Corretjer's persecution on political grounds, considered in a vacuum, leads to a conclusion of limited publication; rather, it is *how Corretjer treated his works* in response to such persecution that establishes limited publication status. LAMCO explained, in painstaking detail, in its answer to Brown's Interrogatory No. 17, why all the Corretjer Works (including the Post-2005 Works) were only published on a limited basis. (*See* ECF 65-9 at 13-17). Relevant case law supports the notion that historical and social factors (such as political persecution) can directly influence how publication occurs (including with respect to the elements of limited publication) and should be evaluated when applying copyright doctrines. *See generally Soc'y of the Holy Transfiguration Monastery, Inc.*, 689 F.3d 29. Under severe political repression, authors like Corretjer routinely and deliberately restrict distribution to trusted individuals (i.e., the "definitely limited" "class of persons"), for the narrow purpose of sharing ideas with sympathetic individuals while avoiding government scrutiny, censorship, and/or abuse (i.e., the "limited purpose"), with implicit understanding that unauthorized broad reproduction could endanger both author and recipients. (*See* ECF 65-9 at 13-17).

Juan Antonio Corretjer was a poet and a journalist among other things, but his main commitment was as a champion for the independence of Puerto Rico, a posture he never renounced and that put him in jail several times and led to several failed attempts against his life. (*Id.* at 13). It is an uncontested fact that Corretjer was the victim of political persecution and repression all through his lifetime. (*Id.* at 14-15). He was followed, photographed, recorded, repressed, and constantly oppressed by a political system that feared his writings and ideas and had no space for dissention. (*Id.*). Corretjer circulated several works in 1957, including *Distancias* as a handwritten pamphlet and the book *Yerba Bruja* in 1957, which includes the works “Inriri Cahuvial,” “El Hijo,” “Ayuburi,” “Serenata,” “En la vida todo es ir,” “Andando de noche sola,” and “Ahora Me Despido.” (*Id.*). Corretjer shared these works only among a limited group of people that were interested in and sympathetic to his political ideas. (*Id.* at 15).

During the 1960s, Corretjer produced several literary works in limited editions which he shared only with a small group of people who sympathized with his philosophies. (*Id.* at 15). In 1965, Corretjer circulated the book *Alabanza a la Torre de Ciales*, which includes the work “Oubau Moin.” (*Id.*). In 1967, Corretjer circulated the book *Pausa para el Amor*, which includes the work “Dia Antes.” (*Id.*) The titles in question were all self-produced by Corretjer and a small group of friends and Corretjer had sole control over access to them. (*Id.*) Copies were only distributed among his small group of friends and acquaintances, who typically were artists, professors, and intellectuals, all of whom were politically aligned with Corretjer and favored Puerto Rico’s independence. (*Id.*) To LAMCO’s knowledge, most if not all surviving copies of the titles containing the Corretjer Works (including the Post-2005 Works) are few and far between and are part of private collections. (*Id.*) Corretjer never gave explicit permission for further reproduction

of these titles, and considering the prevailing political and cultural climate, there would have been an implicit, if not understood, prohibition on widespread dissemination. (*Id*.)

During the 1970s, Corretjer produced many works including *Construcción del Sur* in 1972, which includes the works "En las Aguas del Inabón, El Nombre (Inabon Yunes)," and "Diana de Guilarte." (*Id*. at 16.) Once again, he shared these works only among a small group of people interested in and sympathetic to his political ideas. (*Id.*)

The political nature and limited circulation of Corretjer's works, put in context with the repression he suffered under Puerto Rico's authorities at the time, define his literary production as "grey literature," a term used to describe material produced outside of traditional publishing and distribution channels. (*Id.*) Grey literature is characterized by small print runs, which by nature is a limitation on the general circulation of the work. (*Id*.) The fact that he shared some of his works as small-run pamphlets—a format usually used to disseminate political ideas that go under the radar to a select group of people *without the intention of widespread distribution*—is a clear example of limited publication. (*Id*.)

Plaintiff's argument that Corretjer's publications were "general" is not only legally incorrect, but it is disingenuous given that Plaintiff was and is aware of the factors discussed above. In a November 2020 interview about his own political persecution titled "Roy y su version de 'Boricua en la Luna'" ("Roy and his version of 'Boricua en la Luna'"), Brown stated that "I've dedicated many years of my life to this [referring to "Boricua en la Luna]". At no point when I did it [set the poem to music] did I think it would be a success because this man [Corretjer] was a persecuted person, and I was persecuted too." (*Id* at 17.) In his 2005 deposition Plaintiff testified that Corretjer gave him some of his books as gifts (*Id.*) as they were not circulated, and when asked if he ever purchased a Corretjer book in a bookstore, Plaintiff could not declare he did. (*Id.*). The

reason why Plaintiff could not purchase the Subject Works or any other Corretjer books is because the titles at issue were not sold in bookstores at the time they were released and could only be procured from Corretjer. (*Id.*).

Corretjer's history is a straightforward example of where limited publication occurs. An author carefully controlling distribution based on political trust and ideological alignment during periods of censorship and government oppression can create sufficiently defined boundaries. Indeed, limited publication has been found where the range and purpose of distribution did not suggest that the general public was free to obtain and use the work. *See Burke*, 598 F.2d at 692. While a distribution, to be limited, must communicate the contents of the work "without the right of diffusion, reproduction, distribution or sale," and must be "[r]estricted both as to persons and purpose," such "restrictions can be implied as well as express." *Id.* (internal citations omitted). *Cf. Am. Tobacco Co. v. Werckmeister,* 207 U.S. 284, 300 (1907) (holding that there is no general publication where artwork is exhibited and "there are bylaws against copies, or where it is *tacitly* understood that no copying shall take place, and the public are admitted ... on the *implied understanding* that no improper advantage will be taken of the privilege" (emphasis added)).

Corretjer's actions evidence his intent to maintain limitations on distribution of his writings, even if such restrictions were implied, and draw a clear line establishing limited publication, such that his circumscribed permission "cannot be thought to have authorized any further use or other purpose." *Burke*, 598 F.2d at 693. The case law supports such a finding. *See, e.g.*, *Allen v. Walt Disney Prods.*, 41 F. Supp. 134 (S.D.N.Y.1941) (finding no general publication where composer of a song had loaned manuscripts thereof to various musicians and had sent a copy to two different music companies and no copies had been sold and the composition was not printed until almost 30 years after it was written); *Patterson v. Century Prods., Inc.*, 93 F.2d 489

(2d Cir. 1937) (no general publication even though copies of the film at issue were circulated widely; the copies were sent only to non-profit groups to be shown for non-commercial purposes, with no authorization to copy them further and, apparently, with the understanding that they would be returned); *King v. Mister Maestro, Inc.*, 224 F. Supp. 101, 106-07 (S.D.N.Y. 1963) ("Advance text" copies of Rev. Martin Luther King, Jr.'s "I Have a Dream" speech were given to the press, and excerpts were later broadcast on national television and used in movie house newsreels; publication was limited because copies were given only to a specific group to assist it in covering the event, and were never offered to the public at large); *Est. of Martin Luther King, Jr., Inc. v. CBS, Inc.*, 194 F.3d 1211, 1215–17 (11th Cir. 1999) (release of a copyrighted work to the news media for contemporaneous coverage of a newsworthy event is only a limited publication of that work); *McCarthy & Fischer, Inc. v. White*, 259 F. 364, 364 (S.D.N.Y. 1919) (composer gave a copy of his song to a singer for performance but had not dedicated it to the public because "to give the song to a limited number of artists to sing" did not establish a "probability that any of the copies were sold, or that they were given out for any purpose but a limited use by a few vaudeville artists"); *Mills Music v. Cromwell Music*, 126 F. Supp. 54, 69-70 (S.D.N.Y. 1954) (finding that the singing of an author's composition on a radio broadcast would not be a publication; "the making of a single transcription of a musical composition for use by a radio station in broadcasting, would not constitute a 'publication' because the transcription would be made for a limited specific purpose."); *Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1452–54 (9th Cir. 1991) (the "Oscar" statue did not fall into the public domain by being publicly displayed or presented at the award ceremonies because "mere performance or exhibition of an artistic work does not amount to a publication"; distribution of the Oscar statue to the winners also did not constitute general publication because the winners were a limited select group).

Plaintiff argues that Corretjer did not limit distributing his work to a limited class of people and that Corretjer's small group of friends and acquaintances do not qualify. The First Circuit does not require mathematical precision in defining such groups, nor does Brown cite any authority for such a proposition. And, as noted above, when an author carefully controls distribution based on social and political circumstances, these conditions are sufficient to create the boundaries necessary for limited publication, *see, e.g.*, *Soc'y of the Holy Transfiguration Monastery, Inc.*, 689 F.3d 29, 45-46 (finding limited class of persons where booklets were dispersed to specific religious congregations and parishes), and Brown is not in a position to declare that Corretjer's actions and intentions were inadequate. *See e.g.*, *Conner v. Mark I, Inc.*, 509 F. Supp. 1179, 1181 (N.D. Ill. 1981) ("[I]t is only the actions of the copyright owner which will establish the existence of such constraints."). Nonetheless, Plaintiff states that "A legally cognizable selected group must be clearly delimited and identifiable ex ante. Groups defined by ideological alignment, cultural sympathy, or political interest are inherently open-ended and fluid," (ECF. 65 at 8) yet fails to provide any case law to support that point. The precision Plaintiff claims is necessary is contrary to the myriad cases cited above explaining that limited publication exists where the range and purpose of distribution did not suggest that the general public was free to obtain and use the work.

Here, as explained above, Corretjer only shared the Post-2005 Works with a small group of friends and acquaintances, who typically were artists, professors, and intellectuals, all politically aligned with him and took no action to suggest that the general public was free to obtain and use the work. (ECF. 65-5 at 13-17.) Corretjer's literature was not disseminated in a manner that suggested "[a]nyone was welcome to a copy." *Pub. Affs. Assocs., Inc. v. Rickover*, 284 F.2d 262, 271 (D.C. Cir. 1960), *vacated on other grounds*, 369 U.S. 111 (1962). (*See* ECF 65-9 at 13-17). In fact, it would have been counter to Corretjer's interest for the general public to obtain access

to these works. As such, it is clear that Corretjer's small group of friends with whom he shared the Post-2005 Works satisfies the first prong of the limited publication test, a "limited class of persons".

With respect to the second prong—limited purpose—Plaintiff goes on to argue that Corretjer did not affirmatively create a restriction on the limited group's rights to reproduce, redistribute, or further disseminate the works, and as such the Post-2005 Works are general publications. (ECF 65 at 8-9). However, a general publication necessitates an affirmative action on behalf of the copyright holder. *See Burke*, 598 F.2d at 693-94. Similar to the plaintiff in *Burke*, Corretjer shared the Subject Works with individuals who would know not to reproduce, redistribute, or further disseminate them because it would be counter to both their interests and Corretjer's. (ECF 65-9 at 15-16); *See Burke*, 598 F.2d at 692. Following the First Circuit's reasoning from *Burke*, the record establishes that Corretjer did not authorize any further use or purpose of the Post-2005 Works beyond sharing them with this limited group.

When contrasting the facts surrounding Corretjer's circulation of his works and the facts of the above-referenced cases with cases where general publication has been found, the differences could not be clearer. "In cases where general publication has been found, the creator had made his work available in a manner that suggested that any interested person could have a copy." *Burke*, 598 F.2d at 692; *see also, e.g.*, *Pub. Affs. Assocs., Inc. v. Rickover*, 284 F.2d 262, 266-71 (D.C. Cir. 1960), *vacated on other grounds*, 369 U.S. 111 (1962) (general publication found where copies of speeches were given to the press, sent to individuals both on request and without solicitation, and sent in batches of 50 to sponsors for distribution); *White v. Kimmell*, 193 F.2d 744, 745-47 (9th Cir. 1952) (general publication found where author distributed copies of manuscript to friends, acquaintances, and strangers alike, affirmatively telling many to pass them on and

authorizing some to make copies, with no limitations, no defined group or association, and no limit on the number of copies to be made or who could receive them upon "a mere request"); *Am. Visuals Corp. v. Holland*, 239 F.2d 740, 744 (2d Cir. 1956) (general publication found where plaintiff placed copies of his brochures on a hotel table during an convention and gave copies to insurance association for further distribution to member companies; while purpose of distribution was limited, no limit placed on who could obtain copies); *Conner v. Mark I, Inc.,* 509 F. Supp. 1179, 1181 (N.D. Ill. 1981) (general publication found where photographer submitted image to a newspaper "for the purpose of publication and general circulation. Anyone who desired a copy of the photograph could have obtained it simply by purchasing the particular edition of the newspaper in which it ran.").

Corretjer's literature was not disseminated in a manner that suggested that anyone was welcome to a copy. Like the plaintiff in *Burke*, Corretjer shared his writings with individuals who would inherently know not to reproduce, redistribute, or further disseminate them (i.e., small groups of friends and acquaintances, who typically were artists, professors, and intellectuals, all politically aligned with Corretjer) because doing so would run counter to both their interests and could have resulted in danger both to liberty and physical safety, and, as noted above, such limitations could be implicit. *See Burke*, 598 F.2d at 692. As such, Corretjer satisfied the second element of the limited publication test, a "limited purpose", and the Post-2005 Works are not in the public domain. Plaintiff cannot overcome this reality, and his papers show it, as they are nearly bare of case law, and the cases cited are either out of circuit or are the same as those cited herein, which support LAMCO's position, not Plaintiff's.

**C. Book Reviews and Newspaper Discussions Do Not Equate to General Publication**

Plaintiff also argues that mentions of books containing the Post-2005 Works in Puerto Rican newspapers and periodicals, somehow constitute proof of general publication of those works (and the poems contained therein). (ECF 65 at 6-7). However, despite the fact that Plaintiff provides no evidence demonstrating how the referenced periodicals came into possession of the works, even assuming Corretjer himself provided the Post-2005 Works to newspapers or periodicals, that action alone would not constitute general publication given that copies would have been sent to a single recipient (i.e., the newspaper) without the intention of further dissemination for the narrow purpose of reviewing the works.

*King v. Mister Maestro, Inc.*, 224 F. Supp. 101 (S.D.N.Y. 1963), is instructive. The district court in that case held that the Rev. Martin Luther King, Jr.'s speech, "I Have a Dream," was not in the public domain even though "advance texts were given to the press, and excerpts were later broadcast on national television and used in movie house newsreels. *Id.* at 103-104. And although countless people heard and saw the speech given, the oral delivery was mere performance, not publication. *Id.* at 106-07. The court held that publication occurred when the text was given to the press but that it was "limited" rather than "general", as tangible copies were given only to a specific group to assist it in covering the event, and were never offered to the public at large. *Id*. at 107. *King* directly contradicts Plaintiff's argument that providing the Corretjer Works to the newspaper or periodicals counted as general publications. That newspaper and periodicals informed the public at large about the Corretjer Works is irrelevant. As such, Plaintiff's argument fails under either analysis and the Corretjer Works did not fall into the public domain via general publication.

The best Plaintiff can muster are vague and extremely limited statements by the newspapers that allegedly received Corretjer's books. *First*, he claims that a reviewer in *El Mundo* referred to Corretjer providing "us" with new poetry, and that "us" refers to "the paper's readers," so that must mean that Corretjer intended for the world to have access to his works. (*See* ECF 65 at 6). This is speculative nonsense. Plaintiff provides absolutely no evidence what the word "us" references, whether it means *El Mundo*'s readers, the editorial staff, or the public at large. And even assuming "us" meant the public, that the reviewer believed Corretjer meant to or did provide the public with his works is a decades-old opinion by a non-party unsupported by facts or evidence that is, at best, inadmissible hearsay. Plaintiff's claim that *El Mundo* later published a notice that *Yerba Bruja* had won a literary prize (*see id.*) is similarly immaterial and irrelevant. Plaintiff does not explain the significance of the book winning a prize to general publication, let alone any justification (or proof) that *Yerba Bruja*'s submission to a competition means that the book was sent to anyone other than those judging the contest. (*See id.*)

*Second*, Plaintiff argues that *Construcción del Sur* must have been generally published because on April 1, 1973, *Puerto Rico Illustrado* "included Corretjer's [book] in its section on 'Puerto Rico Books'" and identified it as being a 1972 "publication." (*Id.* at 6). *Construcción del Sur* was, indeed, "Puerto Rico Book," given that it was written by a Puerto Rican author and circulated in Puerto Rico. This is irrelevant, however, as such a bland statement of the obvious has no material significance, let alone legal bearing, on whether *Construcción del Sur* was subject to general publication (and, as discussed above with respect to *Yerba Bruja*, it would not have been given its limited distribution). And that *Puerto Rico Illustrado* referred to as a "publication" is also a red herring. Saying something is a publication does not mean it was generally published as a

matter of copyright law, especially bearing in mind that the statement is a hearsay opinion by a non-party made 44 years ago.

Brown's entire justification is based on unsupported speculation about the motivations of newspapers from decades ago and relies on a massive leap in logic that because a newspaper announced that a book had been released or reviewed it, then it must have been "made available to members of the public at large without regard to who they are." (*Id.* at 7; *see also id.* at 11). He cites no evidence, no authority, and no sources of any kind; this kind of rank speculation is antithetical to summary judgment. *See, e.g.*, *Reynoso v. Dejoy*, 757 F. Supp. 3d 190, 193–94 (D.P.R. 2024) ("It is well established that a party cannot rely on 'conclusory allegations, improbable inferences, and unsupported speculation' at the summary judgment stage.") (quoting *López–Carrasquillo v. Rubianes*, 230 F.3d 409, 412 (1st Cir. 2000)).

***

*Finally*, Brown makes a halfhearted argument accusing LAMCO of attempting to skirt the publication issues raised by the 1909 Act by stating that the Post-2005 Works were first published on January 1, 1989. (*See* ECF 65 at 10-11). Not so. As discussed in LAMCO's summary judgment motion, the dates of first publication pertaining to the Post-2004 Works were incorrect based on conflicting guidance from the Copyright Office at the time. (*See* ECF 74-23 at 3-5). Even so, at no point has LAMCO argued that the 1909 Act did not apply to the Post-2005 Works; if it were taking that position, there would be no point in arguing that the Post-2005 Works were subject only to limited publication rather than general publication, as this distinction only matters when works are published without copyright notices (which were required under the 1909 Act and are not required under the 1976 Act).

**CONCLUSION**

WHEREFORE, Defendant respectfully requests that this Court deny Plaintiff's Motion for Summary Judgment in its entirety and for such other and further relief this Court deems just and proper.

Dated: February 20, 2026

Respectfully Submitted,

**COWAN DEBAETS ABRAHAMS & SHEPPARD, LLP**
Scott J. Sholder *(admitted pro hac vice)*
60 Broad Street, 30th Floor
New York, New York 10004
Telephone: (212) 974-7474
Fax: (212) 974-8474
ssholder@cdas.com

**DMR Law**
Javier Micheo Marcial
USDC-PR No. 305310
Capital Center Building
239 Arterial Hostos Avenue
South Tower – Suite 1101
Hato Rey, P.R. 00918
787-331-9970 / 786-710-8138
j.micheo@dmrpr.com

*Attorneys for Counterclaim-Plaintiffs*