**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **ROY BROWN**, Plaintiff,<br><br>v.<br><br>**LATIN AMERICAN MUSIC CO.**, Defendant. | **CIVIL CASE NO.**: 3:24-cv-01523 (MAJ) |

**CONSUELO CORRETJER'S OPPOSITION TO BROWN'S MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE COURT: Comes now Counterclaim-Plaintiff Consuelo Corretjer, through the undersigned attorneys, and respectfully states and prays:

**PRELIMINARY STATEMENT**

Plaintiff Roy Brown's ("Plaintiff") Motion for Summary Judgment as to Consuelo Corretjer ("Consuelo") seeks to dismiss Consuelo's counterclaims—based on her own independent copyright interests —as to all 13 of the Corretjer poems at issue ("the Corretjer Works"). Plaintiff attempts to argue that 12 of the 13 Corretjer Works reside in the public domain because they were subject to general publications and that the final poem, *Boricua en la Luna*, was given to Plaintiff by Corretjer and that Plaintiff's musical adaptation of the poem is an authorized derivative work. Plaintiff's arguments are fatally flawed.

First, his argument as to the 12 Corretjer Works fails as the Corretjer Works were only subject to limited publications. As such, Plaintiff was not free to create derivative works based on the Corretjer Works and has infringed on Consuelo's copyright interests.

Second, Plaintiff's musical adaptation of *Boricua en la Luna* was not an authorized derivative work as Plaintiff cannot establish the existence of a license for his adaptation and ongoing uncompensated exploitation of the poem. Plaintiff's motion should be denied in its entirety.

## ARGUMENT

### I. THE CORRETJER WORKS WERE SUBJECT TO LIMITED PUBLICATION AND DID NOT FALL INTO THE PUBLIC DOMAIN

#### A. Standards Governing Limited and General Publication under the 1909 Act

Under the 1909 Copyright Act, if a work was generally published without a copyright notice, it lost its copyright protection; but if the publication was limited in nature, it did not lose protection even if it lacked proper notice. *See Technicon Med. Info. Sys. Corp. v. Green Bay Packaging Inc.*, 687 F.2d 1032, 1035 (7th Cir. 1982). As the First Circuit explained in *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, the statutory definition of publication "'in general constitutes a codification of the definition evolved by case law' before the 1976 Act" (quoting 1 M.B. Nimmer & D. Nimmer, *Nimmer on Copyright* § 4.04, at 4-20 (2001), which included "judicially crafted exceptions for limited publication: restricted distribution of the work that does not qualify as publication or trigger the notice requirement." 322 F.3d 26, 36 (1st Cir. 2003). According to the U.S. Copyright Office, a limited publication is defined as "the distribution of copies of a work to a definitely selected group with a limited purpose and without the right of diffusion, reproduction, distribution, or sale. A limited publication is not considered a distribution to the public and, therefore, is not publication." U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 1905.1 (3d ed. 2021) (citing *White v. Kimmell*, 193 F.2d 744, 746-47 (9th Cir. 1952)).

The First Circuit has consistently applied a two-pronged test similar to that articulated by the Copyright Office to determine whether a distribution constitutes limited publication: limited publication "occurs when tangible copies of the work are distributed, but to a *limited class of persons* and for a *limited purpose*." *Burke v. Nat'l Broad. Co.*, 598 F.2d 688, 692 (1st Cir. 1979) (emphasis added). This definition requires both elements to be satisfied simultaneously.

As to the first element, for distribution to be limited, it must be restricted to a definitely selected and limited group of recipients. *Id.* at 693 (first prong satisfied where the plaintiff sent a film to a colleague in response to a specific request from that colleague). On the contrary, when a work is "made available to members of the public at large without regard to who they are or what they propose to do with it" the first element is not satisfied. *Id.* at 691. The second element, limited purpose, means that the distribution does not include the right of general diffusion, reproduction, distribution, or sale. *See id.* at 692-693 (second element satisfied where plaintiff's colleague's request was for specific educational purposes, and the plaintiff's permission "cannot be thought to have authorized any further use or other purpose").

Further, *unauthorized* general distribution by third parties does not divest copyright protection by injecting a work into the public domain. *See Soc'y of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory of Denver, Colorado*, 754 F. Supp. 2d 219, 225 (D. Mass. 2010), *aff'd sub nom. Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29 (1st Cir. 2012). This is because "'[A]n unauthorized user lacks not only the right, but also the ability to 'publish' an author's work and any attempt to do so is ineffective.'" *Id.* (quoting *Cipes v. Mikasa, Inc.*, 346 F. Supp. 2d 371, 375 (D. Mass. 2004)).

Corretjer's treatment of the Corretjer Works satisfies both elements of the limited publication test and any unauthorized general publication—by Plaintiff or otherwise—does not

constitute a legally viable publication that would divest the Corretjer Works of copyright protection. For the avoidance of doubt, the below analysis applies to the 12 Corretjer Works aside from *Boricua en la Luna*, as Plaintiff does not dispute that this poem was unpublished and does not contend that it is in the public domain. (*See* ECF 74 at 6, 16).

**B. The Corretjer Works Were Only Subject to Limited Publications**

Plaintiff's entire argument for why the Corretjer Works are in the public domain fails for two main reasons. First, Plaintiff ignores the fact that an author's political persecution can indicate and influence their actions to ensure a limited publication of their work. Second, Plaintiff incorrectly argues that newspaper reviews and third-party commentary on Corretjer's poems prove that general publication must have occurred. (ECF 71 at 8-10). However, both arguments are fundamentally flawed and fail to refute that Corretjer's conduct established only limited publication of the Corretjer Works.

As to the first defect in Plaintiff's argument, Plaintiff oversimplifies Consuelo's position. Importantly, Consuelo does not claim that Corretjer's persecution on political grounds, considered in a vacuum, leads to a conclusion of limited publication; rather, it is *how Corretjer treated his works* in response to such persecution that establishes limited publication status. LAMCO explained, in painstaking detail, in its answer to Brown's Interrogatory No. 17, why all the Corretjer Works were only published on a limited basis. (*See* ECF 65-9 at 13-17). Relevant case law supports the notion that historical and social factors (such as political persecution) can directly influence how publication occurs (including with respect to the elements of limited publication) and should be evaluated when applying copyright doctrines. *See generally Soc'y of the Holy Transfiguration Monastery, Inc.*, 689 F.3d 29. Under severe political repression, authors like Corretjer routinely and deliberately restrict distribution to trusted individuals (i.e., the

"definitely limited" "class of persons"), for the narrow purpose of sharing ideas with sympathetic individuals while avoiding government scrutiny, censorship, and/or abuse (i.e., the "limited purpose"), with implicit understanding that unauthorized broad reproduction could endanger both author and recipients. (*See* ECF 65-9 at 13-17).

Juan Antonio Corretjer was a poet and a journalist among other things, but his main commitment was as a champion for the independence of Puerto Rico, a posture he never renounced and that put him in jail several times and led to several failed attempts against his life. (*Id.* at 13). It is an uncontested fact that Corretjer was the victim of political persecution and repression all through his lifetime. (*Id.* at 14-15). He was followed, photographed, recorded, repressed, and constantly oppressed by a political system that feared his writings and ideas and had no space for dissention. (*Id.*). Corretjer circulated several works in 1957, including *Distancias* as a handwritten pamphlet and the book *Yerba Bruja* in 1957, which includes the works "Inriri Cahuvial," "El Hijo," "Ayuburi," "Serenata," "En la vida todo es ir," "Andando de noche sola," and "Ahora Me Despido." (*Id.*). Corretjer shared these works only among a limited group of people that were interested in and sympathetic to his political ideas. (*Id.* at 15).

During the 1960s, Corretjer produced several literary works in limited editions which he shared only with a small group of people who sympathized with his philosophies. (*Id.* at 15). In 1965, Corretjer circulated the book *Alabanza a la Torre de Ciales*, which includes the work "Oubau Moin." (*Id.*). In 1967, Corretjer circulated the book *Pausa para el Amor*, which includes the work "Dia Antes." (*Id.*) The titles in question were all self-produced by Corretjer and a small group of friends and Corretjer had sole control over access to them. (*Id.*) Copies were only distributed among his small group of friends and acquaintances, who typically were artists, professors, and intellectuals, all of whom were politically aligned with Corretjer and favored Puerto Rico's

independence. (*Id.*) To Conseulo's knowledge, most if not all surviving copies of the titles containing the Corretjer Works are few and far between and are part of private collections. (*Id.*) Corretjer never gave explicit permission for further reproduction of these titles, and considering the prevailing political and cultural climate, there would have been an implicit, if not understood, prohibition on widespread dissemination. (*Id.*)

During the 1970s, Corretjer produced many works including *Construcción del Sur* in 1972, which includes the works "En las Aguas del Inabón, El Nombre (Inabon Yunes)," and "Diana de Guilarte." (*Id*. at 16.) Once again, he shared these works only among a small group of people interested in and sympathetic to his political ideas. (*Id.*)

The political nature and limited circulation of the Corretjer Works, put in context with the repression he suffered under Puerto Rico's authorities at the time, define his literary production as "grey literature," a term used to describe material produced outside of traditional publishing and distribution channels. (*Id.*) Grey literature is characterized by small print runs, which by nature is a limitation on the general circulation of the work. (*Id.*) The fact that he shared some of his works as small-run pamphlets—a format usually used to disseminate political ideas that fly under the radar to a select group of people *without the intention of widespread distribution*—is a clear example of limited publication. (*Id.*)

Plaintiff's argument that the Corretjer's Works were "general publications" is not only legally incorrect, but it is disingenuous given that Plaintiff was and is aware of the factors discussed above. In a November 2020 interview about his own political persecution titled "Roy y su version de 'Boricua en la Luna'" ("Roy and his version of 'Boricua en la Luna'"), Brown stated that "I've dedicated many years of my life to this [referring to "Boricua en la Luna"]. At no point when I did it [set the poem to music] did I think it would be a success because this man [Corretjer] was a

persecuted person, and I was persecuted too." (*Id* at 17.) In his 2005 deposition Plaintiff testified that Corretjer gave him some of his books as gifts (*Id.*) as they were not circulated, and when asked if he ever purchased a Corretjer book in a bookstore, Plaintiff could not declare he did. (*Id.*). The reason why Plaintiff could not purchase the Corretjer Works or any other Corretjer books is because the titles at issue were not sold in bookstores at the time they were released and could only be procured from Corretjer. (*Id.*).

Corretjer's history is a straightforward example of where limited publication occurs. An author carefully controlling distribution based on political trust and ideological alignment during periods of censorship and government oppression can create sufficiently defined boundaries. Indeed, limited publication has been found where the range and purpose of distribution did not suggest that the general public was free to obtain and use the work. *See Burke*, 598 F.2d at 692. While a distribution, to be limited, must communicate the contents of the work "without the right of diffusion, reproduction, distribution or sale," and must be "[r]estricted both as to persons and purpose," such "restrictions can be implied as well as express." *Id.* (internal citations omitted). *Cf. Am. Tobacco Co. v. Werckmeister,* 207 U.S. 284, 300 (1907) (holding that there is no general publication where artwork is exhibited and "there are bylaws against copies, or where it is *tacitly* understood that no copying shall take place, and the public are admitted ... on the *implied understanding* that no improper advantage will be taken of the privilege" (emphasis added)).

Corretjer's actions evidence his intent to maintain limitations on distribution of his writings, even if such restrictions were implied, and draw a clear line establishing limited publication, such that his circumscribed permission "cannot be thought to have authorized any further use or other purpose." *Burke*, 598 F.2d at 693. The case law supports such a finding. *See, e.g.*, *Allen v. Walt Disney Prods.*, 41 F. Supp. 134 (S.D.N.Y.1941) (finding no general publication

where composer of a song had loaned manuscripts thereof to various musicians and had sent a copy to two different music companies and no copies had been sold and the composition was not printed until almost 30 years after it was written); *Patterson v. Century Prods., Inc.*, 93 F.2d 489 (2d Cir. 1937) (no general publication even though copies of the film at issue were circulated widely; the copies were sent only to non-profit groups to be shown for non-commercial purposes, with no authorization to copy them further and, apparently, with the understanding that they would be returned); *King v. Mister Maestro, Inc.*, 224 F. Supp. 101, 106-07 (S.D.N.Y. 1963) ("Advance text" copies of Rev. Martin Luther King, Jr.'s "I Have a Dream" speech were given to the press, and excerpts were later broadcast on national television and used in movie house newsreels; publication was limited because copies were given only to a specific group to assist it in covering the event, and were never offered to the public at large); *Est. of Martin Luther King, Jr., Inc. v. CBS, Inc.*, 194 F.3d 1211, 1215–17 (11th Cir. 1999) (release of a copyrighted work to the news media for contemporaneous coverage of a newsworthy event is only a limited publication of that work); *McCarthy & Fischer, Inc. v. White*, 259 F. 364, 364 (S.D.N.Y. 1919) (composer gave a copy of his song to a singer for performance but had not dedicated it to the public because "to give the song to a limited number of artists to sing" did not establish a "probability that any of the copies were sold, or that they were given out for any purpose but a limited use by a few vaudeville artists"); *Mills Music v. Cromwell Music*, 126 F. Supp. 54, 69-70 (S.D.N.Y. 1954) (finding that the singing of an author's composition on a radio broadcast would not be a publication; "[t]he making of a single transcription of a musical composition for use by a radio station in broadcasting, would not constitute a 'publication' because the transcription would be made for a limited specific purpose"); *Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1452–54 (9th Cir. 1991) (the "Oscar" statue did not fall into the public domain by being publicly

displayed or presented at the award ceremonies because "mere performance or exhibition of an artistic work does not amount to a publication"; distribution of the Oscar statue to the winners also did not constitute general publication because the winners were a limited select group).

Plaintiff attempts to argue that Corretjer did not limit distributing his work to a limited class of people and that Corretjer's small group of friends and acquaintances do not qualify. (*See* ECF 71 at 7). The First Circuit does not require mathematical precision in defining such groups, nor does Brown cite any authority for such a proposition. And, as noted above, when an author carefully controls distribution based on social and political circumstances, these conditions are sufficient to create the boundaries necessary for limited publication, *see, e.g.*, *Soc'y of the Holy Transfiguration Monastery, Inc.*, 689 F.3d 29, 45-46 (finding limited class of persons where booklets were dispersed to specific religious congregations and parishes), and Plaintiff is not in a position to declare that Corretjer's actions and intentions were inadequate. *See e.g.*, *Conner v. Mark I, Inc.*, 509 F. Supp. 1179, 1181 (N.D. Ill. 1981) ("[I]t is only the actions of the copyright owner which will establish the existence of such constraints."). The position Plaintiff takes is contrary to the myriad cases cited above explaining that limited publication exists where the range and purpose of distribution did not suggest that the general public was free to obtain and use the work.

Here, as explained above, Corretjer only shared the Corretjer Works with a small group of friends and acquaintances, who typically were artists, professors, and intellectuals, all politically aligned with him and took no action to suggest that the general public was free to obtain and use the work. (ECF. 65-9 at 13-17.) Corretjer's literature was not disseminated in a manner that suggested "[a]nyone was welcome to a copy." *Pub. Affs. Assocs., Inc. v. Rickover*, 284 F.2d 262, 271 (D.C. Cir. 1960), *vacated on other grounds*, 369 U.S. 111 (1962). (*See* ECF 65-9 at 13-17). In fact, it would have been counter to Corretjer's interest for the general public to obtain access

to these works. As such, it is clear that Corretjer's small group of friends with whom he shared the Corretjer Works satisfies the first prong of the limited publication test, a "limited class of persons".

With respect to the second prong—limited purpose—Plaintiff insinuates that Corretjer did not affirmatively create a restriction on the limited group's rights to reproduce, redistribute, or further disseminate the works, and as such the Corretjer Works are general publications. (ECF 71 at 7-10). However, a general publication necessitates an affirmative action on behalf of the copyright holder. *See Burke*, 598 F.2d at 693-94 . Similar to the plaintiff in *Burke*, Corretjer shared the Corretjer Works with individuals who would know not to reproduce, redistribute, or further disseminate them because it would be counter to both their interests and Corretjer's. (ECF 65-9 at 15-16); *See Burke*, 598 F.2d at 692. Following the First Circuit's reasoning from *Burke*, the record establishes that Corretjer did not authorize any further use or purpose of the Corretjer Works beyond sharing them with this limited group.

When contrasting the facts surrounding Corretjer's circulation of his works and the facts of the above-referenced cases with cases where general publication has been found, the differences could not be clearer. "In cases where general publication has been found, the creator had made his work available in a manner that suggested that any interested person could have a copy." *Burke*, 598 F.2d at 692; *see also, e.g.*, *Pub. Affs. Assocs., Inc. v. Rickover*, 284 F.2d 262, 266-71 (D.C. Cir. 1960), *vacated on other grounds*, 369 U.S. 111 (1962) (general publication found where copies of speeches were given to the press, sent to individuals both on request and without solicitation, and sent in batches of 50 to sponsors for distribution); *White v. Kimmell*, 193 F.2d 744, 745-47 (9th Cir. 1952) (general publication found where author distributed copies of manuscript to friends, acquaintances, and strangers alike, affirmatively telling many to pass them on and authorizing some to make copies, with no limitations, no defined group or association, and no limit

on the number of copies to be made or who could receive them upon "a mere request"); *Am. Visuals Corp. v. Holland*, 239 F.2d 740, 744 (2d Cir. 1956) (general publication found where plaintiff placed copies of his brochures on a hotel table during an convention and gave copies to insurance association for further distribution to member companies; while purpose of distribution was limited, no limit placed on who could obtain copies); *Conner v. Mark I, Inc.,* 509 F. Supp. 1179, 1181 (N.D. Ill. 1981) (general publication found where photographer submitted image to a newspaper "for the purpose of publication and general circulation. Anyone who desired a copy of the photograph could have obtained it simply by purchasing the particular edition of the newspaper in which it ran.").

Corretjer's literature was not disseminated in a manner that suggested that anyone was welcome to a copy. Like the plaintiff in *Burke*, Corretjer shared his writings with individuals who would inherently know not to reproduce, redistribute, or further disseminate them (i.e., small groups of friends and acquaintances, who typically were artists, professors, and intellectuals, all politically aligned with Corretjer) because doing so would run counter to both their interests and could have resulted in danger both to liberty and physical safety, and, as noted above, such limitations could be implicit. *See Burke*, 598 F.2d at 692. As such, Corretjer satisfied the second element of the limited publication test, a "limited purpose", and the Corretjer Works are not in the public domain. Plaintiff cannot overcome this reality, and his papers show it, as they are nearly bare of case law, and the cases cited are either out of circuit or are the same as those cited herein, which support LAMCO's position, not Plaintiff's.

**C. Book Reviews and Newspaper Discussions Do Not Equate to General Publication**

Plaintiff's second argument is that mentions of books containing certain Corretjer Works in Puerto Rican newspapers and periodicals, somehow constitute proof of general publication of

those works (and the poems contained therein). (ECF 71 at 8-10). However, despite the fact that Plaintiff provides no evidence demonstrating how the referenced periodicals came into possession of the works, even assuming Corretjer himself provided the Corretjer Works to newspapers or periodicals, that action alone would not constitute general publication given that copies would have been sent to a single recipient (i.e., the newspaper) without the intention of further dissemination for the narrow purpose of reviewing the works.

*King v. Mister Maestro, Inc.*, 224 F. Supp. 101 (S.D.N.Y. 1963), is instructive. The district court in that case held that the Rev. Martin Luther King, Jr.'s speech, "I Have a Dream," was not in the public domain even though "advance texts" were given to the press, and excerpts were later broadcast on national television and used in movie house newsreels. *Id.* at 103-104. And although countless people heard and saw the speech given, the oral delivery was mere performance, not publication. *Id.* at 106-07. The court held that publication occurred when the text was given to the press but that it was "limited" rather than "general", as tangible copies were given only to a specific group to assist it in covering the event, and were never offered to the public at large. *Id*. at 107. *King* directly contradicts Plaintiff's argument that providing the Corretjer Works to the newspaper or periodicals counted as general publications. That newspaper and periodicals informed the public at large about the Corretjer Works is irrelevant. As such, Plaintiff's argument fails under either analysis and the Corretjer Works did not fall into the public domain via general publication.

The best Plaintiff can muster are vague and extremely limited statements by the newspapers that allegedly received Corretjer's books. *First*, he claims that a reviewer in *El Mundo* referred to Corretjer providing "us" with new poetry, and so that must mean that Corretjer intended for the world to have access to his works. (*See* ECF 71 at 8). This is speculative nonsense. Plaintiff provides absolutely no evidence what the word "us" references, whether it means *El Mundo*'s

readers, the editorial staff, or the public at large. And even assuming "us" meant the public, that the reviewer believed Corretjer meant to or did provide the public with his works is a decades-old opinion by a non-party unsupported by facts or evidence that is, at best, inadmissible hearsay. Plaintiff's claim that *El Mundo* later published a notice that *Yerba Bruja* had won a literary prize (*see id.*) is similarly immaterial and irrelevant. Plaintiff does not explain the significance of the book winning a prize to general publication, let alone any justification (or proof) that *Yerba Bruja*'s submission to a competition means that the book was sent to anyone other than the "jurors of the Circulo Cultural Yaucano" for the limited purposes of being considered for the prize. (*See id.*)

*Second*, Plaintiff argues that *Construcción del Sur* must have been generally published because on April 1, 1973, *Puerto Rico Illustrado* "included Corretjer's [book] in its section on 'Libros de Puerto Rico' (Puerto Rico Books)" and identified it as being a 1972 "publication." (*Id.* at 9). *Construcción del Sur* was, indeed, a "Puerto Rico Book," given that it was written by a Puerto Rican author and circulated in Puerto Rico. This is irrelevant, however, as such a bland statement of the obvious has no material significance, let alone legal bearing, on whether *Construcción del Sur* was subject to general publication (and, as discussed above with respect to *Yerba Bruja*, it would not have been given its limited distribution). And that *Puerto Rico Illustrado* referred to as a "publication" is also a red herring. Saying something is a publication does not mean it was generally published as a matter of copyright law, especially bearing in mind that the statement is a hearsay opinion by a non-party made 44 years ago.

*Third*, Plaintiff argues that *Distancias* (contained in a work called *Imagen de Borinquen 3*) must have been generally published because *El Mundo* listed it in a section of its newspaper called "'Libros Recibidos' (Books Received)". (*Id.* at 9). Plaintiff says nothing regarding who "received" the book or who sent the book, let alone that distribution was any broader than a book reviewer at

*El Mundo*, and in this instance, he cannot even point to a third party using the word "published." (*See id.*)

*Fourth*, Plaintiff asserts that *Alabanza en la Torre de Ciales* must have been generally published because in 1954, an article in *El Mundo* said that the Mexican edition of another magazine had reviewed the book. (*See id.* at 10). This example is even feebler than the last three. Apart from relying on multiple levels of hearsay from 72 years ago, again, Plaintiff provides no evidence of how or when the book was acquired or reached a book reviewer in Mexico or that the dissemination went beyond review purposes.

*Finally*, Plaintiff argues that *Pausa para el Amor* must have been generally published because *Puerto Rico Illustrado* listed it in a section of its newspaper called "'Libros Recibidos' (Received Books)" and "identif[ied]" it as a 1967 "publication." (*Id.* at 10). As with *Distancias*, Plaintiff says nothing regarding who "received" the book or who sent the book, let alone that distribution was any broader than a book reviewer at *Puerto Rico Illustrado*. And that *Puerto Rico Illustrado* again referred to the work as a 1967 "publication" is a red herring for the same reasons set forth above regarding *Construcción del Sur*—that is, saying something is a publication does not equate to stating that it is a general publication for copyright purposes, especially when the statement is decades-old hearsay opinion by a non-party. Plaintiff's entire justification for relying on these articles is based on unsupported speculation about the motivations of newspapers from decades ago and a massive leap in logic that because a newspaper announced that a book had been released, it must have been subject to general publication. (*See id.* at 10). He cites no evidence, no authority, and no sources of any kind; this kind of rank speculation is antithetical to summary judgment. *See, e.g.*, *Reynoso v. Dejoy*, 757 F. Supp. 3d 190, 193–94 (D.P.R. 2024) ("It is well established that a party cannot rely on 'conclusory allegations, improbable inferences, and

unsupported speculation' at the summary judgment stage.") (quoting *López–Carrasquillo v. Rubianes*, 230 F.3d 409, 412 (1st Cir. 2000)).

## II. BROWN'S ADAPTATION OF BORICUA EN LA LUNA IS NOT AN AUTHORIZED DERIVATIVE WORK

### A. Brown Cannot Establish the Existence of a License for His Adaptation and Ongoing Infringement of *Boricua En La Luna*

Unlike the other Corretjer Works, Brown does not contend that *Boricua en la Luna* fell into the public domain. Instead, Brown ostensibly asserts the existence of a license, arguing that Corretjer authorized him to set it to music. (ECF 71 at 4 (referring to non-exclusive licenses generally), 11-16 (arguments as to *Boricua en la Luna*)). Whether Brown was authorized to set *Boricua En La Luna* (or any of Corretjer's poems) to music is beside the point however, given that Counterclaim Plaintiffs' claims rest not only on Brown's *initial creation* of a derivative work; they rest on Brown's *continued commercial exploitation* of that derivative work for decades, without any compensation to Corretjer or his successors-in-interest, by way of countless reproductions, distributions, and public performances for profit. (*See* ECF 44, Counterclaims, ¶¶ 7, 9, 26, 27, 29, 46-52.) As explained below, the record reflects no evidence of any kind that would suggest Brown was authorized to engage in such conduct. Far from establishing the existence of a license on summary judgment, Brown cannot even create a genuine issue of fact.

At the outset, because a license is an affirmative defense to infringement, the burden unquestionably rests on Brown to prove its existence. *See, e.g., Latin Am. Music Co., Inc. v. Disco Hit Prods.*, 2008 WL 11500497, at *5 (D.P.R. June 23, 2008); *accord John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 40 (1st Cir. 2003). But as the putative licensee of Corretjer's rights, Brown has not identified any license, whether written or oral. Brown has not identified any contract granting him the rights to adapt and commercialize *Boricua en la Luna*, nor

any statements that expressly grant same. Instead, Brown apparently argues a license was implied by Corretjer's conduct. *See Comerica Bank & Tr., N.A. v. Habib*, 433 F. Supp. 3d 79, 100 (D. Mass. 2020) (explaining that nonexclusive licenses may be granted in writing, orally, or "may be implied from conduct which indicates the owner's intent to allow a licensee to use the work" (quoting *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 40 (1st Cir. 2003)).

In particular, Brown claims that approximately *fifty years ago* (and several years *before* the poem was even completed, as Brown himself later stated[1]), Corretjer handed Brown a copy of *Boricua en la Luna* and told him that it was "something you should set to music." (ECF 71 at 11.) This stale statement, presented in conflicting accounts and corroborated by no one,[2] should be excluded as inadmissible hearsay. But even if considered, the statement does not establish (let alone create a material dispute over) the existence of a non-exclusive, perpetual, worldwide, royalty-free license that would allow Brown to adapt to music, commercially reproduce and distribute, and publicly perform *Boricua en la Luna* for decades, without restriction, and without providing so much as a penny to Corretjer and his heirs. Yet Brown has admittedly done just that. (ECF 48, admissions in reply to Counterclaims ¶ 27, 48-51.)

---

[1] Brown has claimed, for purposes of litigation, that Corretjer gave him the poem in 1976 or 1977 (ECF 71, at 11-12); (ECF 71-1, ¶ 23), yet outside of litigation, Brown has stated in public interviews that he believed Corretjer wrote the poem in 1981. (ECF 74-15.) Brown's account, as given in public interviews, is furthermore consistent with the fact that the full lyrics only exist on a typewritten copy signed by Corretjer on December 12, 1980 (*id.*; *see also* ECF 74-11), The fact that Consuelo's copyright registration for Corretjer's poem lists "1981" as the year of completion, is, as Consuelo has stated, a result of Brown's own inconsistent statements. (*See* ECF 71-20, 74-21 at ¶ 6.)

[2] When asked during his deposition in 2005 who else had witnessed Corretjer hand Brown a copy of *Boricua en la Luna* and tell Brown that it "is something you should set to music," Brown admitted that he could not name any witnesses, despite purportedly being handed the work in the presence of many other people. (ECF 71-17 at 23:16-26:22.)

1. Brown's License Defense Rests on Nothing Other Than Inadmissible Hearsay

It is black letter law that hearsay evidence "may not be considered on summary judgment." *Bonner v. Triple-S Mgmt. Corp.*, 68 F.4th 677, 689 (1st Cir. 2023); *see also S.E.C. v. Ficken*, 546 F.3d 45, 53-54 (1st Cir. 2008) (affirming lower court's finding that statements of unavailable witness were deemed inadmissible and thus insufficient to raise a genuine issue of material fact); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) ("[A]bsent a showing of admissibility—and none was forthcoming here—appellant may not rely on rank hearsay, whether or not embodied in an interrogatory answer, to oppose proper motions for summary judgment."). Hearsay is defined as a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." *Bonner*, 68 F.4th at 678 (citing Fed. R. Evid. 801(c)).

Brown cites to *Rivera Molina v. Casa La Roca, LLC*, 2021 WL 374442 (D.P.R. Aug. 24, 2021) for the proposition that self-serving declarations, supported by first-hand knowledge, can support or defeat summary judgment. Notably, however, the court there did *not* consider a self-serving declaration.*ISee id.* at *4 (rejecting declaration based upon information and belief). But more importantly, that case is inapposite because Brown does not rely upon "first-hand knowledge"; he relies upon a fifty-year old statement (i.e., that Brown should set *Boricua en la Luna* to music), made by an out-of-court declarant (i.e., Corretjer), for the truth of the matter asserted in that statement (i.e., that Corretjer told Brown to set *Boricua en la Luna* to music). This is textbook hearsay, and as such, should not be considered.

Nor can Brown demonstrate that any exception applies, as is his burden. *See U.S. v. Bartelho*, 129 F.3d 663, 670 (1st Cir. 1997) ("A party who seeks admission of hearsay evidence

bears the burden of proving each element of the exception that he asserts."). For one thing, while Corretjer may be a predecessor-in-interest to Consuelo's rights, he is not a party, and as such, any statement on which Brown relies cannot be considered a party admission under Fed. R. Evid. 801(d)(2). *See, e.g., Huff v. White Motor Corp.*, 609 F.2d 286 (7th Cir. 1979) (rejecting argument that decedent's privity with the opposing party rendered decedent's statement a party admission); *In re Cornfield*, 365 F. Supp. 2d 271, 277 (E.D.N.Y. 2004), *aff'd sub nom. Cornfield v. Cornfield*, 156 F. App'x 343 (2d Cir. 2005) (same).

At the same time, none of the exceptions set forth in Fed. R. Evid. 803 or 804 are applicable here. Corretjer's statement that *Boricua en la Luna* is something Brown should set to music is not a present sense impression, for instance, *see* Fed. R. Evid. 803(1); not an excited utterance, *see* Fed. R. Evid. 803(2); nor is it a then-existing mental or emotional condition, *see* Fed. R. Evid. 803(3); and is clearly not a business record, *see* Fed. R. Evid. 803(6); and while it purports to affect a property interest, the statement was not made in any document, *see* Fed. R. Evid. 803(14)-(16).

Furthermore, while Corretjer is of course unavailable as a witness, *see* Fed. R. Evid. 804(a)(4), the exceptions for unavailable declarants fare no better for Brown. *Inter alia*, Corretjer's statement was not part of former testimony, *see* Fed. R. Evid. 804(b)(1), made under the belief of imminent death, *see* Fed. R. Evid. 804(b)(2), or a statement against interest, *see* Fed. R. Evid. 804(b)(3), which would require Corretjer to have known the statement was substantially against his proprietary or pecuniary interest *at the time it was made*. *See U.S. v. Millan*, 230 F.3d 431, 437 n.3 (1st Cir. 2000) (noting that the "statement against interest" exception applies to a statement which goes against declarant's interest "at the time of its making"); *Kesey, LLC v. Francis*, 2009 WL 909530, at *19 (D. Ore. Apr. 3, 2009) (refusing to admit decedent's statements related to

screenplay in dispute over rights to screenplay, because the statements, which were made well before any dispute over the rights arose, did not qualify as a statement against interest).

At bottom, Corretjer's decades-old statement, which is supported by nothing other than Brown's own self-serving (and inconsistent) recollection, and which is not subject to testing by any factfinder, is inadmissible, and thus insufficient to raise a genuine dispute of material fact regarding any alleged "permission" Brown received from Corretjer to adapt *Boricua en la Luna*.

2. Even if Admissible, the Evidence Proffered Does Not Support a License Defense

Even if the Court considers Corretjer's alleged statement, it does not insulate Brown from liability. As the First Circuit has cautioned, "[i]mplied licenses are found only in narrow circumstances." *John G. Danielson, Inc.*, 322 F.3d at 40. The First Circuit is guided by the Ninth Circuit's three-prong test requiring a showing that (i) the licensee requested the creation of the work, (ii) the licensor created and delivered the work, and (iii) the licensor intended that the licensee distribute the work, *see id.* at 41 (citing *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990)) but has made clear that the last prong—intent—is the most important requirement. *See id.* at 41 ("The touchstone for finding an implied license . . . is intent.").

Intent is an objective inquiry, and because implied licenses sound in contract, courts look to whether the facts objectively demonstrate a manifestation of the licensor's intent to be bound. *See id.* at 42; *Hogar CREA, Inc. v. Hogar CREA Intern. of Connecticut, Inc.*, 2011 WL 4852313, at *11 (D.P.R. Sept. 6, 2011) (explaining that implied license claims sound in contract); *Furie v. Infowars, LLC*, 401 F. Supp. 3d 952, 968 (C.D. Cal. 2019) ("The party asserting the affirmative defense of an implied license therefore must prove 'the same elements necessary to evidence an express contract . . . .'"); *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 124 (S.D.N.Y. 2012) (noting that the question of whether an implied license exists boils down to whether there

was a "meeting of the minds" between the parties to permit the particular usage at issue), *aff'd on other grounds*, 748 F.3d 120 (2d Cir. 2014).

Here, the record is devoid of evidence that Corretjer intended to be bound to a license agreement that would permit Brown to freely distribute and profit off his works. Even assuming *arguendo* that the statement carried with it the implied permission to set *Boricua en la Luna* to music, such permission extends to merely one of Corretjer's exclusive copyright rights therein. *See* 17 U.S.C. § 106(2) (identifying the right to "prepare derivative works" as one of the exclusive rights under copyright); § 201(d)(2) (providing that any of the exclusive copyright rights can be transferred separately). But to avoid infringement liability, the licensee's use of the copyrighted work must "stay within the bounds of an implied license," *Comerica Bank*, 433 F. Supp. 3d at 100, and nothing about Corretjer's alleged statement could possibly be interpreted to establish a meeting of the minds that would grant Brown the broad, unfettered, and completely royalty-free right to commercially reproduce, distribute, and publicly perform *Boricua en la Luna* with added music, let alone reproduce the text of the poem (as lyrics) on his website and in physical media such as vinyl gatefolds and CD liner notes.

Brown advances several post-hoc rationalizations in an attempt to convince this Court to transform a vague, decades-old statement, containing virtually no contract terms essential or otherwise, into a broad grant of rights that insulates him from liability for rampant, unauthorized commercial exploitation of one of Corretjer's most important works. None holds merit.

*First*, Brown apparently believes that accompanying the vague statement with an unpublished copy of *Boricua en la Luna* can transform the statement into a get-out-of-jail-free card. (*See* ECF 71 at 11.) Not so. It is a fundamental tenet of copyright law that a transfer of a material object in which the work is embodied does not translate into a transfer of copyright rights

in the embodied work. *See* 17 U.S.C. § 202. In other words, a copy of a poem does not carry with it the right to copy that poem, let alone create derivatives or distribute copies. *See Lowry's Reps., Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 750-51 (D. Md. 2003) ("The mere transfer of a copyrighted newsletter does not imply a license to engage in copying that newsletter."). As such, whether Brown was handed a copy of *Boricua en la Luna* is immaterial, because such evidence does not somehow create a broad grant of rights out of whole cloth. *See Gray v. Paramount Glob.*, 794 F. Supp. 3d 204, 215 (S.D.N.Y. 2025) (allegations that plaintiffs supplied defendants with contributions to screenplay did not evidence intention to grant defendants license to use those contributions without compensation).

*Second*, Brown claims that Corretjer praised Brown for "tak[ing] my poetry to their place of birth: the heart of Puerto Rico." (ECF 71 at 12-13.) Brown does not claim Corretjer made the statement directly to him. Rather, Brown claims that the statement was made in a book—a book from which Brown only produced a few select pages, which is itself hearsay, and which has not been properly authenticated. *See* Fed. R. Evid. 901; *U.S. v. Bradford*, 748 F. App'x 217, 219-20 (11th Cir. 2018) (upholding refusal to admit unauthenticated documents under ancient-documents hearsay exception).[3] It is therefore not properly considered on a motion for summary judgment. *See e.g., Bonner,* 68 F.4th at 689; *Ficken*, 546 F.3d at 53-54; *Garside,* 895 F.2d at 50. Even if

[3] Brown's submitted fact statement asserts that Corretjer published the book containing the alleged statement, titled *Para que los Pueblos Canten*, on July 31, 1976 (ECF 71-1, ¶ 27), but Brown provides no evidence whatsoever to factually support this assertion, nor does he provide any evidence to support the apparent assertion baked into that same fact statement that Exhibit P—a seven (7) page document—accurately reflects excerpts from *Para que los Pueblos Canten*. No witness has attested to the authenticity of the document or even identified where the document was obtained. *See* Fed. R. Evid. 901(8). Moreover, Brown argues that because *Para que los Pueblos Canten* states "Es propriedad de Consuelo Corretjer de Perron. Derechos reservados," that Consuelo must have been the one to publish the book with Brown's picture and must have been aware of "[her] father's praises of Brown's musical adaptations." (ECF 71 at 14). This is a stretch, to say the least, and constitutes more improper speculation without an iota of actual proof. *See Reynoso*, 757 F. Supp. at 193–94.

considered, however, Brown's public statements from fifty years ago, not made to anyone in particular, cannot create broad copyright rights out of whole cloth. *See, e.g.*, *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001) (rejecting argument that defendant had an implied license to freely distribute plaintiff's music over internet because plaintiff "encourag[ed] MP3 file exchange"); *Comerica Bank*, 433 F. Supp. 3d at 100 (finding broad, public statements which did not "set out any license terms" failed to "demonstrate an intent to contract with [defendant]," and therefore defendants' implied license defense failed); *Furie v. Infowars, LLC*, 401 F. Supp. 3d 952, 968 (C.D. Cal. 2019) (rejecting defendant's implied license argument premised on plaintiff's public statements suggesting that he was happy his work had become a meme, because such statements missed the basic contractual elements and did not "invite the performance of a specific act without further communication").

Brown furthermore did not just "take [*Boricua en la Luna*] to . . . the heart of Puerto Rico" (ECF 71 at 12-13) (whatever that means). Instead, it is undisputed that Brown took *Boricua en la Luna* to his website, where he sells downloads of his music, and to major streaming services, where he collects a royalty every time someone listens to it, among other places. In any event, the suggestion that Brown's liability is insulated by a vague and diffuse metaphorical statement from 50 years ago, which is only impliedly connected to him (among several artists), is nonsensical.

*Third*, Brown argues that an implied license is evidenced by statements in the 1988 copyright registration for his adaptation of *Boricua en la Luna* identifying Juan Corretjer, and for statements in Consuelo Corretjer's subsequent 2021 registration for the poem itself which identifies Brown's adaptation (ECF 71 at 13-14.) This does not evidence *any* license, let alone a license that insulates Brown from liability for the conduct at issue here, so it is yet another red herring. Simply put, the registrations contain no representations of any kind recognizing Brown's

right to set *Boricua en la Luna* to music, or his right to commercially exploit that adaptation for decades. To the contrary, as Consuelo Corretjer has affirmed in support of Counterclaim-Plaintiffs' motion for summary judgment, the 2021 registration was affirmatively *not* a recognition of Brown's rights at all. Rather, it was a mistake, based on Consuelo's layperson belief that it was necessary to identify the year of Brown's unauthorized release of *Boricua en la Luna* as the year of publication for registration purposes. (ECF 74-21, ¶ 5-6.) And much like how merely crediting the rightful author or owner of a copyrighted work does not insulate an infringer from liability, *see e.g., Iantosca v. Elie Tahari, Ltd.*, 2020 WL 5603538, at *6 (S.D.N.Y. Sept. 18, 2020) ("Simply put, attribution is not a defense against copyright infringement."), disclosing *Boricua en la Luna* as a preexisting work in a subsequent copyright registration is not a panacea; rather, it is simply an administrative step in the registration process.[4]

At bottom, Brown's license defense necessarily depends on a grant of rights that is wholly unsupported by the record. Far from establishing the defense, Brown's arguments and evidence demonstrate that this defense is legally and factually untenable.

Finally, and in the unlikely event that Brown could establish an implied license, it would at very least still not insulate him from liability for any post-suit conduct and therefore still fails as to any reproduction, distribution, or public performance that took place after February 18, 2025, when LAMCO filed counterclaims against Brown (ECF 23.) It is well-established that implied licenses which are unsupported by consideration are revocable. *See Atlantis Servs., Inc. v. Asigra, Inc.*, 2017 WL 4780701, at *3 (D. Mass. Oct. 23, 2017). To the extent Brown had any rights

[4] To the extent Brown tries to rely on purported "constructive notice" and "four decades of inaction" by Consuelo—who was not the putative licensor and who undisputably did not hand Brown a copy of *Boricua en la Luna* and tell him to set it to music—such arguments are irrelevant. Brown cites no authority for how such actions by Consuelo relate to the purported intent of Juan Corretjer to grant Brown a royalty-free unrestricted license.

whatsoever to *Boricua en la Luna* (or any other Corretjer Poem for that matter), such rights were unquestionably revoked at the beginning of last year when this case was initiated, or at the very latest on July 16 of last year, when Corretjer's own daughter alerted Brown that he lacked rights to *Boricua en la Luna*, and that his actions were therefore not authorized (*see generally* ECF 44). Accordingly, while Brown never had rights to *Boricua en la Luna*, even if he did, his rights expired last year, and his present exploitation of it constitutes infringement as a matter of law which is indefensible. *See Broad. Music, Inc. v. Rindge Lane Corp.*, 1995 WL 136940, at *10 (D.N.H. Mar. 27, 1995) (holding defendants liable for copyright infringement, based on their public performance of musical works despite being put on notice that their licenses expired).

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should deny Plaintiff's motion for summary judgment against Consuelo and for such other and further relief this Court deems just and proper.

Dated: February 20, 2026

Respectfully Submitted,

**COWAN DEBAETS ABRAHAMS & SHEPPARD, LLP**
Scott J. Sholder *(admitted pro hac vice)*
60 Broad Street, 30th Floor
New York, New York 10004
Telephone: (212) 974-7474
ssholder@cdas.com

**DMR Law**
Javier Micheo Marcial
USDC-PR No. 305310
Capital Center Building
239 Arterial Hostos Avenue
South Tower – Suite 1101
Hato Rey, P.R. 00918
787-331-9970 / 786-710-8138
j.micheo@dmrpr.com

*Attorneys for Counterclaim-Plaintiffs*