UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ROY BROWN<br><br>Plaintiff<br><br>v.<br><br>LATIN AMERICAN MUSIC CO.<br><br>Defendants | CIVIL NO. 24-cv-01523 (MAJ)<br><br>COPYRIGHT INFRINGEMENT |

**REPLY TO LAMCO AND CONSUELO CORRETJER'S S OPPOSITION TO BROWN'S MOTION FOR SUMMARY JUDGMENT (DKT. NOS. 79, 80)**

TO THE HONORABLE COURT:

Comes now Plaintiff, Roy Brown, through the undersigned attorney, and very respectfully states and prays:

LAMCO and Consuelo Corretjer's oppositions to Plaintiff Brown's Motions for Summary Judgment are virtually identical as to their first argument regarding the nature of the Corretjer publications (i.e. whether they constituted general or limited publications). Plaintiff, therefore, will address both in a single reply. Consuelo Corretjer's Opposition includes a second argument as to the poem *Boricua en la luna*. Consuelo Corretjer's opposition is addressed in a second section to this motion.

## I. LAMCO's and Consuelo Corretjer's claim of limited publication rests on inadmissible evidence

LAMCO and Consuelo Corretjer's sole evidence in support of their limited-publication theory is a longwinded narrative of political persecution given by LAMCO's Copyright & Catalog Administrator, Alberto Suárez, as an answer to Interrogatory Number

17. The claim is that: "LAMCO explained, in painstaking detail, in its answer to Brown's Interrogatory No. 17, why all the Corretjer Works were only published on a limited basis. (See ECF 65-9 at 13-17)." Dkt. 8o, p.4. That testimony, however, is not admissible.

Rule 56 makes clear that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). In summary judgment proceedings, answers to interrogatories are subject to the same requirements as affidavits. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir. 1990). They carry no probative value where they are not based on personal knowledge or otherwise fail to meet Rule 56's evidentiary standards. Id. Personal knowledge may include inferences or opinions, but only when those inferences are grounded in the witness's own perception and experience. *United States v. Doe*, 960 F.2d 221, 223 (1st Cir. 1992).

Interrogatory Answer No. 17 does not satisfy those requirements. Suárez verifies the interrogatory responses only "to the best of my knowledge and belief," and expressly states that the statements are based on information "available to and/or shared with me." Doc. 74-13. It cannot be any other way as he is providing a historical narrative of events occurring before he was born. That formulation is the opposite of a statement grounded in personal knowledge. It confirms that the assertions in Answer No. 17 are derived from secondhand sources—whether documents reviewed, conversations held, or information conveyed by others—rather than from Suárez's own perception.

Accordingly, because Interrogatory Answer No. 17 is not based on Suárez's personal knowledge and instead relies on secondhand historical assertions, it fails to meet

the evidentiary requirements of Rule 56 and cannot support their opposition to summary judgment.

Admissibility issue aside, LAMCO and Consuelo Corretjer's legal theory runs into unsalvable contradictions. LAMCO and Consuelo Corretjer state that: "Under severe political repression, author like Corretjer routinely and deliberately restrict distribution to trusted individuals (…), for the narrow purpose of sharing ideas with sympathetic individuals while avoiding government scrutiny, censorship and/or abuse (…), with implicit understanding that unauthorized broad reproduction could endanger both author and recipients". Dkt. 80. pp 4-5.

That alleged purpose of avoiding government scrutiny and censorship cannot be reconciled with the recognized fact that the books were regularly reviewed in the press. LAMCO and Consuelo Corretjer assume Juan Antonio Corretjer himself provided copies of the works to newspapers or periodicals but that such distribution would still qualify as a limited publication because the works were allegedly given to a single recipient—the newspaper—for the narrow purpose of review. Dkt. 80 at 12. Their claim that the situation is akin to King v. Mister Maestro, Inc., 224 F. Supp. 101 (S.D.N.Y. 1963), where Martin Luther King distributed his "I have a Dream" speech to press prior to the event in Washington.

Corretjer's reliance on King is misplaced. King concerned the distribution of advance texts of a speech solely to members of the press as part of a controlled press kit to facilitate coverage of a single public event. The advance text served only to assist journalists in reporting on a speech that would shortly be publicly delivered. In other words, the dissemination in King was a tightly controlled distribution to a clearly defined and

restricted class of recipients for a specific functional purpose—news reporting of the speech itself.

The circumstances at hand are fundamentally different. Here, Corretjer did not deliver the books to the press as support for a discrete event, on the contrary, he delivered them to the press for book reviews. A book review is a form of public literary criticism published in newspapers, magazines, or journals for the purpose of informing the reading public about a work's existence, its content, quality, and significance. In other words, a review is intended to draw public attention to it.

So, LAMCO and Consuelo Corretjer try to sell us a tale of clandestine publications, where works are handed over in controlled settings to avoid persecution and censorship, but the author himself takes them to the newspapers for book reviewing. The attempt to reconcile this contradiction by characterizing newspapers as "single recipients" is ludicrous. That framing ignores the functional reality of the transaction. A newspaper is not the ultimate audience of the material it receives; it is an intermediary whose purpose is to communicate information to the public. Newspapers are not private confidants. They exist precisely to disseminate material to the public. Providing works to newspapers is therefore the opposite of restricting distribution to a small, trusted class. Supplying a work to the press is an act undertaken for the very purpose of broad public dissemination.

Accordingly, LAMCO and Consuelo Corretjer's theory collapses under its own logic, because distributing Corretjer's books to newspapers for review—an act inherently intended to promote public dissemination—is fundamentally incompatible with their claim that the works were circulated only through confidential, limited publication to avoid public exposure.

## II. As to Boricua en la Luna, Corretjer's Challenge to Brown's Authorization and Her Revocation Theory Both Fail

Consuelo Corretjer advances separate arguments with respect to *Boricua en la Luna*, a poem that has not entered the public domain. Her argument there is twofold. First, she questions whether Roy Brown ever obtained authorization for the musical adaptation of the poem. According to Corretjer, Brown cannot establish the existence of a license permitting the creation and continued exploitation of the musical adaptation. Second, she asserts that even if Brown had obtained authorization, his license has been revoked with the filing of the counterclaim. On that basis, she asserts that Brown's ongoing exploitation of the song infringes the copyright in the underlying poem notwithstanding that the adaptation was created decades ago. Neither argument holds.

Corretjer first posits that: "Brown has not identified any contract granting him the rights to adapt and commercialize *Boricua en la Luna*, nor any statements that expressly grant same. Instead, Brown apparently argues a license was implied by Corretjer's conduct." Opposition, pp. 15-16. Her main point is that Brown's testimony is inadmissible hearsay. That is not so.

As Corretjer herself acknowledges, Brown's testimony under penalty of perjury is that Corretjer himself gave him the poem and told him that it was something he should set to music. That act is not ambiguous. When the author of a poem gives the work to a musician and asks him to transform it into a song, the author is necessarily granting permission to create a musical adaptation. Consuelo Corretjer disputes Brown's testimony as inadmissible hearsay and inconsistent with statements he may have made to the press more than twenty years later. That is without merit.

Under the well-established "verbal acts" doctrine statements that themselves affect legal rights—such as words of offer, acceptance, consent, or authorization—are not hearsay because they carry independent legal significance. See Preferred Props., Inc. v. Indian River Estates, Inc., 276 F.3d 790, 798–99 (6th Cir. 2002); Robertson v. U.S. Bank, N.A., 831 F.3d 757, 764 (6th Cir. 2016); Wright & Miller § 7005. As the Advisory Committee explains, the rule excludes from hearsay the entire category of "verbal acts" and "verbal parts of an act," in which the statement itself affects the legal rights of the parties. Fed. R. Evid. 801(c), Advisory Committee Note. In other words, statements that have independent legal significance—i.e., that constitute the very operative words creating authorization—are not hearsay at all. When the existence of the statement itself has legal consequences, it falls outside Fed. R. Evid. 801(c).

Here, Brown offers Corretjer's statement to establish that permission was verbally granted. That is a quintessential verbal act. The legal significance lies in the utterance itself—the granting of authorization to set the poem to music. Because legal consequences flow from the fact that the words of authorization were spoken, Brown's testimony recounting those words constitutes evidence of a verbal act and is not hearsay under Rule 801(c).

Corretjer next points to an inconsistency between Brown's deposition testimony, given in 2005, and a press interview given in 2020. But the alleged inconsistency is immaterial. At summary judgment, a factual dispute is "material" only if it has the potential to affect the outcome under the governing law. Fed. R. Civ. P. 56(a). Here the discrepancy concerns only the precise time and location of the interaction, not the substance of the event itself. In both accounts, Brown consistently states the same essential fact: that Corretjer

personally gave him the poem and encouraged him to put it to music. That core fact—the existence of authorization from Corretjer—remains unchanged.

Next, Consuelo Corretjer next claims that the submission of *Para que los Pueblos Canten* was not properly authenticated, and that the fact that the books asserts that Consuelo Corretjer is its copyright holder is "improper speculation without an iota of actual proof." Dkt. 80, p. 21 n.3. Since this assertion is being made by Consuelo Corretjer herself, it must be taken as a denial by her that the book was published and she holds the copyrights to it.

Because Consuelo Corretjer has chosen to deny the authenticity of a work thought to have been published by her, an affidavit is being included with this Reply attesting that the pages presented as an exhibit are from a printed copy of *Para que los Pueblos Canten* in counsel's possession. The authentication requirement of Fed. R. Evid. Rule 901 is satisfied by testimony that the exhibit is a true and correct copy of the publication.

Consuelo Corretjer further invokes the rule of completeness. There is no requirement that an entire book be submitted when only specific passages are relevant. If the opposing party believes additional portions are necessary to provide context, Fed. R. Evid. 106 permits them to require the introduction at any time of any other part. But it is evident from the pages included that nothing else is needed. The relevant text reads:

> In a modest display of gratefulness, I am including in this edition portraits of these groups of young musicians and singers who have so generously welcomed my poems. I cannot help thinking about them when having my book printed.
>
> They have taken my poetry to where it was born: the heart of Puerto Rico.

Dkt. 87-1, p.14. The picture of Brown found in the book is included in the exhibit. It cannot be seriously contested that Corretjer is expressing gratefulness to Brown (as well as others), for taking his poetry to the heart of Puerto Rico "where it was born.

Corretjer's final argument is that even if the Court were to recognize an implied license, such a license was revoked with the filing of the Counterclaim on February 18, 2025, or on July 2025 when "Corretjer's own daughter alerted Brown that he lacked rights to *Boricua en la Luna*, and that his actions were therefore not authorized." DKt. 80, pp.23-24. And therefore "his present exploitation of it constitutes infringement as a matter of law which is indefensible". Id. at 24. That argument is unavailing because Corretjer has admitted that Brown's musical adaptation of *Boricua en la Luna* is a derivative work.

In 17 USC 203(b)(1), Congress expressly legislated a derivative work exemption for license terminations:

> **(b)Effect of Termination.**—Upon the effective date of termination, all rights under this title that were covered by the terminated grants revert to the author, authors, and other persons owning termination interests under clauses (1) and (2) of subsection (a), including those owners who did not join in signing the notice of termination under clause (4) of subsection (a), **but with the following limitations**:
>
> **(1) A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination**, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

17 USC 203(b)(1) (emphasis ours). Congress enacted this provision precisely to ensure that termination or revocation does not destroy derivative works already created in reliance on the original authorization. As the House Report accompanying the 1976 Act explains, the exception was designed to balance the author's termination rights with the need to

protect those who had invested in derivative works created under the original grant. H.R. Rep. No. 94-1476, at 127 (1976).

As the Second Circuit has observed:

> The Derivative Works Exception reflects Congress's judgment that the owner of a derivative work should be allowed to continue to use the derivative work after termination, "both to encourage investment by derivative work proprietors and to assure that the public retain[s] access to the derivative work." Note, *The Errant Evolution of Termination of Transfer Rights and the Derivative Works Exception*, 48 Ohio St. L.J. 897, 912 (1987). Without the Exception, the creator of a derivative work (and, indeed, the public at large) could be held hostage to the potentially exorbitant demands of the owner of the copyright in the underlying work.

*Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc*., 155 F.3d 17, 22 (2d Cir. 1998)

Accordingly, Consuelo's reliance on *Broadcast Music, Inc. v. Rindge Lane Corp*. is misplaced because it is not a derivate work case. That case addresses a fundamentally different situation where a nightclub publicly performed copyrighted musical compositions without a valid license from the copyright owners or their licensing agent, BMI. The court held the establishment liable for infringement because it continued performing songs from the BMI repertoire after the applicable performance license had been cancelled.

Unlike the nightclub in *Rindge Lane*, Brown is not performing works owned by unrelated third-party copyright holders. Rather, Brown performs his own musical composition, which is a derivative work created from Corretjer's poems. Brown therefore owns the copyright in the musical expression embodied in those compositions. In that situation, even assuming arguendo that any license to adapt the poem were revocable, that premise still would not prohibit Brown from performing the derivative work he created, because it is expressly allowed under 17 U.S.C. § 203(b)(1). Accordingly, even if a license were later revoked, the derivative work itself remains lawful and may continue to be exploited.

Although 203(b)(1) makes license revocation inoperative as to a derivative work and thus moots Consuelo Corretjer's argument, she did not establish that the license was revocable in the first place. Only implied licenses unsupported by consideration are revocable. *Atlantis Servs. Inc. v. Asigra, Inc.*, 2017 WL 4780701. All Corretjer says is that Brown has not paid royalties. But consideration is not limited to money. As we saw in the quote from *Para Que los Pueblos Canten*, Corretjer was grateful to Brown for taking his poems to the heart of Puerto Rico. That was his consideration. Corretjer is immortal in Puerto Rico history because of the quality of his work and the contribution of his life. But he is immortal "in the heart of Puerto Rico" because of what Brown and others have done by putting his poems to music. That is his continuing consideration. While he lived, he never demanded payment for Brown. He was simply–but profoundly–grateful.

Accordingly, the undisputed record shows that Corretjer authorized Brown to set *Boricua en la Luna* to music, that Brown's testimony establishing that authorization is admissible as evidence of a verbal act, and that—even assuming arguendo that any license could later be revoked—Brown's musical composition remains a lawful derivative work that may continue to be exploited under 17 U.S.C. § 203(b)(1).

WHEREFORE, plaintiff respectfully requests hat the Honorable Court enter summary judgment dismissing counterclaim.

RESPECTFULLY SUBMITTED

In San Juan, Puerto Rico, this 4 March 2026.

**s/ Patricia Rivera MacMurray**
Patricia Rivera MacMurray

USDC 222309
E-mail: prm3@mac.com
250 Tetuán, San Juan, PR 00901
Tel. 787 607-3700

I HEREBY CERTIFY that on this date, I electronically filed the foregoing using the CM/ECF system, which will send a notification to all parties in the case.

**s/ Patricia Rivera MacMurray**