**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **Roy Brown,** *Plaintiff*, v. **Latin American Music Co., Inc.,** *Defendant*. | Civil No. 24-01523 (MAJ) |

## OPINION AND ORDER

### I.    Introduction

Plaintiff Roy Brown ("Brown") is a Puerto Rican musician. (**ECF No. 1 at 1 ¶ 4**). On November 12, 2024, Brown filed this copyright infringement action against Latin American Music Company ("LAMCO"), a music publisher that owns the rights to a large catalogue of Latin American musical compositions. (**ECF No. 1**) (the "Complaint"); (**ECF No. 14 at 7**). Brown alleged that LAMCO had infringed his copyright interest in thirteen songs that adapt to music various poems written by Juan Antonio Corretjer ("the Corretjer Works"), a renowned Puerto Rican poet ("Corretjer"). (**ECF No. 1 at 3−4 ¶ 14**). LAMCO answered the Complaint and counterclaimed against Brown for copyright infringement, claiming ownership of the songs in question in its capacity as a representative of Juan Antonio Corretjer. (**ECF No. 23 at 7 ¶ 4**). According to the Answer, LAMCO assumed a copyright interest in the Corretjer Works by assignment from an heir to Juan Antonio Corretjer. (**ECF No. 23 at 7 ¶ 4**).

The Court dismissed the Complaint for failure to state a claim for which relief may be granted. (**ECF No. 53**). Shortly thereafter, the Court also dismissed numerous counterclaims on collateral estoppel grounds, based on a previous lawsuit in which Brown prevailed against LAMCO on copyright claims. (**ECF No. 61**) (citing *Brown v. Latin Am. Music Co.*, 498 F.3d 18, 25 (1st Cir. 2007)). Three songs giving rise to the counterclaims—*Ahora Me Despido*, *Serenata*, and *Inabón Yunez*—were not involved in the prior lawsuit and the infringement claims based on those songs survived the motion to dismiss. (**ECF No. 61 at 17**).

On July 14, 2025, LAMCO filed an Amended Counterclaim (the "Counterclaims") in order to join Consuelo Corretjer as an additional claimant (collectively, "Claimants"). (**ECF No. 44**). Consuelo Corretjer was not a party to the prior litigation between Brown and LAMCO, (**ECF No. 44 at 13 ¶ 36**); (**ECF No. 48 at 8 ¶ 36**), and Brown has not moved to dismiss her claims on res judicata grounds. (**ECF No. 71**). Consuelo Corretjer brings copyright infringement claims against Brown arising from the same thirteen songs that gave rise to LAMCO's original counterclaims: *Ahora Me Despido*, *Andando de Noche Sola*, *Ayuburi*, *Boricua en la Luna*, *Día Antes*, *Diana de Guilarte*, *Distancias*, *El Hijo*, *En la Vida Todo Es Ir*, *Inriri Cahuvial*, *Oubau Moin*, *Serenata*, and *Inabón Yunez*. (**ECF No. 44 at 7 ¶ 3**).

The parties have filed cross motions for summary judgment. (**ECF No. 65**); (**ECF No. 71**); (**ECF No. 74**).[1] For the reasons that follow, the Court grants summary judgment in favor of Brown as to the copyright infringement claims arising from the works *Ahora*

---

[1]    The parties have filed responses, replies, and sur-replies to the pending motions for summary judgment. *See* (**ECF No. 77**); (**ECF No. 79**); (**ECF No. 80**); (**ECF No. 92**); (**ECF No. 95**); (**ECF No. 96**); (**ECF No. 99**); (**ECF No. 101**).

*Me Despido, Andando de Noche Sola, Ayuburi, Día Antes, Diana de Guilarte, Distancias,*

*El Hijo, En la Vida Todo Es Ir, Inriri Cahuvial, Oubau Moin, Serenata,* and *Inabón*

*Yunez.* Accordingly, those claims are **DISMISSED** with prejudice. As to the claim arising

from *Boricua en la Luna,* the Court finds that a triable issue of fact exists.

## II.    Findings of Fact[2]

Twelve of the thirteen Corretjer Works in controversy were first disseminated in

books released prior to January 1, 1978.[3] (**ECF No. 74-1 at 1–3 ¶¶ 1–12**); (**ECF No. 77-**

**1 at 1–3 ¶¶ 1–12**). Those twelve works were disseminated in the poetry collections *Yerba*

*Bruja* (1957),[4] *Imagen de Boriquen 3* (1957),[5] *Alabanza en la Torre de Ciales* (1965),[6]

---

[2]    In making the following findings of fact, the Court applies the standard set forth under Rule 56(c) of the Federal Rules of Civil Procedure and Local Rule 56. *See infra* Sec. III.b.

[3]    LAMCO and Consuelo Corretjer repeatedly object to factual assertions set forth in Brown's Statement of Uncontested Material Facts on the ground that Brown cites to evidence that is "not properly authenticated under Fed. R. Evid. 901." *See, e.g.,* (**ECF No. 79-1 at 1–5 ¶¶ 1–10**). Those objections are overruled. At the summary judgment stage, a "party need not produce evidence in a form that would be admissible at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, the material cited to support or dispute a fact must simply be reducible to an admissible form. *See Joseph v. Lincare, Inc.*, 989 F.3d 147, 155 n.4 (1st Cir. 2021). After all, to hold that a district court may not consider non-authenticated evidence at the summary judgment stage would require this Court to reject the very notion that cases may be resolved on summary judgment.

[4]    In 1957, Juan Antonio Corretjer released *Yerba Bruja*. (**ECF No. 65-1 at 1 ¶ 1**); (**ECF No. 79-1 at 1 ¶ 1**). The book included the poems *Inriri Cahuvial, El Hijo, Ayuburi, Ahora Me Despido, Serenata, En la Vida Todo Es Ir,* and *Andando de Noche Sola.* (**ECF No. 65-1 at 2 ¶ 3**); (**ECF No. 79-1 at 2 ¶ 3**); (**ECF No. 71-1 at 2 ¶ 3**); (**ECF No. 80-1 at 2 ¶ 3**).

[5]    Juan Antonio Corretjer also released the book *Imagen de Boriquen 3* in 1957. (**ECF No. 71-1 at 3 ¶ 11–12**); (**ECF No. 80-1 at 6–7 ¶ 11–12**). The book contained the poem *Distancias.* (**ECF No. 71-1 at 3–4 ¶ 13**); (**ECF No. 80-1 at 7 ¶ 13**). Although Defendants object to Brown's reliance on a photocopy of *Imagen de Boriquen 3* that was allegedly not disclosed during discovery, Defendants admit the book "was released in 1957 without a copyright notice."(**ECF No. 79-1 at 7 ¶ 12**). Since there is no genuine dispute over the fact that *Imagen de Boriquen 3* was released in 1957 without a copyright notice, the Court accepts that fact as true.

[6]    *Alabanza en la Torre de Ciales* was released in Costa Rica in 1953, and later it was released in Puerto Rico in 1965. (**ECF No. 71-1 at 4 ¶¶ 14–15**); (**ECF No. 80-1 at 8 ¶¶ 14–15**). *Alabanza en la Torre de Ciales* included the poem *Oubao Moin.* (**ECF No. 80-1 at 4 ¶ 16**); (**ECF No. 79-1 at 8 ¶ 16**).

*Pausa para el Amor* (1967),[7] and *Construcción del Sur* (1972).[8] None of those releases contained a copyright notice. (**ECF No. 65-1 at 1–2 ¶¶ 2, 5**); (**ECF No. 79-1 at 1–3 ¶¶ 2, 5**); (**ECF No. 71-1 at 1 ¶ 2, 3 ¶¶ 11–12, 4 ¶¶ 15, 19**); (**ECF No. 80-1 at 2 ¶ 2, 6–7 ¶ 11–12, 8 ¶ 15, 9–10 ¶ 19**). The twelve Corretjer Works released in those collections include: *Ahora Me Despido, Andando de Noche Sola, Ayuburi, Día Antes, Diana de Guilarte, Distancias, El Hijo, En la Vida Todo Es Ir, Inriri Cahuvial, Oubau Moin, Serenata,* and *Inabón Yunez.*[9] The parties do not dispute that Brown set the Corretjer Works to music. (**ECF No. 74-1 at 1 ¶ 3**); (**ECF No. 77-1 at 1 ¶ 3**). However, because none of the collections containing those poems included a copyright notice, Brown contends that those poems are in the public domain. (**ECF No. 71 at 8**).[10]

Upon their release, each of the five poetry collections in question received recognition in the press. In 1953, shortly after the release of *Alabanza en la Torre de Ciales* in Costa Rica, a Mexican edition of a bi-monthly poetry magazine published a review of the collection. (**ECF No. 71-1 at 4 ¶ 17**); (**ECF No. 80-1 at 5 ¶ 17**). In 1957, the newspaper *El Mundo* recognized the release of the book *Imagen de Boriquén 3.* (**ECF No. 71-1 at 3–4 ¶ 13**); (**ECF No. 80-1 at 7 ¶ 13**). In March 1958, *El Mundo* published an article focusing on *Yerba Bruja* titled "A book by Juan Antonio Corretjer" ("Un Libro

---

[7]      *Pausa para el Amor* was released by Juan Antonio Corretjer in 1967. (**ECF No. 71-1 at 4 ¶ 18**); (**ECF No. 80-1 at 9 ¶ 18**). *Pausa para el amor* included the poem *Dia Antes.* (**ECF No. 71-13 at 2, 4**).

[8]      Juan Antonio Corretjer released *Construcción del Sur* in 1972. (**ECF No. 65-1 at 2 ¶ 4**); (**ECF No. 79-1 at 2–3 ¶ 4**). The poems *Diana de Guilarte* and *En las Aguas del Inabón, El Nombre* were each included in *Construcción del Sur.* (**ECF No. 71-1 at 3 ¶ 9**); (**ECF No. 80-1 at 5 ¶ 9**). Claimants allege that Brown relies on a version of *Construcción del Sur* that was not disclosed during discovery. (**ECF No. 79-1 at 2–3 ¶ 4**). However, they affirmatively admit "that *Construcción del Sur* was released in 1972." (**ECF No. 79-1 at 3 ¶ 4**). The Court therefore finds that there is no genuine dispute over the fact that *Construcción del Sur* was released in 1972.

[9]      *See supra* notes 3–7.

[10]      *Brown* does not contend that *Boricua en la Luna* is in the public domain. Instead, as the Court will address below, Brown alleges that Corretjer personally authorized Brown to set *Boricua en la Luna* to music.

Civ. No. 24-01523 (MAJ)                                                    Page 5

de Juan Antonio Corretjer"), stating, "Juan Antonio Corretjer offers us a new book of poems." (**ECF No. 65-6**) ("Juan Antonio Corretjer nos ofrece un nuevo libro de poemas[.]"); (**ECF No. 65-1 at 2 ¶¶ 7–8**); (**ECF No. 79-1 at 4–5 ¶¶ 7–8**). In June 1958, *El Mundo* published another article focused on *Yerba Bruja*, this one announcing that the jurors of *Circulo Cultural Yaucano* had awarded the book first prize in a poetry contest. (**ECF No. 65-1 at 3 ¶ 9**); (**ECF No. 79-1 at 5 ¶ 9**). In 1967, the periodical *Puerto Rico Ilustrado* mentioned *Pausa para el Amor* in a column titled "Books from Puerto Rico" ("Libros de Puerto Rico"). (**ECF No. 71-1 at 4–5 ¶ 20**); (**ECF No. 80-1 at 10 ¶ 20**). The entry also listed *Yerba Bruja* and *Alabanza en la Torre de Ciales* as known works previously released by Corretjer. (**ECF No. 71-14 at 2**). In April 1973, the periodical *Puerto Rico Ilustrado* mentioned *Construcción del Sur* in the "Books from Puerto Rico" column. (**ECF No. 65-1 at 3 ¶ 10**); (**ECF No. 79-1 at 5 ¶ 10**).

### III.   Legal Standard

#### a.  Summary Judgment

Summary judgment is appropriate when there is no genuine dispute as to any material fact and only questions of law remain. *White v. Hewlett Packard Enterprise Co.*, 985 F.3d 61, 68 (1st Cir. 2021). "A genuine dispute is one that a reasonable fact-finder could resolve in favor of either party[.]" *Flood v. Bank of Am. Corp.*, 780 F.3d 1, 7 (1st Cir. 2015). "A fact is material if it has the potential of affecting the outcome of the case[.]" *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 93 (1st Cir. 2021) (internal quotations and citations omitted).

To obtain summary judgment, the moving party must show that "there is an absence of evidence to support" the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "The party moving for summary judgment bears the initial

burden of showing that no genuine issue of material fact exists." *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (citation omitted). This burden is met "when the moving party demonstrates that the opposing party has failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *E.E.O.C. v. Kohl's Dept. Stores, Inc.*, 774 F.3d 127, 131 (1st Cir. 2014) (internal quotations and citation omitted).

In opposing a motion for summary judgment, the claimant "bears the burden of producing specific facts sufficient to" defeat summary judgment. *González-Cabán v. JR Seafood Inc.*, 48 F.4th 10, 14 (1st Cir. 2022) (internal quotations and citation omitted). The Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 6 (1st Cir. 2003). In addition, the Court will "not engage making credibility determinations or weighing the evidence at the summary judgment stage[.]" *Pina v. Children's Place*, 740 F.3d 785, 802 (1st Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

### b. Findings of Fact

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a party asserting that a fact is "genuinely disputed" must provide support for that the assertion by:

(A) citing to particular parts of materials in the record . . . or

(B) showing that the materials cited [by the adverse party] do not establish the absence or presence of a genuine dispute, or that [the] adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A)–(B). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" and may "grant

summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e).

The Local Rules for the District of Puerto Rico prescribe a detailed process that litigants must observe in order to satisfy the requirements of Rule 56(c) of the Federal Rules of Civil Procedure. Under Local Rule 56(c), "[a] party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts." D.P.R. Loc. Civ. R. 56(c). As to the party contesting a motion for summary judgment, "[u]nless a fact is admitted, the opposing statement shall support each denial or qualification by a record citation[.]" D.P.R. Loc. Civ. R. 56(c).

Local Rule 56(c), also known as the "anti-ferret rule," is "intended to protect the district court from perusing through the summary judgment record in search of disputed material facts and prevent litigants from shifting that burden onto the court." *López-Hernández v. Terumo P.R. LLC*, 64 F.4th 22, 26 (1st Cir. 2023). As the First Circuit has lamented, "violations of this local rule are astoundingly common and constitute an unnecessary burden to the trial court's docket and time." *López-Hernández v. Terumo Puerto Rico LLC*, 64 F.4th 22, 26 (1st Cir. 2023). Yet "compliance with Local Rule 56 is a mandate, not a suggestion." *Ramirez-Rivera v. DeJoy*, 693 F. Supp. 3d 210, 213 (D.P.R. 2023); *see also López-Hernández*, 64 F.4th at 26 ("We have repeatedly emphasized the importance of complying with said local rule and have implored litigants to comply or ignore it 'at their peril.'"). Accordingly, where a fact set forth by the movant has not been properly controverted, it will be deemed admitted. D.P.R. Loc. Civ. R. 56(e) ("The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment.").

Civ. No. 24-01523 (MAJ)                                                    Page 8

## IV.    Analysis

This controversy centers on two main issues. First, Brown contends that twelve of the thirteen Corretjer Works—*Ahora Me Despido*, *Andando de Noche Sola*, *Ayuburi*, *Día Antes*, *Diana de Guilarte*, *Distancias*, *El Hijo*, *En la Vida Todo Es Ir*, *Inriri Cahuvial*, *Oubau Moin*, *Serenata*, and *Inabón Yunez*—are in the public domain and lack copyright protections, such that his derivative musical works do not constitute acts of copyright infringement. Second, Brown contends that Corretjer personally authorized him to set *Boricua en la Luna* to music. Claimants bear the burden to prove the existence of a valid copyright. S*ee Brown*, 498 F.3d at 24. The Court will address each issue in turn.

### a.  There is no genuine dispute of material fact that twelve of the thirteen Corretjer Works are in the public domain.

The validity of a copyright in a work distributed prior to January 1, 1978 is determined by the Copyright Act of 1909. *See Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. KG.*, 510 F.3d 77, 87 n.8 (1st Cir. 2007) (noting that "[p]re-1978 [copyright] claims . . . are governed by the Copyright Act of 1909"). The Copyright Act of 1909 provided:

> Any person entitled thereto by this title may secure copyright for his work by publication thereof with the notice of copyright required by this title; and such notice will be affixed to each copy thereof published or offered for sale in the United States by authority of the copyright proprietor[.]

1909 Copyright Act, 17 U.S.C. § 101. As the First Circuit explained in *Brown*:

> The general rule under the 1909 Act is that a work must bear a valid copyright notice upon publication in order to secure copyright protection in the United States. Under that rule, a publication of a work in the United States without the statutory notice of copyright fell into the public domain, precluding forever any subsequent copyright protection of the published work.

Civ. No. 24-01523 (MAJ)                                                    Page 9

498 F.3d at 23 (quoting *Twin Books Corp. v. Walt Disney Co.*, 83 F.3d 1162, 1165–66 (9th Cir.1996)).

However, "[u]nder the 1909 Act[,] the principle evolved that a 'general publication' without the statutory notice could bar access to federal copyright, but a 'limited publication' would not." *Id.* (citing *Burke v. Nat'l Broad. Co., Inc.*, 598 F.2d 688, 691 (1st Cir.1979)). That principle derived from the common law, which "recognizes three ways of exposing a work to the public: exhibition or performance, limited publication, and general publication. Of these, only general publication results in loss of the common law copyright by the creator." *Burke*, 598 F.2d at 691.

Claimants assert that the Corretjer Works in question were released only by "limited publication" rather than by any "general publication." (**ECF No. 74 at 6**). "A general publication occurs when a work is made available to members of the public at large without regard to who they are or what they propose to do with it." *Burke*, 598 F.2d at 691. In other words, "[a] general publication is such dissemination of the work itself among the public as justifies the belief that it has been dedicated to the public and rendered common property." *Id.* "A 'limited publication,' by contrast, occurs when tangible copies of the work are distributed, but to a limited class of persons and for a limited purpose." *Id.* "[A] limited publication communicates the contents of a [work] to [1] a definitely selected group and [2] for a limited purpose [3] without the right of diffusion, reproduction, distribution or sale[.]" *Id.* (citing *White v. Kimmell*, 193 F.2d 744, 746 -47 (9th Cir. 1952)). Whether a publication is general or limited is "determined objectively from the implications of [the artist's] outward actions to the reasonable outsider." *Warner Bros. Ent. v. X One X Prods.*, 644 F.3d 584, 593 (8th Cir. 2011). Crucially, "[i]f the creator exceeds the scope of a limited publication and allows the work

to pass into the public domain, a 'general publication' of the work occurs. At that point, unless the creator has obtained a statutory copyright, anyone can copy, distribute or sell the work." *Academy of Motion Picture Arts & Sciences. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1451–52 (9th Cir. 1991) (citing *Burke*, 598 F.2d at 691). Thus, "[e]ven if the persons receiving copies in fact constitute only a select group, the publication is nevertheless general if copies were available to persons not included in the group." *Brown v. Tabb*, 714 F.2d 1088, 1092 (11th Cir. 1983).

By way of example, the delivery of "booklets to selected religious congregations for the circumscribed purpose of literary feedback rings more of a limited publication . . . than a general publication[.]" *Society of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 45 (1st Cir. 2012). The mere public performance of a work likewise does not divest the work of copyright protections. *Estate of Martin Luther King, Jr., Inc. v. CBS, Inc.*, 194 F.3d 1211, 1215 (11th Cir. 1999) (collecting cases). Similarly, the Oscar, the gold figure trophy presented at the Academy Awards, "constituted a limited publication" where the Academy Awards merely "distributed personalized Oscar statuettes to a select group of distinguished artists" and "did not sell or directly profit from the award" and did not "encourage its further distribution." *Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1454, 1451–52 (9th Cir. 1991). In another instance, where a photographer entered into a photograph licensing agreement with a company in which the photographer granted the company a two-year license to inspect a definite number of original photos in order to select certain photographs to curate, the Fourth Circuit held it was "a classic case" where a copyright work was published to only "a definitely selected group, for the limited purpose of its examination and review, without any right to further distribution." *Philpot v. Indep. J. Rev.*, 92 F.4th

252, 266 (4th Cir. 2024); *see also Silverman v. CBS Inc.*, 632 F.Supp. 1344, 1354 (E.D.N.Y. 1986) (finding limited publication where CBS circulated television broadcasts under "Affiliation Agreements" with specific broadcasting stations containing a clause requiring the immediate return of copies of any program distributed for a single broadcast).

In contrast, in the case of an advertising jingle, the Eleventh Circuit found that an artist had issued a general publication of their work where each recipient of the jingle was "free to use the jingle for his own commercial benefit" and there was "no evidence [that] any potential purchaser was ever turned away." *Brown v. Tabb*, 714 F.2d 1088, 1091–92 (11th Cir. 1983); *see also Continental Casualty Co. v. Beardsley*, 253 F.2d 702, 707 (2d Cir.1958) (finding a general publication where "[t]he only limitation was that attributable to a lack of general interest in the highly specialized subject-matter"). The circulation of a work may also constitute a "general publication" where there is evidence of "widespread distribution." *X One X Prods.*, 644 F.3d at 595 (noting that the purpose of distributing the materials in question was "to reach as much of the public as possible"). And even if a work is released only to a small group of individuals, the circulation of the work constitutes a general publication where the means by which an artist "decided whether an individual should receive [the publication] was completely subjective" such that it was "not possible to ascertain what individuals were or would be part of a select or restricted class." *Penguin Books U.S.A. v. New Christian Church of Full Endeavor, Ltd.*, 288 F.Supp.2d 544, 556 (S.D.N.Y. 2003).

There is no dispute that the Corretjer Works—with the sole exception of *Boricua en la Luna*—were released without a copyright notice prior to January 1, 1978. To prevail on their copyright infringement claims against Brown, therefore, Claimants must

introduce sufficient evidence to permit a reasonable jury to conclude that the Corretjer Works were circulated only by a "limited publication." S*ee Brown*, 498 F.3d at 24 (noting that the burden to prove the existence of a valid copyright rests with the claimant). After careful consideration, the Court finds that they have failed to do so. First, for their theory of limited publication, Claimants rely on a sworn affidavit that is not admissible. Second, even if the Court were to admit the affidavit as evidence, it would not permit a reasonable jury to find that Corretjer circulated his works only to a definitely selected group, for a limited purpose, and without any right to further distribution.

> **i. To create a dispute of material fact over the copyright status of the Corretjer Works, Claimants rely on inadmissible evidence.**

Pursuant to Federal Rule of Civil Procedure 56(c)(4), an affidavit submitted in opposition to a motion for summary judgment must be based on "personal knowledge." *See Perez v. Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir. 2001). Affidavits are a disfavored form of proof under Rule 56(c)(4), and the "personal knowledge" standard is exacting. *See id.*; *see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir. 1990) (describing affidavits as generally "subject to . . . infirmities"). Any portions of an affidavit that fail the "personal knowledge" requirement may be excluded. *See Bonner v. Triple-S Mgmt. Corp.*, 68 F.4th 677, 687 (1st Cir. 2023). In applying Rule 56(c)(4), a district court must "approach the declaration with a scalpel, not a butcher's knife, disregarding only those portions that are inadmissible and crediting the remaining statements." *Id.* (citations and quotations omitted).

"[A] bare assertion that a statement is based on the affiant's personal knowledge will not suffice; rather, the affidavit must be factually specific and explain the basis for that knowledge." *Navedo v. Nalco Chem., Inc.*, 848 F. Supp. 2d 171, 179 (D.P.R. 2012)

(*citing Perez*, 247 F.3d at 315). An affidavit that does not "contain enough specifics [or] speak meaningfully to matters within [the affiant's] personal knowledge" may not be considered. *Cadle Co. v. Hayes*, 116 F.3d 957, 961 (1st Cir. 1997); *see also Perez*, 247 F.3d 303 (striking an affidavit statement where it "purport[ed] to be based on personal knowledge," yet was "totally lacking in specificity about the identity" of the corporate defendant's alleged representatives with whom the affiant allegedly interacted). For that reason, "[s]tatements predicated upon undefined discussions with unnamed persons at unspecified times are simply too amorphous to satisfy the requirements of Rule 56(e), even when proffered in affidavit form by one who claims to have been a participant." *Perez*, 247 F.3d at 316; *see also* Fed. R. Civ. P. 56(e).

To support their theory of "limited publication," Claimants rely on sworn interrogatory answers provided by Alberto Súarez, the Copyrights Catalog Administrator at Latin American Music Company. (**ECF No. 74-1 at 2–4 ¶¶ 6, 9–10, 13–14, 16–17, 19–22**); (**ECF No. 74-13**). The sworn statement outlines a theory that Juan Antonio Corretjer, as a result of facing political persecution and repeated threats to his physical safety, shared his works only "among a limited group of people that were interested in and sympathetic to his ideas" so that he could avoid retaliation for the contents of his poems, (**ECF No. 74-1 at 2 ¶ 9**) (citing (**ECF No. 74-13 at 14–18**)), as well as "evade censorship based on his activism and share his ideas directly with his base of support." (**ECF No. 74-13 at 18**). Corretjer therefore shared his works, according to Súarez, only with "a small group of friendly artists, professors, and intellectuals, all of whom were politically aligned with Corretjer and favored Puerto Rico's independence." (**ECF No. 74-1 at 3 ¶ 14**) (citing (**ECF No. 74-13 at 14–18**)). Súarez contends that "Corretjer exercised sole control over access" to his writings and "never gave explicit permission for

further reproduction of the titles in question. (**ECF No. 74-1 at 3 ¶¶ 13, 16**) (citing (**ECF No. 74-13 at 14–18**)). According to the sworn statement prepared by Súarez, "[g]iven the prevailing political and cultural climate, there would have been an implicit and generally understood prohibition on widespread dissemination, even absent explicit statements in that regard." (**ECF No. 74-1 at 3 ¶¶ 13, 16**) (**ECF No. 74-13 at 14–18**)).

The sworn statement prepared by Súarez does not set forth any basis for his purported "personal knowledge" of these facts. Súarez alleges that his "personal knowledge" of the facts proffered in his sworn statement was attained not from any of his own experiences and observations of the facts in controversy, but instead "from [his] three years of working at LAMCO" and from "the personal knowledge of other LAMCO personnel[.]" (**ECF No. 74-12 at ¶ 3**). Notably, his sworn statement does not allege that he personally knew or met Juan Antonio Corretjer; nor does the sworn statement allege that Súarez was personally acquainted with any of the people to whom Corretjer distributed his works. In fact, Súarez does not specify whether he was even alive at the time of the events described in his sworn statement, some of which occurred over seventy years ago.

If that were not enough, the sworn statement prepared by Súarez lacks any further indicia of reliability. The sweeping account of Corretjer's biography and twentieth century Puerto Rican history proffered in the sworn statement does not contain any citations to primary sources or peer-reviewed scholarship; nor does Súarez hold himself out to be a qualified expert on the biography of Juan Antonio Corretjer or the twentieth century history of Puerto Rico.[11] (**ECF No. 74-13 at 14–18**). And the most relevant details in the

---

[11]    Claimants do not contend that Súarez is an expert witness, nor do they contend that they provided notice of any such anticipated expert witness testimony in compliance with Rule 26(a)(2) of the Federal Rules of Civil Procedure.

sworn statement are extremely vague; for instance, where Súarez alleges that Corretjer only disseminated his work to "a select group of people" among "his friends and acquaintances" who were "typically . . . artists, professors, and intellectuals, all politically aligned with Corretjer," he fails to name a single such individual or entity. (**ECF No. 74-13 at 17**). In another such instance, when Súarez alleges broadly that "Corretjer never gave explicit permission for further reproduction of the titles in question," he identifies no document or person that could provide a reasonable factual basis for that claim. (**ECF No. 74-13 at 16**).

"[P]redicated upon undefined discussions with unnamed persons at unspecified times[,]" the sworn statement is "simply too amorphous to satisfy the requirements of Rule 56(e)[.]" *Perez*, 247 F.3d at 316. The Court therefore strikes the statement from the summary judgment record. Since the sworn statement provides the only factual basis for Claimants' theory of limited publication, (**ECF No. 74-1 at 2–4 ¶¶ 6, 9–10, 13–14, 16–17, 19–22**), the theory fails.

> ii. **The Súarez affidavit fails to create a dispute of material fact because, even if taken to be true, it would not permit a reasonable jury to conclude the Corretjer Works were released in "limited publications."**

The Court also finds that the facts alleged in the sworn statement prepared by Súarez would – even if admitted – fail to provide an evidentiary basis for a reasonable jury to conclude that the twelve Corretjer Works in question were circulated as "limited publications," because the allegations set forth in that sworn statement fail to identify a

specific group of people to whom the Corretjer Works were circulated or a specific purpose for which they were circulated. *See Burke*, 598 F.2d at 691.[12]

As to the identification of a specific group, Súarez alleges only that Corretjer circulated his work to "a select group of people" among an unnamed and indeterminate number of "his friends and acquaintances" who were "*typically* . . . artists, professors, and intellectuals, all politically aligned with Corretjer[.]" (**ECF No. 74-13 at 17**) (emphasis added). But "[a] select group cannot be created by an author's subjective test of cordiality." *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 288 F. Supp. 2d 544, 556 (S.D.N.Y. 2003). Where it is "not possible to ascertain what individuals were or would be part of a select or restricted class" a work is not protected as a limited publication. *Id*. Moreover, Súarez does not allege that the Corretjer Works in question were never circulated beyond the intimate group of unknown "friends and acquaintances" described in the sworn statement, or that Corretjer ever turned away any potential purchaser of the works. *See Brown v. Tabb*, 714 F.2d 1088, 1092 (11th Cir. 1983) (explaining that "[e]ven if the persons receiving copies in fact constitute only a select group, the publication is nevertheless general if copies were available to persons not included in the group"). The sworn statement also does not explain how the Corretjer Works managed to receive recognition in the press despite the purportedly strict limitations on their circulation, as Súarez does not allege that Corretjer was personally acquainted with the journalists who promoted his work in the press. *See Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 288 F. Supp. 2d 544, 557 (S.D.N.Y. 2003) (noting that "[a]n author's lack of personal knowledge or friendship with

---

[12]    As previously noted, the only evidence provided by Claimants to support their theory of "limited publication" is the sworn statement prepared by Súarez. *See* (**ECF No. 74-1 at 2–4 ¶¶ 6, 9–10, 13–14, 16–17, 19–22**).

persons that receive the work is indicative that a distribution was not limited as to the group or the purpose.") (citing *White v. Kimmell*, 193 F.2d 744, 747 (9th Cir. 1952)).

Nor does the sworn statement provided by Súarez identify a sufficient "specific purpose" for the purportedly limited circulation of the Corretjer Works in question. At best, Súarez speculates that Corretjer limited the circulation of his work as part of "an active strategy to evade censorship based on his activism and share his ideas directly with his base of support." (**ECF No. 74-13 at 18**). Assuming that to be true, the theory proves self-defeating: if Corretjer's intention in circulating his works was to share his ideas and further his political activism as broadly as possible, that would only support the conclusion that the publications in question were general, not limited. *See X One X Prods.*, 644 F.3d at 595 (finding general publication where the purpose of distributing the materials in question was "to reach as much of the public as possible").

Accordingly, viewing the evidence in a light most favorable to Claimants, the Court hold that they have failed to set forth evidence sufficient to permit a reasonable jury to find that Brown committed copyright infringement with respect to the twelve Corretjer Works in question.

### b. A genuine dispute of material fact exists as to whether Corretjer licensed Brown to adapt *Boricua en la Luna* to music.

The Court now turns to the copyright infringement claim arising from the poem *Boricua en la luna*. Brown does not contend that *Boricua en la Luna* is in the public domain. (**ECF No. 74-1 at 2 ¶ 5**); (**ECF No. 77-1 at 1 ¶ 5**). Instead, Brown asserts that Juan Antonio Corretjer personally authorized Brown to adapt *Boricua en la Luna* into a song, thereby granting Brown a non-exclusive license to adapt the work. (**ECF No. 71 at 8**).

The record establishes that Consuelo Corretjer holds a valid copyright interest in the work *Boricua en la Luna*. (**ECF No. 74-1 at 2 ¶ 3, 8 ¶¶ 47–50**); (**ECF No. 77-1 at 1 ¶ 3, 16 ¶¶ 47–50**). The burden therefore shifts to Brown to prove that he possessed a valid license to use that copyright: "[t]he burden of proving the existence of such a license is on the party claiming its protection, the licensee." *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 322 F.3d 26, 40 (1st Cir. 2003); *see also Latin Am. Music Co., Inc. v. Disco Hit Productions*, Civ. No. 02-1788, 2008 WL 11500497, at *5 (D.P.R. June 23, 2008) (explaining that, because a "license is an affirmative defense to infringement, the party claiming the protection of a license has the burden of proving the existences of a license").

"[A] nonexclusive license may be granted orally, or may even be implied from conduct." *Data General Corp. v. Grumman Systems Support Corp.*, 36 F.3d 1147, 1167 n.35 (1st Cir. 1994) (quoting 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.03[A], at 10–38) (internal quotations omitted); *see also Photographic Illustrators Corp. v. Orgill, Inc.*, 953 F.3d 56, 60 (1st Cir. 2020) (applying federal common law to resolve an "implied license" defense to a copyright infringement claim). "Uses of [a] copyrighted work that stay within the scope of a nonexclusive license are immunized from infringement suits." *Winchester-Conant Properties*, 322 F.3d at 40. Whether expressed orally or implied by conduct, such non-exclusive licenses exist "[w]hen the totality of the parties' conduct indicates an intent to grant such permission[.]" *Nimmer*, § 10.03[A][7]; *see also Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 41 (1st Cir. 2010) ("The touchstone for finding an implied license . . . is intent.") (internal quotations and citations omitted).

Civ. No. 24-01523 (MAJ)                                                                        Page 19

According to Brown, at a 1976 concert at Teatro La Perla in Ponce, Puerto Rico, Juan Antonio Corretjer personally gave Brown an unreleased copy of *Boricua en la Luna* and told Brown: "This is something you should set to music." (**ECF No. 71-1 at 5 ¶¶ 21–25**). The physical copy of the poem allegedly conveyed by Juan Antonio Corretjer to Brown is dated September 1976, which corroborates Brown's sworn testimony regarding the encounter. (**ECF No. 71-1 at 5 ¶¶ 23–25**). In 1988, Roy Brown registered his musical adaptation of *Boricua en la Luna* with the Copyright Office of the United States. (**ECF No. 71-1 at 6 ¶ 30**). In that filing, Brown claimed ownership only of the musical composition and identified Juan Antonio Corretjer's poem as the pre-existing work from which the musical composition was derived. (**ECF No. 71-1 at 6 ¶ 31**). Further circumstantial evidence supports Brown's version of the encounter: on July 31, 1976, Juan Antonio Corretjer released a book presciently titled *Para que los Pueblos Canten* ("So that the people may sing"). (**ECF No. 71-1 at 5 ¶ 27**).[13] *Para que los Pueblos Canten* includes a picture of Roy Brown, (**ECF No. 71-18 at 5**), and states "in a modest gesture of gratitude, I include in this edition portraits of these groups of young musicians and singers that have so generously received my poems." (**ECF No. 71-18 at 6**) ("En modesta prueba de agradecimiento incluyo en esta edición retratos de estas agrupaciones de jóvenes músicos y cantantes que tan generosamente han acogido mis poemas.").

---

[13]    Claimants object to the consideration of any evidence relating to *Para que los Pueblos Canten* on the grounds that the evidentiary support appended by Brown to the Motion for Summary Judgment is allegedly "not the version of *Para que los Pueblos Canten* disclosed during discovery" and is instead "an incomplete or truncated version" of materials exchanged in discovery. (**ECF No. 80-1 at 12 ¶ 27**). Claimants do not explain why an excerpted version of evidence properly disclosed during the course of discovery should be subject to "the severe exclusionary penalty provided for by Rule 37(c)(1)" or how the introduction of this excerpted photocopy caused any "harm" to Claimants. *Acadia Ins. Co. v. Cunningham*, 771 F.Supp.2d 172, 175 (1st Cir. 2011) (noting that in the absence of harm, a district court may not apply the exclusionary penalty of Rule 37(c)(1)). Accordingly, Claimants objection is overruled.

Claimants do not introduce any evidence that directly contradicts Brown's account of his alleged 1976 encounter with Juan Antonio Corretjer. Instead, Claimants point to impeachment evidence that they believe calls into question the credibility of Brown's version of the encounter. Across multiple instances in which Brown has recounted the alleged exchange in which Juan Antonio Corretjer authorized him to set *Boricua en la Luna* to music, Brown has described the time and location of the encounter inconsistently. First, in connection with a prior copyright infringement case, Brown provided sworn deposition testimony in 2005 stating that the alleged encounter happened at a concert in Ponce in 1977, rather than in 1976. (**ECF No. 80-1 at 10−11 ¶¶ 21−23, 25**) (citing (**ECF No. 74-13 at 10**)). Second, Brown gave an interview in 2020 to the National Foundation for Popular Culture in which he stated that he "believe[d]" that Corretjer "wrote [*Boricua en la Luna*] in 1981, and in that same year, [Brown] visited him at his daughter Consuelo's house in New Jersey," where Corretjer gave Brown the poem and instructed him "[s]et it to music." (**ECF No. 80-1 at 10−11 ¶¶ 21−22, 25**) (citing (**ECF No. 74-15**)).

The Court finds that this record presents a genuine dispute of material fact warranting submission of the evidence to a jury. The Court will address each of the pending cross-motions for Summary Judgment in turn.

### i. Viewing the evidence in a light most favorable to Brown, the record fails to establish that he committed copyright infringement as a matter of law.

Viewing the evidence in a light most favorable to Brown, the record fails to establish that he committed copyright infringement as a matter of law: Claimants therefore are not entitled to summary judgment on their copyright infringement claim. A reasonable jury would be entitled to credit Brown's story in which Juan Antonio Corretjer

gave him a copy of *Boricua en la Luna* and stated, "this is something you should set to music," (**ECF No. 71-1 at 5 ¶¶ 21–25**), and infer from those facts that it was Corretjer's intention to grant Brown a non-exclusive license to use the lyrics to the poem in his songs. *See Nimmer*, § 10.03[A][7] (explaining that non-exclusive licenses exist "[w]hen the totality of the parties' conduct indicates an intent to grant such permission"). Claimants' arguments to the contrary are unavailing.

First, Claimants argue that "the record . . . is devoid of evidence . . . that would show that Corretjer intended to grant Brown any type of copyright interest, let alone the type of broad, unrestricted, commercial use that Brown has engaged in here." (**ECF No. 74 at 23**). This argument proves too much. The record is not "devoid of evidence" that Corretjer intended to grant Brown a non-exclusive license: a jury would be entitled to believe Brown's testimony that Corretjer approached him with a copy of *Boricua en la Luna* and stated, "this is something you should set to music." Viewed in a light most favorable to Brown, that statement alone is enough to permit a reasonable jury to find that Corretjer intended to grant Brown a non-exclusive license to exploit his work. To the extent that Claimants argue that a non-exclusive copyright license can only be created by the "magic words" of formalized contract law, *see* (**ECF No. 92 at 6**) (arguing that the statement "this is something you should set to music" cannot establish such intent because it includes no "express contract terms"), Claimants provide no legal authority on point to support their argument, which also happens to conflict with the very concept of an *implied* license.[14] Moreover, although Claimants do not meaningfully engage with the

---

[14]    If it were true that, as Claimants contend, the creation of a copyright license required the articulation of express contract terms, there would be no room for a doctrine whereby non-exclusive licenses could "be implied from conduct." See *Data General Corp. v. Grumman Systems Support Corp.*, 36 F.3d 1147, 1167 n.35 (1st Cir. 1994) (internal quotations omitted).

factors that guide the analysis of intent in the implied license context, it bears noting that

each of those factors favor Brown. As the First Circuit has explained, courts evaluating the

validity of a purported implied copyright license look to:

> (1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts . . . providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.

*John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 41 (1st Cir. 2003)

(quoting *Nelson-Salabes v. Morningside Development, LLC*, 284 F.3d 505, 516 (4th Cir.

2002)). Because there is evidence to suggest that Brown and Corretjer had an ongoing

relationship, evidence that they never executed any formal written contracts providing

that copyright materials could only be used with Corretjer's future involvement or express

permission, and evidence proffered by Brown that would, taken in a light most favorable

to Brown, suggest that Corretjer's actions upon the delivery of *Boricua en la Luna*

indicated that use of the material without his involvement or consent was permissible, it

is clear that a reasonable jury could find that an implied license was validly formed.

Second, Claimants argue that the Corretjer statement "this is something you

should set to music" constitutes inadmissible hearsay. (**ECF No. 74 at 22**). The Court

disagrees. The statement does not constitute hearsay because it is not "offer[ed] in

evidence to prove the truth of the matter asserted in the statement." *See* Fed. R. Evid.

801(c). Plaintiff ventures to introduce the Corretjer statement that "this is something you

should set to music" in order to prove that Corretjer objectively manifested the intention

to grant Brown a non-exclusive license to set *Boricua en la Luna* to music, not in order to

prove that from some aesthetic or ethical point of view *Boricua en la Luna* "should" have

been adapted to music by Brown. Put another way, the statement in question falls within the so-called "verbal acts" doctrine. Under the doctrine, the rule against hearsay does not include "the entire category of 'verbal acts' and 'verbal parts of an act,' in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights." Fed. R. Evid. 801, Advisory Committee Note to Subdivision (c). For instance, a "signature endorsement" may constitute "a legally operative verbal act" where it is offered to prove a "fraudulent action." *United States v. Bowles*, 751 F.3d 35, 40 (1st Cir. 2014) ("In this respect, the endorsements are comparable to words offering a bribe or making a threat, which we have recognized as verbal acts that are not hearsay."). By the same logic, offers to form a contract are a classic species of "verbal act" that does not fall within the definition of "hearsay" under Rule 801. *See United States v. DeCologero*, 530 F.3d 36, 59 (1st Cir. 2008) ("[Verbal] acts are limited to statements that have independent legal significance, such as contractual offers or inter vivos gifts") (quoting *United States v. Stover*, 329 F.3d 859, 870 (D.C. Cir. 2003)) (internal quotations omitted); *see also Preferred Properties, Inc. v. Indian River Estates, Inc.*, 276 F.3d 790, 798 n.5 ("The verbal acts doctrine applies where legal consequences flow from the fact that words were said, e.g. the words of offer and acceptance which create a contract") (quoting Black's Law Dictionary (6th ed. 1990)) (internal quotations omitted); *Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992) ("A contract, for example, is a form of verbal act to which the law attaches duties and liabilities and therefore is not hearsay . . . In addition, various communications—e.g., conversations, letters, and telegrams—relevant to the making of the contract are also not hearsay."). The same logic applies here in the context of an oral or implied non-exclusive copyright license. See *John G. Danielson*, 322 F.3d at 42 (describing the test for an implied non-exclusive copyright

license as "an objective inquiry into facts that manifest such contractual intent" and as "a typical task in contract law"). Moreover, and for the same reason, even if the statement did constitute hearsay, it would fall within the exception to the rule against hearsay for statements evincing "the declarant's then-existing state of mind (such as motive, intent, or plan)[.]" *See* Fed. R. Evid. 803(3); *Southex Exhibitions, Inc. v. Rhode Island Builders Ass'n, Inc.,* 279 F.3d 94, 103 n.8 (1st Cir. 2002) (holding that district court did not commit abuse of discretion by admitting a hearsay statement evincing "intent in signing a contract" under Rule 803(3)). The Court therefore finds that the statement "this is something you should set to music" does not constitute hearsay.

Third, Claimants argue that to establish "an implied license" the licensee must provide "affirmative proof that [he] requested the creation of the work, that the licensor created and delivered the work, and[,] most importantly, that the licensor intended that the licensee distribute the work." (**ECF No. 74 at 23**) (citing *John G. Danielson,* 322 F.3d at 41). Without developing this argument in detail, Claimants imply that Brown cannot establish that he "requested the creation of [*Boricua en la Luna*]," and that his affirmative defense therefore fails. This argument misses the mark, since Claimants flatly misstate the law regarding implied copyright licenses: as the First Circuit held in *Orgill*, a person raising an implied license defense need not prove that they requested the production of the copyrighted work to prevail. 953 F.3d at 62. Instead, the core question is one of intent. *Id.* (concluding that the "implied license" analysis should "focus on manifestations of the [creator's] intent") (internal quotations and citations omitted). As explained above, the Court concludes that a reasonable jury could find that the direct statement "this is something you should set to music"—coupled with corroborating circumstantial evidence—would permit a reasonable jury to conclude that Corretjer

granted Brown a valid non-exclusive license to reproduce and distribute *Boricua en la Luna*. The instant Motion for Summary Judgment, (**ECF No. 74**), is therefore **DENIED**.[15]

> ### ii. Viewing the evidence in a light most favorable to Claimants, a triable issue of fact exists as to whether Juan Antonio Corretjer granted Brown a non-exclusive license to reproduce *Boricua en la Luna*.

Turning to the Motion for Summary Judgment filed by Brown, "summary judgment is warranted only if [Brown] has provided conclusive evidence proving the license" to reproduce and distribute *Boricua en la Luna*. *Photographic Illustrators Corp. v. Orgill, Inc.*, 953 F.3d 56, 65 (1st Cir. 2020) (citations and quotations omitted). The Court finds that Brown falls short of that standard.

To establish as a matter of law that Corretjer granted Brown a non-exclusive license to exploit *Boricua en la Luna*, Brown relies on his sworn testimony asserting that Corretjer told him "this is something you should set to music," along with circumstantial evidence that tends to corroborate Brown's account of that event. Brown is correct that "a party's own [sworn-statement], containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 53 (1st Cir. 2000) (citing *Cadle Co. v. Hayes*, 116 F.3d 957, 961 n. 5 (1st Cir. 1997)) (internal quotations omitted).

---

[15]    Claimants also appear to imply—again, without developing the argument—that Brown's testimony is inadequate to defeat summary judgment because it is a "self-serving, decades-old statement." (**ECF No. 74 at 23**). Yet "[t]he law regarding this dispute is clear[:] . . . a party's own [sworn statement], containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 53 (1st Cir. 2000) (citing *Cadle Co. v. Hayes*, 116 F.3d 957, 961 n. 5 (1st Cir. 1997)) (internal quotations omitted).

Yet Brown falls short of establishing as a matter of law that Corretjer intended to grant him a non-exclusive license to reproduce and distribute *Boricua en la Luna*. Whether Corretjer intended to grant Brown a non-exclusive license to reproduce and distribute *Boricua en la Luna* is a question of fact.[16] To establish that fact, Brown provides a sworn statement that Claimants intend to impeach with prior inconsistent statements made by Brown regarding the facts of that encounter. *See* (**ECF No. 80-1 at 10–11 ¶¶ 21–23, 25**) (citing (**ECF No. 74-13 at 10**)); (**ECF No. 80-1 at 10–11 ¶¶ 21–22, 25**) (citing (**ECF No. 74-15**)). Under these circumstances, summary judgment is not warranted. *See Xiaoyan Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 216 –217 (1st Cir. 2016) (finding that prior inconsistent statements made by the plaintiff did not warrant the entry of summary judgment in favor of the defendants, since "[c]redibility determinations are for the factfinder at trial, not for the court at summary judgment.") (quoting *Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 49 (1st Cir. 1999)) (internal quotations omitted); *Machado-Mariscal v. Bayamón Medical Center Corp.*, Civ. No. 21-1468, 2024 WL 5405261, at *1 (D.P.R. Mar. 13, 2024) (finding that impeachment evidence undermining the credibility of the defendant's witnesses "only reinforce[d] the need for trial"). Viewing the facts in a light most favorable to Claimants, a reasonable jury would be entitled to disbelieve Brown's account of the facts material to his affirmative license defense, since there is evidence that Brown himself has on multiple occasions provided conflicting versions of the alleged exchange between himself and Corretjer. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility

---

[16]     Where a fact-finder looks to the "intent of the grantor" to "determine[e] the existence of an implied nonexclusive license[,]" the inquiry focuses on "facts that manifest such contractual intent." *John G. Danielson,* 322 F.3d at 42. "This is a typical task in contract law," *id.*, which treats this inquiry as "a question of fact." Am. Jur. 2d Contracts § 29 ("Necessity of mutual assent and intent to be bound, generally").

Civ. No. 24-01523 (MAJ)                                                                  Page 27

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."); *Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 35 (1st Cir. 1998) ("The party who has the burden of proof on a dispositive issue cannot attain summary judgment unless the evidence that he provides on that issue is conclusive"). Accordingly, Brown's Motion for Summary Judgment is **DENIED** as to the copyright infringement claims arising from *Boricua en la Luna*.[17]

## V.    Conclusion

For the reasons set forth above, the Court grants summary judgment in favor of Brown as to the copyright infringement claims arising from *Ahora Me Despido*, *Andando de Noche Sola*, *Ayuburi*, *Día Antes*, *Diana de Guilarte*, *Distancias*, *El Hijo*, *En la Vida Todo Es Ir*, *Inriri Cahuvial*, *Oubau Moin*, *Serenata*, and *Inabón Yunez*. As to the copyright infringement claims arising from *Boricua en la Luna*, the Court finds that summary judgment is not warranted, since a genuine dispute of material fact exists over whether Brown possessed a non-exclusive license to exploit that copyright.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 12th day of August, 2026.

> ***/s/ María Antongiorgi-Jordán***
> **MARIA ANTONGIORGI-JORDAN**
> **UNITED STATES DISTRICT JUDGE**

---

[17]    In their opposition to the Motion for Summary Judgment filed by Brown, Claimants also argue that even if Brown had proffered sufficient evidence to permit a reasonable jury to find that Corretjer granted him a non-exclusive license to exploit *Boricua en la Luna*, because licenses unsupported by consideration are revocable, the filing of the Counterclaims effectively revoked Brown's authorization to exploit the work. (**ECF No. 80 at 23–24**) (citing *Atlantis Servs., Inc. v. Asigra, Inc.*, Civ. No. 16-10864, 2017 WL 4780701, at *3 (D. Mass. Oct. 23, 2017)). Because the Court denies the Motion for Summary Judgment filed by Brown on distinct grounds, and because Claimants do not move for summary judgment in their favor on the basis of their revocation theory, *see* (**ECF No. 74**), the Court need not address the argument at this stage.